**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | |
|---|---|---|
| **In Re: Highland Capital Management, L.P.** | § | Case No. **19-34054-SGJ-11** |
| The Charitable DAF Fund LP | § | |
| | § | |
| Appellant | § | 22-03052 |
| vs. | § | |
| **Highland Capital Management, L.P.** | § | |
| | § | |
| Appellee | § | **3:22-CV-02280-S** |

**[43]  Order granting amended motion to dismiss adversary proceeding with prejudice (related document # 19) Entered on 9/30/2022**

# APPELLANT RECORD
# VOLUME 14

SBAITI & COMPANY PLLC
Mazin A. Sbaiti (TX Bar No. 24058096)
Jonathan Bridges (TX Bar No. 24028835)
J.P. Morgan Chase Tower
2200 Ross Avenue, Suite 4900W
Dallas, TX 75201
T: (214) 432-2899
F: (214) 853-4367

*Counsel for The Charitable DAF Fund, L.P.*
*and CLO Holdco, Ltd.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | § Chapter 11 |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § Case No. 19-34054-sgj11 |
| | § |
| Debtor. | § |
| | § |
| THE CHARITABLE DAF FUND, L.P. | § |
| | § |
| Plaintiff, | § Adversary Proceeding No. |
| | § |
| vs. | § 22-03052-sgj11 |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | § |
| Defendant. | § |
| | § |

*INDEX*

## APPELLANT'S SECOND AMENDED STATEMENT OF ISSUES AND
## DESIGNATION OF RECORD ON APPEAL

Pursuant to Rules 8009(a)(1)(A)-(B) and (a)(4) of the Federal Rules of Bankruptcy

Procedure, The Charitable DAF Fund, L.P. ("Appellant") hereby designates the following items

to be included in the record and identifies the following issues with respect to its appeal of the

Order Granting Defendant's Amended Motion to Dismiss Adversary Proceeding [Doc.43] which

was entered by the United States Bankruptcy Court for the Northern District of Texas on
September 30, 2022.

**I.    STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL**

> Whether the Bankruptcy Court erred in granting Defendant's Amended
> Motion to Dismiss Adversary Proceeding.

**II.    DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD**

*Vol. 1*
*000001*    1.    Notice of Appeal for Bankruptcy Case Adversary Proceeding No. 21-
03067-sgj11 [Doc. 46].

*000004*    2.    The judgment, order, or decree appealed from: Order Granting Amended
Motion to Dismiss Adversary Proceeding [Doc. 43].

3.    Any opinion, findings of fact and conclusions of law of the bankruptcy court
relating to the issues on appeal, including transcripts of all oral rulings:
None.

*000032*    3.    Docket Sheet kept by the Bankruptcy Clerk.

4.    Documents listed below and as described in the Docket Sheet for
Bankruptcy Case Proceeding No. 22-03052-sgj.

*Vol. 2*

| No. | Date Filed | Docket No. | Description/Document Text |
|---|---|---|---|
| 1 | 5/25/22 (7/22/21) | 1 | (18 pgs; 4 docs) Adversary case 22-03052. ORDER REFERRING CASE 3:21-CV-1710-N from U.S District Court for the Northern District of Texas, Dallas Division to U.S. Bankruptcy Court for Northern District of Texas, Dallas Division and Complaint by Charitable DAF Fund, LP against Highland Capital Management, L.P. Fee Amount $350 (Attachments: # 1 Original Complaint # 2 Civil Cover Sheet # 3 Docket Sheet from 21-CV-1710). Nature(s) of suit: 02 (Other (e.g., other actions that would have been brought in state court if unrelated to bankruptcy)). (Okafor, Marcey) |
| 2 | 5/25/22 (10/5/21) | 8 | (8 pgs; 2 docs) MOTION for Reconsideration re 7 Order on Motion to Stay (Highland Capital Management, L.P.'s Motion for Reconsideration of Stay Order) filed by Highland Capital Management LP (Attachments: # 1 Exhibit A) Attorney Zachery Z. Annable added to party Highland Capital Management LP(pty: dft) (Annable, Zachery) [ORIGINALLY FILED IN 21-CV-1710 AS #8 ON |

*000040*

*000058*

| | | | |
|---|---|---|---|
| | | | 10/05/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, Marcey) |
| 3 | 5/25/22 (10/5/21) | 9 | (15 pgs) Brief/Memorandum in Support filed by Highland Capital Management LP re 8 MOTION for Reconsideration re 7 Order on Motion to Stay (Highland Capital Management, L.P.'s Motion for Reconsideration of Stay Order) (Annable, Zachery) [ORIGINALLY FILED IN 21-CV-1710 AS #9 ON 10/05/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, Marcey) |
| 4 | 5/25/22 (10/5/21) | 10 | (1012 pgs; 28 docs) Appendix in Support filed by Highland Capital Management LP re 8 MOTION for Reconsideration re 7 Order on Motion to Stay (Highland Capital Management, L.P.'s Motion for Reconsideration of Stay Order) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27) (Annable, Zachery) [ORIGINALLY FILED IN 21-CV-1710 AS #10 ON 10/05/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION](Okafor, Marcey) |
| 5 | 5/25/22 (10/5/21) | 11 | (8 pgs; 2 docs) MOTION to Dismiss (Highland Capital Management, L.P.'s Motion to Dismiss) filed by Highland Capital Management LP (Attachments: # 1 Exhibit A) (Annable, Zachery) [ORIGINALLY FILED IN 21-CV-1710 AS #11 ON 10/05/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, Marcey) |
| 6 | 5/25/22 (10/5/21) | 12 | (10 pgs) Brief/Memorandum in Support filed by Highland Capital Management LP re 11 MOTION to Dismiss (Highland Capital Management, L.P.'s Motion to Dismiss) (Annable, Zachery [ORIGINALLY FILED IN 21-CV-1710 AS #12 ON 10/05/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, Marcey) |
| 7 | 5/25/22 (10/5/21) | 13 | ((238 pgs; 4 docs) Appendix in Support filed by Highland Capital Management LP re 11 MOTION to Dismiss (Highland Capital Management, L.P.'s Motion to Dismiss) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3) (Annable, Zachery) [ORIGINALLY FILED IN 21-CV-1710 |

*Handwritten annotations in left margin:* Vol. 2 ; 000066 ; 000081 ; Thru Vol. 6 ; Vol. 7 ; 001093 ; 001101 ; 001111

| | | | |
|---|---|---|---|
| **Vol. 8** | | | AS #13 ON 10/05/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, Marcey) |
| 8 | 5/25/22 (10/27/21) | 15 | (3 pgs) RESPONSE filed by Charitable DAF Fund LP re: 8 MOTION for Reconsideration re 7 Order on Motion to Stay (Highland Capital Management, L.P.'s Motion for Reconsideration of Stay Order) (Sbaiti, Mazin) [ORIGINALLY FILED IN 21-CV-1710 AS #15 ON 10/27/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, Marcey) |
| 9 | 5/25/22 (11/5/21) | 16 | (7 pgs) REPLY filed by Highland Capital Management LP re: 8 MOTION for Reconsideration re 7 Order on Motion to Stay (Highland Capital Management, L.P.'s Motion for Reconsideration of Stay Order) (Annable, Zachery) [ORIGINALLY FILED IN 21-CV-1710 AS #16 ON 11/05/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (Okafor, Marcey) |
| 10 | 5/25/22 (11/21/21) | 18 | (2 pgs) ORDER re: 8 Motion for Reconsideration. The Court grants Defendant's motion, lifts the stay, and refers this case to Judge Stacey G.C. Jernigan of the United States Bankruptcy Court for the Northern District of Texas, to be adjudicated as a matter related to the Chapter 11 Bankruptcy of HCM., Chapter 11 Case No. 10-34054. The Clerk of this Court and the Clerk of the Bankruptcy Court to which this case is referred are directed to take such actions as are necessary to docket this matter as an Adversary Proceeding associated with the aforementioned consolidated bankruptcy case. (Ordered by Judge David C Godbey on 5/19/2022) (oyh) (Main Document 18 replaced on 5/23/2022) (twd). (Entered: 05/20/2022) [ORIGINALLY FILED IN 21-CV-1710 AS #18 ON 11/21/2021 IN U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION] (*ERROR IN ENTRY: CORRECT CASE NUMBER IS: 19-34054*) (Okafor, Marcey) |
| 11 | 5/27/22 | 19 | (8 pgs; 2 docs) Amended Motion to dismiss adversary proceeding (related document(s):11) filed by Defendant Highland Capital Management, L.P. (Attachments:# 1 Exhibit A--Proposed Order) (Annable, Zachery) |
| 12 | 5/27/22 | 20 | (12 pgs) Brief in support filed by Defendant Highland Capital Management, L.P. (RE: related document(s)19 Amended Motion to dismiss adversary proceeding (related document(s):11)). (Annable, Zachery) |
| 13 | 5/27/22 | 21 | (637 pgs) Support/supplemental document (*Appendix in Support of Highland Capital Management, L.P.'s Amended* |

*Handwritten annotations in left margin:* Vol. 8 · 001349 · 001352 · 001359 · 001361 · 001369 · 001381 Thru Vol. 10

| | | | | |
|---|---|---|---|---|
| | | | | *Motion to Dismiss)* filed by Defendant Highland Capital Management, L.P. (RE: related document(s)19 Amended Motion to dismiss adversary proceeding (related document(s):11)). (Annable, Zachery) |
| | 14 | 6/1/22 | 23 | (6 pgs; 2 docs) Notice of hearing filed by Defendant Highland Capital Management, L.P. (RE: related document(s) 19 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, L.P.). Hearing to be held on 8/3/2022 at 02:30 PM at https://us courts.webex.com/meet/jerniga for 19 and for 19, (Attachments: # 1 Exhibit A)(Hayward, Melissa) |
| | 15 | 7/5/22 | 30 | (12 pgs) Response opposed to (related document(s): 19 Amended Motion to dismiss adversary proceeding (related document(s):11) filed by Defendant Highland Capital Management, L.P.) filed by Plaintiff Charitable DAF Fund, LP . (Ecker, C.) (Entered: 07/06/2022) |
| | 16 | 7/26/22 | 31 | (15 pgs) Reply to (related document(s): 30 Response filed by Plaintiff Charitable DAF Fund, LP) filed by Defendant Highland Capital Management, L.P.. (Annable, Zachery) |
| | 17 | 7/26/22 | 32 | (865 pgs) Support/supplemental document *(Amended Appendix in Support of Highland Capital Management, L.P.'s Amended Motion to Dismiss)* filed by Defendant Highland Capital Management, L.P. (RE: related document(s) 21 Support/supplemental document). (Annable, Zachery) |
| | 18 | 8/1/22 | 34 | (867 pgs; 23 docs) Witness and Exhibit List *(Reorganized Debtor's Witness and Exhibit List with Respect to Evidentiary Hearing to Be Held on August 3, 2022)* filed by Defendant Highland Capital Management, L.P. (RE: related document(s) 19 Amended Motion to dismiss adversary proceeding (related document(s):11)). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22) (Annable, Zachery) |
| | 19 | 8/3/22 | 40 | (1 pg) Court admitted exhibits date of hearing August 3, 2022 (RE: related document(s) 19 Amended Motion to dismiss adversary proceeding (related document(s):11) filed by Defendant Highland Capital Management, L.P. (Attachments: # 1 Exhibit A--Proposed Order)) COURT ADMITTED EXHIBIT 17. COURT TOOK JUDICIAL NOTICE OF EXHIBITS 1-13, 21 AND 22. (Ellison, T.) (Entered: 08/04/2022) |

Handwritten annotations:
Vol. 11 — 002018 (row 14)
002024 (row 15)
002036 (row 16)
002051 Thru Vol 14 (row 17)
Vol. 15 — 002916 Thru Vol. 18 (row 18)
Vol. 19 — 003183 Thru Vol. 22 (row 19)

| | 20 | 9/30/22 | 42 | (28 pgs) Memorandum of opinion regarding Defendant's amended motion to dismiss adversary proceeding (RE: related document(s)19 Motion to dismiss adversary proceeding filed by Defendant Highland Capital Management, L.P.). Entered on 9/30/2022 (Okafor, Marcey) |
| | 21 | 8/4/22 | 41 | 41 Transcript regarding Hearing Held 08/03/2022 (45 pages) RE: Motion to Dismiss Adversary Proceeding (19). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 11/2/2022. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Kathy Rehling, kathyrehlingtranscripts@gmail.com, Telephone number 972-786-3063. (RE: related document(s) 37 Hearing held on 8/3/2022. (RE: related document(s)19 Amended Motion to dismiss adversary proceeding (related document(s):11) filed by Defendant Highland Capital Management, L.P.) (Appearances: G. Demo and Z. Annabel for Movant/Highland; J. Bridges for Respondant/Charitable DAF. Evidentiary hearing. Motion granted. Court to issue Opinion and Order.)). Transcript to be made available to the public on 11/2/2022. (Rehling, Kathy) |

*(handwritten: Vol. 22, 004651, 004679)*

Dated:  November 28, 2022

Respectfully submitted,

**SBAITI & COMPANY PLLC**

*/s/ Mazin A. Sbaiti*
**Mazin A. Sbaiti**
Texas Bar No. 24058096
**Jonathan Bridges**
Texas Bar No. 24028835
JPMorgan Chase Tower
2200 Ross Avenue – Suite 4900W
Dallas, TX  75201
T: (214) 432-2899
F: (214) 853-4367
E: mas@sbaitilaw.com
   jeb@sbaitilaw.com

**Counsel for Appellant**

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was filed electronically through the Court's ECF system, which provides notice to all parties of interest, on this 28th day of November, 2022.

*/s/ Mazin A. Sbaiti*
Mazin A. Sbaiti

Case 22-03052-sgj    Doc 32    Filed 07/26/22    Entered 07/26/22 14:17:26    Desc Main
Case 3:22-cv-02280-S    Document 14    Filed 10/26/22    Page 9 of 231    PageID 2851

5

1    trial by jury.

2        But the order does deprive trials by jury, first by

3    asserting sole jurisdiction here, where jury trials are

4    unavailable, and secondly, by abolishing any trial rights for

5    claims that do not involve gross negligence or intentional

6    misconduct.

7        Movants' third cause of action in the District Court case

8    is for ordinary negligence.  It comes with a Seventh Amendment

9    jury right.  But it's barred by the order because the order

10   only allows colorable claims involving gross negligence or

11   intentional conduct, not ordinary negligence.

12       Movants' second cause of action in the District Court case

13   is for breach of contract.  That comes with a Seventh

14   Amendment jury right, but it's barred by the order because the

15   order only allows colorable claims of gross negligence or

16   intentional misconduct, not negligent or faultless breaches of

17   contractual obligations.

18       Movants' first cause of action in the District Court case,

19   breach of Advisers Act fiduciary duties, comes with a jury

20   right.  It's also barred by the order because the order only

21   allows colorable claims involving gross negligence or

22   intentional misconduct.

23       You see there what I mean.  Congress couldn't have been

24   clearer.  Courts cannot deprive litigants of their day in

25   court before a jury of their peers by invoking general equity

Appx 000639
002693

6

```
 1    powers.  Those powers don't trump the constitutional right to
 2    a jury trial.
 3        Yet this Court's order purports to do precisely that, not
 4    only for the Movants, but also for future potential litigants
 5    who may have claims that have not even accrued yet.  If those
 6    claims are for ordinary negligence or breach of contract or
 7    breach of fiduciary duties and don't rise to the level of
 8    gross negligence or intentional misconduct, this order says
 9    that those claims are barred, and it would deprive them of
10    their day in court.
11        The Court's general equity powers are simply not broad
12    enough to uphold such an order.
13        This issue is even more problematic when the causes of
14    action at issue fall within the mandatory withdrawal of the
15    reference provisions of 28 U.S.C. § 157(d).  As this Court
16    knows, it lacks jurisdiction over proceedings that require
17    consideration of non-bankruptcy federal law regulating
18    interstate commerce.  Some such claims -- Movants' Advisers
19    Act claim, for instance -- do not involve culpability rising
20    to the level of gross negligence or intentional misconduct,
21    but the order purports to bar them nonetheless, despite this
22    Court's lacking jurisdiction over the subject matter of those
23    claims.
24        Even if there is gross negligence or intentional
25    misconduct, the order states that this Court will have sole
```

7

 1   jurisdiction over such claims.  And that can't be right if

 2   withdrawal of the reference is mandatory.

 3        Opposing counsel will tell you that 157(d) is inapplicable

 4   here because they think our claims in the District Court won't

 5   require substantial consideration of the Advisers Act or any

 6   other federal laws regulating interstate commerce.  But their

 7   cases don't come anywhere close to making that showing, as the

 8   briefing demonstrates.

 9        And in any case, that argument is beside the point.  This

10   order is contrary to 157(d) because it asserts jurisdiction

11   over claims that 157(d) does not apply -- I'm sorry, does

12   apply to.  And that's true regardless of whether Movants'

13   claims are among those.

14        The idea that there's no substantial consideration of

15   federal law, however, in the District Court case is undermined

16   by Mr. Seery's testimony in support of his appointment in

17   which he confirmed that the Advisers Act applies to him and

18   that he has fiduciary duties under that Act to the investors

19   of the funds he manages.

20        Your Honor, importantly, the Advisers Act isn't the

21   typical federal statute with loads of case law under it.  It's

22   actually an underdeveloped, less-relied-upon statute, and most

23   -- most of the law under that Act is promulgated by regulation

24   and supervised by the SEC.  As a registered investment

25   advisor, Mr. Seery is bound by that Act, which he admits, he

Case 22-03052-sgj   Doc 32   Filed 07/26/22   Entered 07/26/22 14:17:26   Desc Main
Case 3:22-cv-02280-S   Document 4   Filed 10/06/22   Page 12 of 231   PageID 2854

8

1   agrees to.  But to flesh out what his duties are requires a

2   close exam of more than three dozen regulations under 17

3   C.F.R. Part 275.

4       The obligations include robust duties of transparency and

5   disclosure, as well as duties against self-dealing and the

6   necessity of obtaining informed consent, none of which are

7   waivable, these duties.

8       The proceedings here in this Court reflect an effort to

9   have those unwaivable duties waived.  The allegations in the

10  District Court are essentially insider trading allegations

11  that the Debtor and Mr. Seery knew or should have known

12  information that they had a duty under the Advisers Act to

13  disclose to their advisees.  Both under the Act and

14  contractually, they had those duties.  And, instead, they did

15  not disclose and consummated a transaction that benefited

16  themselves nonetheless.

17      In considering those claims, the presiding court will have

18  to consider and apply the Advisers Act and the many

19  regulations promulgated under it, in addition to other federal

20  laws regulating interstate commerce.  For that reason,

21  withdrawal of the reference on the District Court action is

22  mandatory.  That's the two major -- that's two major problems

23  out of four with the order that we're here on today.

24      First, it deprives litigants of their right to trial, to a

25  jury trial, when Section 959(a) says that can't be done.  And,

9

1  two, the order asserts jurisdiction -- sole jurisdiction, even

2  -- over proceedings in which withdrawal of the reference is

3  mandatory under 157(d).

4      The fourth major problem is what the Court called

5  specificity at the previous hearing.  The Fifth Circuit's

6  *Applewood Chair* case holds that the rule from *Shoaf* does not

7  apply without a "specific discharge or release," and that that

8  release has to be enumerated and approved by the Bankruptcy

9  Court.  Thus, the order here can't exculpate Mr. Seery of

10  liability for ordinary negligence and the like in a blanket

11  fashion.  The claims being released must be identified.

12      That's what happened in *Shoaf*.  Shoaf's guaranty

13  obligation was explicitly released.  That's also what happened

14  in *Espinosa*.  Espinosa's plan listed his student loan as his

15  only specific indebtedness.  But it's not what happened here.

16  And it couldn't happen here, because the ordinary negligence

17  and similar claims being discharged by the order had not yet

18  accrued and thus were not even in existence at the time the

19  order issued.

20      Instead, what we have here is a nonconsensual, nondebtor

21  injunction or release that's precisely what the Fifth Circuit

22  refused to enforce in the *Pacific Lumber* case.

23      So, lack of specificity is the third major problem with

24  the order.  And that brings us to the fourth problem, which is

25  the *Barton* doctrine.  *Barton* is the only possible basis for

Case 22-03052-sgj    Doc 32    Filed 07/26/22    Entered 07/26/22 14:17:26    Desc Main
Case 3:22-cv-02280-S    Document 14    Filed 09/08/2865    Page 14 of 231    PageID 2856

10

1    this Court to assert exclusive or sole jurisdiction over

2    anything.  Outside of *Barton*, it's plain black letter law that

3    the District Court's jurisdiction is equal to and includes

4    anything that this Court's derivative jurisdiction would also

5    reach.

6        But the exception to the *Barton* doctrine in 959(a) plainly

7    applies here, leaving no basis for exclusivity with regards to

8    jurisdiction and the District Court.  That's because Mr. Seery

9    is carrying on the business of a debtor and managing the

10   property of others, rather than merely administering the

11   bankruptcy estate.  The exclusive jurisdiction function of the

12   *Barton* doctrine has no applicability because 959(a) creates

13   that exception here.

14       Under its general equity powers, yes, 959(a) still

15   authorizes this Court to exercise some control over actions

16   against Mr. Seery, but short of depriving litigants of their

17   day in court.  And nothing in 959(a), that exception to

18   *Barton*, says that the Court can nonetheless exercise

19   exclusivity in that jurisdiction.  Those general equity powers

20   do not create exclusive or sole jurisdiction.  They do not

21   deprive the District Court of its Congressionally-granted

22   original jurisdiction.

23       Moreover, Mr. Seery is not an appointed trustee entitled

24   to the protections of the *Barton* doctrine in any case.  His

25   appointment was a corporate decision that the Court was asked

Case 22-03052-sgj    Doc 32    Filed 07/26/22    Entered 07/26/22 14:17:26    Desc Main
Case 3:22-cv-02280-S    Document 4    Filed 10/10/22    Page 15 of 231    PageID 2857

11

1  not to interfere with.  The Court was asked to defer under the

2  business judgment rule to the Debtor's appointment of Mr.

3  Seery.  And the Court did so.

4      As we asserted last time, no authority that we can find

5  combines these two unrelated doctrines, the *Barton* doctrine

6  and the business judgment rule.  And they don't go together.

7  None of the testimony or the briefing or argument, in the July

8  order, in the January order that preceded it, none of that

9  indicated that Mr. Seery would be a trustee or the functional

10  equivalent of a trustee.  The word "trustee" does not appear

11  in any of those briefs or transcripts.

12      Opposing -- and because of that, the District Court suit

13  is not about -- well, not because of that.  The District Court

14  suit simply is not about any trustee-like role that Mr. Seery

15  may have played anyway.  Opposing counsel will try to convince

16  you otherwise, will tell you that the District Court case is a

17  collateral attack on the settlement, but it's not.  Wearing

18  his estate administrator hat, Mr. Seery can settle claims in

19  this court.  Wearing his advisor hat, he has to fulfill his

20  Advisers Act duties and properly advise his clients.

21      He doesn't have to wear both hats, and it seems highly

22  unusual that he would choose to fill both of those roles

23  simultaneously.  But he has chosen both roles.  And the

24  District Court case is a hundred percent about his role as an

25  advisor.  Did he comply with the Act?  Did he do the things

Case 22-03052-sgj   Doc 32   Filed 07/26/22   Entered 07/26/22 14:17:26   Desc Main
Case 3:22-cv-02280-S   Document 14   Filed 09/02/22   Page 16 of 231   PageID 2858

12

 1   that his advisor role obligated him to do as a manager of that

 2   property?

 3       The District Court suit really is only being used to

 4   illustrate the issues that we're raising here.  It's

 5   important, it's timely to address those issues now because of

 6   the District Court action, but that's an illustration of the

 7   problems with the order.  It is not exclusively that that

 8   action is what we're attempting to address.  Rather, the order

 9   exculpating Mr. Seery from ordinary negligence liability and

10   similar liability is problematic, is contrary to the law.  On

11   top of that, the Court is asserting jurisdiction over gross

12   negligence and intentional misconduct claims.  To the extent

13   that 157(d) applies, it is problematic and contrary to law as

14   well.

15           THE COURT:  Okay.  We're occasionally getting some

16   breakup of your sound.  So please -- I don't know what you can

17   do to adjust, but it was just now, and intermittently we get a

18   little bit of garbly.  So if you could just say your last

19   sentence one more time, and we'll see if it improves.

20           MR. BRIDGES:  Your Honor, I'm not sure I can say this

21   last sentence again.

22           THE COURT:  Okay.

23           MR. BRIDGES:  I was -- I was mentioning that the

24   District Court case is an illustration of our argument.  Our

25   argument is not merely that the District Court case should be

13

1   exempted or excepted from the order.  Our argument is that the

2   order is legally infirm and that the District Court case and

3   the claims there illustrate some of those infirmities, but

4   that the infirmities go beyond just what's at issue in the

5   District Court case.

6        In sum, there are four problems with the order that render

7   parts of it legally infirm.  It deprives the right of a jury

8   trial -- in fact, of any trial -- in contravention of 959(a)

9   for some causes of action.

10       It asserts jurisdiction -- two, it asserts jurisdiction

11  over claims that are subject to the mandatory withdrawal of

12  the reference provision (garbled) 157(d).

13       And three, it lacks the specificity required to discharge

14  future claims under *Applewood*.

15       Finally, Your Honor, number four, the order relies on the

16  *Barton* doctrine, which doesn't apply and which 959(a) creates

17  an exception to.

18       Movants respectfully submit the order should be modified

19  for those reasons.

20       MR. SBAITI:  Tell him Mark Patrick is here, for the

21  record.

22       THE COURT:  All right.  I have a couple of follow-up

23  questions for you.  I want to drill down on the issue of your

24  client not having appealed the July 2020 order.  Or the

25  HarbourVest settlement order, for that matter.  Tell me as

14

 1   directly as possible why you don't view that as a big problem.

 2   Because it's high on my list of possible problems here.

 3          MR. BRIDGES:  I understand, Your Honor.  The

 4   *Applewood Chair* case is our -- our defense to that argument,

 5   that without providing specifics as to the claims being

 6   discharged in the July order, that *Shoaf* cannot apply to

 7   create a res judicata effect from the failure to appeal that

 8   order.

 9          THE COURT:  But is that really what we're talking

10   about, a discharge of certain claims?  We're talking about a

11   protocol that the Court established which wasn't appealed.

12          MR. BRIDGES:  Your Honor, your order does many

13   things.  We're talking about a few of them in one paragraph of

14   the order.  And in that order -- in that paragraph, yes, it

15   creates a protocol for determining the colorability of some

16   claims, claims that rise to the level of gross negligence or

17   intentional misconduct.  It does not create a protocol for

18   claims that fall below that threshold, claims for ordinary

19   negligence, as an example.

20          THE COURT:  Okay.

21          MR. BRIDGES:  For breach of contract that's not

22   intentional, is not grossly negligent, it's just a breach of

23   contract.  It can even be faultless.  There's still liability.

24   There's still a jury right under the Seventh Amendment for

25   faultless breach of contract.

App. 002702

15

1      The protocols in the order do not address such claims

2   other than to bar them.  To discharge them.  And thus, yes,

3   it's a release, it's a discharge of those claims.  It can be

4   viewed as a permanent injunction against bringing such claims.

5   It's what's -- it's what's not allowed by the *Applewood Chair*

6   case and by *Pacific Lumber*.

7           THE COURT:  All right.  So you're arguing that was --

8   the wording of the order was not specific enough to apprise

9   affected parties of what they were releasing, they're

10  releasing claims based on ordinary negligence against Mr.

11  Seery?  That's not specific enough?

12          MR. BRIDGES:  Correct.  Future unproved claims, the

13  factual basis for which has not happened yet.  Those cannot be

14  and were not disclosed with any specificity in this order.

15      If we compare it to *Shoaf* and to *Espinosa*, in *Shoaf* what

16  we had was a guaranty, Shoaf's guaranty on a transaction that

17  was listed in the actual release, describing what the

18  transaction was that was being -- that the guaranty was being

19  released for.

20      In *Espinosa*, what we had was a student loan --

21          THE COURT:  Right.

22          MR. BRIDGES:  -- that was listed in the plan

23  specifically, as the only specific indebtedness.

24      Here, we don't have any of that specificity.  What we have

25  is a notice to the entire world, Your Honor, that for an

App. 002703

16

 1   unlimited period of time any claim for ordinary negligence,

 2   for ordinary breach of contract or fiduciary duty against Mr.

 3   Seery is barred if it relates to his CEO role.  And his CEO

 4   role means as a manager of property, exactly precisely what

 5   959(a) is talking about.

 6      Those jury rights (garbled) claims cannot be released,

 7   discharged, expunged, done away with, in an order that isn't

 8   explicit.

 9      On top of that, even in an explicit order, 959(a) tells

10   the Court it cannot deprive a litigant of its jury trial

11   right.

12         THE COURT:  Well, as anyone knows who's been around a

13   while in this case, my brain sometimes goes down an unexpected

14   trail, and maybe this one is one of those situations.  Are

15   there contracts that your clients would rely on in potential

16   litigation?

17         MR. BRIDGES:  Yes, Your Honor.

18         THE COURT:  What are those contracts?

19         MR. BRIDGES:  It is a management contract.  I don't

20   think I can give you the specifics at this moment, but I

21   probably can before we're done here today.  A management

22   contract in which the Debtor provides advisory and management

23   services to the DAF --

24         THE COURT:  Well, you know, the shared services

25   agreements that we heard so much about in this case?  A shared

17

 1   service agreement?  I can't remember, you know, which entities

 2   have them and which do not at times.  So, --

 3          MR. BRIDGES:  The shared services agreement is one of

 4   those contracts, Your Honor.

 5          THE COURT:  Okay.

 6          MR. BRIDGES:  It's not the only one.

 7          THE COURT:  And what are the others?

 8          MR. BRIDGES:  There's -- the other is the investment

 9   advisory agreement.

10          THE COURT:  Those two?

11          MR. BRIDGES:  (no response)

12          THE COURT:  Those are the only two?

13          MR. BRIDGES:  There may be one other, Your Honor.

14   I'm not sure.

15          THE COURT:  Are they in evidence?

16          MR. BRIDGES:  I can find out shortly.

17          THE COURT:  Are they in evidence?  We haven't talked

18   about evidence yet, but are they going to be in evidence,

19   potentially?

20          MR. BRIDGES:  They are referenced in the District

21   Court case, the complaint, which is in evidence.

22          THE COURT:  I'm asking, are --

23          MR. BRIDGES:  But those contracts I don't believe are

24   listed as exhibits here in this motion, no.

25          THE COURT:  They are not?  Okay.

18

1    Well, what my brain is thinking about here is, of the

2    umpteen agreements I've seen -- more than umpteen -- of the

3    many, many agreements I've seen over time in this case, so

4    often there's a waiver of jury trial rights, as I recall, as

5    well as an arbitration clause.  I just was curious, hmm, you

6    know, you talked a lot about your clients' jury trial rights:

7    do we know that these agreements have not waived those?

8        MR. BRIDGES:  Your Honor, I think I can answer that

9    by the end of our hearing.  I don't have an answer off the top

10   of my head.  What I can tell you is a jury right has been

11   demanded in the federal court complaint, which is in evidence,

12   and that opposing counsel has brought no evidence indicating

13   that they have the defense of our having waived the right to a

14   jury trial here.

15       THE COURT:  Okay.  Well, I just --

16       MR. BRIDGES:  Or arbitra...

17       THE COURT:  -- would think that you would know that.

18   Does anyone know that on the Debtor's side off the top of your

19   head?

20       MR. POMERANTZ:  I do not, Your Honor.

21       THE COURT:  Uh-huh.

22       MR. POMERANTZ:  And to Mr. Bridges' last point, we

23   have filed a motion to dismiss.  We have not answered the

24   complaint.  So any time to object to their jury trial right

25   would be in the context of the answer.  So the implication

19

1   that we have not raised the issue and therefore it doesn't

2   exist is just not a correct implication and connection he's

3   trying to draw.

4              THE COURT:  Okay.  All right.

5        Well, let me also ask you about this.  I'm obsessing a

6   little over the *Barton* doctrine and your insistence that it

7   does not provide authority or an analogy here.

8        Well, for one thing, is there anything in the Fifth

9   Circuit case *Sherman v. Ondova* that you think either helps you

10  or hurts you on that point?  I'm intimately familiar with it,

11  although I haven't read it in a while, because it was my

12  opinion that the Fifth Circuit affirmed.  And I spent a lot of

13  time thinking about that.  It was a trustee, a traditional --

14  well, no, a Chapter 11 trustee and his counsel.  But anything

15  from that case that you think is worthy of pointing out here?

16             MR. BRIDGES:  No, Your Honor.  I'm not -- nothing

17  comes to mind.  That case is not fresh on my mind.

18       What I would tell you is that *Barton* doctrine and the

19  business judgment rule are incompatible, and the appointment

20  of a trustee never involves application of the business

21  judgment rule or deference to the Debtor or another party in

22  terms of making that appointment.

23       The *Barton* doctrine, as it applies to trustees, is viewed

24  as an extension, to some extent, of judicial immunity to the

25  trustee, who is chosen by, selected by the Court and assigned

App. 002707

20

1   by the Court to carry out certain functions.  That --

2          THE COURT:  Well, let me --

3          MR. BRIDGES:  -- quasi-immunity --

4          THE COURT:  -- stop you there.  You say it's an

5   extension of immunity.  But isn't it, by nature, really a

6   gatekeeping provision?  It's a gatekeeping provision, right?

7   Before you even get to immunity, maybe, in a lawsuit, it's a

8   gatekeeping function that the Supreme Court has blessed, you

9   know, obviously in the context of a receiver, but appellate

10  courts have blessed it in the bankruptcy context.  The

11  Bankruptcy Court can be the gatekeeper on whether the trustee

12  or someone I think in a similar position can get sued or not.

13      And then we had that Fifth Circuit case after *Ondova*.  It

14  begins with a V, *Villegas* or something like that.  Didn't

15  that, I don't know, further ratify, if you will, the whole

16  *Barton* doctrine by saying, oh, just because they're noncore

17  claims, state law or non-bankruptcy law claims, doesn't mean,

18  after *Stern*, the Bankruptcy Court still cannot serve the

19  gatekeeper function.

20      Tell me what you disagree.  That's my kind of combined

21  reading of all of that.

22          MR. BRIDGES:  Your Honor, I have to parse it out.

23  There's a lot to unpack there.  If I can make sure to get in

24  the follow-ups, I can start with saying it's okay for the

25  Court in many instances to act as a gatekeeper.

21

```
1            THE COURT:  Okay.

2            MR. BRIDGES:  Both under Barton -- under Barton, or

3    when the Barton exception in 959(a) applies, under the Court's

4    general equitable powers, that gatekeeping functions are not

5    across-the-board prohibited, --

6            THE COURT:  Okay.

7            MR. BRIDGES:  -- and we aren't trying to argue that

8    they're prohibited across the board.

9            THE COURT:  Okay.

10           MR. BRIDGES:  Now, to try to dig into that a little

11   deeper, the order does two things:  gatekeeping as to some

12   claims, and, frankly, discharging or barring other claims.

13   Those are two separate functions.

14        The first one, the gatekeeping, may be, in some

15   circumstances, which we'll come to, many circumstances, may be

16   allowable, may be even mandatory under Barton, not even

17   requiring an order from this Court, for the gatekeeping of

18   Barton to apply.  But nonetheless, allowable in many instances

19   under the Court's general equity powers under 959(a).  That

20   part is right about gatekeeping.

21        It does not create jurisdiction in this Court where 157(d)

22   deprives this Court of jurisdiction.  Just because it's

23   related to bankruptcy isn't enough to say that the Court

24   therefore has jurisdiction if, one, if mandatory withdrawal of

25   the reference is required.
```

Case 22-03052-sgj   Doc 32   Filed 07/26/22   Entered 07/26/22 14:17:26   Desc Main
Case 3:22-cv-02280-S   Document 4   Filed 10/03/22   Page 26 of 231   PageID 2868

22

1      Furthermore, Your Honor, that gatekeeping function, under

2   the equity powers authorized by 959(a), will not allow a court

3   to discharge or -- or deprive, is the word I'm looking for --

4   deprive a litigant of their right to a trial -- a specific

5   kind of trial, a jury trial -- but a trial.  And by crafting

6   an order that says certain kinds of claims that do (garbled)

7   jury rights are barred, rather than just providing a

8   gatekeeper provision, flat-out bars them, that doesn't -- that

9   doesn't comply with 959.

10          THE COURT:  Okay.

11          MR. BRIDGES:  Your Honor, if I could add one last

12   thing.

13          THE COURT:  Go ahead.

14          MR. BRIDGES:  The Supreme Court's *Stern* case points

15   out that -- that it's -- well, actually, it's the *Villegas*

16   case from the Fifth Circuit --

17          THE COURT:  The one I mentioned.

18          MR. BRIDGES:  -- points out that *Stern* -- *Stern* --

19   yes, you did.  *Stern* did not create an exception to the *Barton*

20   doctrine.  And that gives -- that endorses a *Barton* court's

21   ability to perform gatekeeping, even over claims that *Stern*

22   says there would not be jurisdiction over.

23      Contrast that with 959(a), which *Collier on Bankruptcy* and

24   the Fifth Circuit have held is an exception to the *Barton*

25   doctrine.  Because of that exception, *Barton* no longer

23

1   applies, and what you're using in invoking a gatekeeper order

2   is the Court's inherent equitable powers, its general powers

3   in equity.  And those equity powers are cabined.  They're

4   broad, but they're cabined by 959(a)'s prohibition of doing

5   away with a litigant's right to a trial, a jury trial.

6       Now, I also -- counsel is telling me I should note for the

7   record that Mr. Mark Patrick is here as a representative of

8   our clients.  But Your Honor, I'll -- I will quit now unless

9   you have further questions for me.

10          THE COURT:  All right.  I do not at this time.  Mr.

11   Morris or Mr. Pomerantz, who's going to make the argument?

12          MR. POMERANTZ:  It's me, Your Honor.

13          OPENING STATEMENT ON BEHALF OF THE DEBTOR

14          MR. POMERANTZ:  And I'll start with the jury trial

15   right.  In the last few minutes, we have been able to

16   determine that the Second Amended and Restated Investment

17   Advisory Agreement between the DAF and the Debtor has a broad

18   jury trial waiver under 14(f).  And in addition, as I will

19   include in my discussion, there is no private right of action

20   under the Investment Advisers Act.

21       I think those two points are fatal to Movants' argument,

22   and probably I can get away with not even responding to the

23   others.  But since I prepared a lengthy presentation to

24   address the issues that were raised today, and also the half

25   hour that Mr. Bridges spent with Your Honor on June 8th in

24

1  which was his first opening statement on the motion for

2  reconsideration, I'll now proceed.

3          THE COURT:  All right.

4          MR. POMERANTZ:  The arguments that the Movants made

5  in the original motion essentially boil down to one legal

6  proposition, that the Court did not have jurisdiction to enter

7  the July 16th order because those orders impermissibly

8  stripped the District Court from jurisdiction, in violation of

9  (inaudible) Supreme Court precedent and 28 U.S.C. Section

10 157(d).

11     As with all things Dondero, the arguments continue to

12 morph, and you heard argument at the contempt hearing on June

13 8th and further argument today that now the prospective

14 exculpation for negligence in the order is also unenforceable

15 and should be modified.

16     Movants continue to try to distance themselves from the

17 January 9th order and argue that it is not relevant because

18 they seek to pursue claims against Mr. Seery as CEO and not as

19 an independent director.  Movants ignore, however, that the

20 January 9th order not only protects Mr. Seery in his role as

21 the independent director, but also as an agent of the board.

22 I will walk the Court through my arguments on that issue in a

23 few moments.

24     Of course, the Movants had no explanation, Your Honor, for

25 the question of why it took them until May of 2021, 10 months

25

1   after the entry of the July 16th order that appointed Mr.

2   Seery as CEO and CRO, and 16 months after the Court appointed

3   the independent board, with Mr. Dondero's blessing and

4   consent, as a substitute for what would have surely been the

5   imminent appointment of a Chapter 11 trustee.

6       Movants try to distance themselves from the prior orders

7   by essentially arguing that the DAF is a newcomer to the

8   Chapter 11 and is not under Mr. Dondero's control but is

9   rather managed separately and independently by Mr. Patrick,

10   who recently replaced Mr. Scott.

11      The Movants admit, as they must, that the DAF is the

12   parent and the sole shareholder of CLO Holdco and conducts its

13   business through CLO Holdco, and both entities conduct their

14   business through one individual.  It was Grant Scott then;

15   it's Mark Patrick now.  So even if Mr. Dondero does not

16   control the DAF and CLO Holdco, which issue was the subject of

17   lengthy testimony in connection with the DAF hearing, both the

18   DAF and the CLO Holdco are bound by the Debtor's res judicata

19   argument, which I will discuss shortly.

20      In any event, I really doubt the Court is convinced that

21   the DAF operates truly independently of Mr. Dondero any more

22   than the Court has been convinced that the Advisors, the

23   Funds, Dugaboy and Get Good, all operate independently from

24   Mr. Dondero.  The only explanation for the delay is that Mr.

25   Dondero has been and continues to be unhappy with the Court's

26

1   rulings and has now hired a new set of lawyers in a desperate

2   attempt to evade this Court's jurisdiction.  Having failed in

3   their attempt to recuse Your Honor from the case, this is

4   essentially their last hope.

5       And these new lawyers, Your Honor, have not only filed

6   this DAF lawsuit in the District Court which is the subject of

7   the contempt motion and today's motion, but they also filed

8   another lawsuit in the District Court on behalf of an entity

9   called PCMG, another Dondero entity, challenging yet another

10  of Mr. Seery's postpetition decisions.

11      And there's no doubt that this is only the beginning.  Mr.

12  Dondero recently told Your Honor at a hearing that there were

13  many more sets of lawyers waiting in the wings.  And as the

14  Court remarked at the hearing on the Trusts' motion to compel

15  compliance with Rule 2015.3, the Trusts were trying through

16  that motion to obtain information about the Debtor's control

17  entities so that they could file more lawsuits against the

18  Debtor, a concern that Mr. Draper unconvincingly denied.

19      I would like to focus the Court preliminarily on exactly

20  what the January 9th and July 16th orders do, because Movants

21  try to confuse things by casting the entire order with a broad

22  brush of their jurisdictional overreach arguments, and they

23  misinterpret Supreme Court and Fifth Circuit precedent.

24      I would like to put up on the screen the language of

25  Paragraph 10 of the January 9th order and Paragraph 35

27

1  (garbled) of the July 16th.

2      Your Honor is very familiar with these orders, I'm sure,

3  having dealt with them in connection with confirmation and in

4  prior proceedings.  But to recap, the orders essentially do

5  three things.

6      First, they require the parties to first come to the

7  Bankruptcy Court before commencing or pursuing a claim against

8  certain parties.

9      Second, they provided the Court with the sole jurisdiction

10 to make a finding of whether the party has asserted a

11 colorable claim of negligence -- of willful misconduct or

12 gross negligence.

13     And lastly, the orders provided the Court with exclusive

14 jurisdiction over any claims that the Court determined were

15 colorable.

16     The protected parties under the January 9th order are the

17 independent directors, their agents and advisors, which, as I

18 mentioned earlier, includes Mr. Seery -- who, at least as of

19 March 2020, was acting as the agent on the board's behalf as

20 the CEO -- for any actions taken under their direction.

21     The protected parties under the July 16th order are Mr.

22 Seery, as the CEO and CRO, and his agents and advisors.

23     Movants spend a lot of time in their moving papers and

24 reply arguing that the Court may not assert exclusive

25 jurisdiction over any claims that pass through the gate.  They

28

1    also spend a lot of time arguing that the Bankruptcy Court

2    does not even have jurisdiction at all to assert -- to

3    adjudicate claims against Mr. Seery because such claims are

4    subject to mandatory withdrawal under Section 157(d).

5        The Debtor doesn't agree, and has briefed why mandatory

6    withdrawal of the reference is inapplicable.  The Debtor has

7    also filed in the District Court a motion to enforce the

8    reference in effect in this district which refers cases in

9    this district arising under, arising in, or related to Chapter

10   11 to the Bankruptcy Court.

11       The motion to enforce the reference, Your Honor, which

12   extensively briefs this issue, is contained in Exhibit 3 of

13   the Debtor's exhibits.

14       We were somewhat surprised that the complaint filed in the

15   District Court wasn't automatically referred to this Court

16   under the standing order in effect in this district, given the

17   related bankruptcy case, the Court's prior approval of the

18   HarbourVest settlement, and the appeal in the District Court

19   of the HarbourVest settlement.

20       When we dug a little further, we found out that Movants

21   filed a civil case cover sheet accompanying the complaint in

22   the District Court.  They neglected in that initial filing to

23   point out that there was any related case to the lawsuit they

24   filed.

25       Mr. Bridges fell on his sword at the contempt hearing on

Appx 00692
002716

29

 1   June 8th and took complete responsibility for the oversight.

 2   I commend him for not trying to argue that the bankruptcy

 3   case, the HarbourVest settlement, and the District Court

 4   appeal are not related cases that would require disclosure, an

 5   argument that surely would have been unsupportable.

 6       But as I said at the contempt hearing, I find it curious

 7   that such an important issue was overlooked, an issue which

 8   would have likely changed the entire trajectory of the

 9   proceedings and landed the DAF lawsuit in this Court rather

10   than the District Court.

11       And this Tuesday, Your Honor, Movants filed a revised

12   civil cover sheet with the District Court.  Although they

13   referenced the bankruptcy case as a related case, they didn't

14   bother to mention the appeal already pending in the District

15   Court regarding the HarbourVest settlement -- surely, a

16   related case.

17       Your Honor also asked Mr. Bridges at the June 8th hearing

18   whether it was an oversight or intentional that he didn't

19   mention 28 U.S.C. Section 1334 as a basis for jurisdiction in

20   his complaint.  Mr. Bridges had no answer for Your Honor then,

21   and has given no answer now.  His only comment at the hearing

22   last time was that it must have been Ms. Sbaiti that wrote it

23   because he had no recollection of it.

24       So, Your Honor, it's no surprise that Movants conveniently

25   found themselves in the District Court, which was their

App. 00662
002717

30

1   ultimate strategy from the get go.

2        In any event, Your Honor, we have briefed the withdrawal

3   of the reference issue.  A response by the Movants is due --

4   CLO Holdco and DAF is due on June 29th.  And we hope the

5   District Court will decide soon thereafter whether to enforce

6   the reference.

7        While I'm happy to argue why Movants' mandatory withdrawal

8   of the reference argument is [not] persuasive, I don't think

9   it's necessary, but I do, again, want to highlight that there

10  is no private right of action under the Investment Advisers

11  Act.

12       Your Honor, it's not really relevant to today's hearing,

13  since we have argued in opposition to the motion before Your

14  Honor that resolving the issue of the Bankruptcy Court's

15  jurisdiction to adjudicate claims contained in the complaint

16  as they relate to Mr. Seery is premature at this point.  The

17  January 9th and July 16th orders first require the Court to

18  determine whether a claim is colorable.  It's not until this

19  Court determines if a claim is colorable that the decision on

20  where the lawsuit should be tried is relevant.

21       Having said that, Your Honor, we read the Movants' reply

22  brief very carefully and noticed in Footnote 6 that the

23  Movants state that modifying the exclusive grant of

24  jurisdiction to adjudicate any claims that pass through the

25  gate to include the language "to the extent permissible by

31

 1  law," in the same way the Debtor modified the plan, would

 2  resolve the motion.  So let's look at the provision as it

 3  exists in the plans.

 4      Ms. Canty, if you can put up the next demonstrative,

 5  please.

 6      This provision provides that the Bankruptcy Court will

 7  have sole and exclusive jurisdiction to determine whether a

 8  claim or cause of action is colorable, and, only to the extent

 9  legally permissible and provided in Article XI, shall have

10  jurisdiction to determine -- to adjudicate the underlying

11  colorable claim or cause of action.

12      The Movants request in their reply brief in Footnote 6

13  that the July 16th order be given the plan treatment.  That

14  treatment:  sole authority to determine colorability and

15  jurisdiction, and, to the extent legally permissible, to

16  adjudicate underlying claim, only if jurisdiction existed.

17      After reviewing the reply brief and prior to the June 8th

18  hearing, we decided that we would agree to modify both the

19  January 9th and the July 16th orders to provide that the

20  Bankruptcy Court would only have jurisdiction to adjudicate

21  claims that pass through the colorability gate to the extent

22  permissible by law.

23      Prior to the June 8th hearing, Mr. Morris and I had a

24  conversation with Mr. Bridges.  We conferred about a potential

25  resolution and a proposed modification.  Mr. Bridges indicated

1   they were interested in exploring a resolution and wanted to

2   --

3          MR. BRIDGES:  Objection, Your Honor.

4          THE COURT:  There's an objection?

5          MR. BRIDGES:  Objection, Your Honor.  There's a Rule

6   408 settlement discussion.  He's welcome to talk about the

7   results, but he shouldn't be talking about what was -- what

8   was proposed by opposing counsel in a settlement conversation.

9          THE COURT:  Okay.  I overrule.

10         MR. POMERANTZ:  Your Honor, this was not --

11         THE COURT:  I don't think this is a 408 issue.

12   Continue.

13         MR. BRIDGES:  Thank you.

14         MR. POMERANTZ:  The stipulation and order which we

15   provided to counsel is attached to my declaration, which is

16   found at Document 2418, and it was filed in connection with a

17   Notice of Revised Proposed Orders that we filed at Docket

18   2417.  And I would like to put up on the screen the relevant

19   paragraphs of the order that we provided to the Movants.

20      So, you see, we agreed to modify each of the orders at the

21   end to do what the plan says.  The Court would only have

22   jurisdiction for claims passing through the gate if the Court

23   had jurisdiction and it was legally permissible.

24      Movants' counsel, however, responded with a mark-up that

25   went beyond -- went beyond what Movants proposed in Footnote 6

33

 1   and sought to fundamentally change the January 9th and July

 2   16th orders in ways that were not acceptable to the Debtor and

 3   not even contemplated by the original motion.

 4       Ms. Canty, can you put up on the screen the relevant

 5   paragraphs of the response we received?

 6       Specifically, Your Honor, you see at the first part they

 7   wanted to provide that the only -- the order only applied to

 8   claims involving injury to the Debtor, presumably as opposed

 9   to alleged injuries to affiliated funds or third parties.

10   They also provided that the Court's ability to make the

11   initial colorability determination was also qualified by "to

12   the extent permissible by law" in the way that the Court --

13   that the Debtor agreed to modify the ultimate adjudication

14   jurisdiction provision.

15       Your Honor, Movants haven't even talked about this back

16   and forth.  They haven't talked about their about-face.  And

17   I'll leave it for Your Honor to read their Footnote 6 that

18   said it would resolve their motion, the back and forth, our

19   proposal, and now Mr. Bridges' modified, morphed arguments

20   that now point out other issues.

21       In any event, Your Honor, we made the change, and we think

22   it should resolve the motion, or at least it resolves part of

23   the motion.  There can't be any argument that the Court is

24   trying to exert exclusive jurisdiction on claims that pass

25   through the gate.

Case 22-03052-sgj   Doc 32   Filed 07/26/22   Entered 07/26/22 14:17:26   Desc Main
Case 3:22-cv-02280-S   Document 14   Filed 07/28/22   Page 38 of 231   PageID 2880

34

1     What apparently remains from the arguments raised by the

2     Movants is the argument that the Court does not even have

3     jurisdiction to act as a gatekeeper in the first place because

4     it doesn't have jurisdiction of the underlying lawsuit.  And

5     on June 8th and today, they've added a new argument, that the

6     orders impermissibly exculpate Mr. Seery and others, violate

7     their jury trial rights, and are contrary to the Fifth Circuit

8     precedent.

9     Movants claims that the orders are a jurisdictional

10    overreach, a violation of constitutional proportions, a

11    violation of due process, and inconsistent with several U.S.

12    Supreme Court cases.  But, of course, they cite no cases whose

13    facts are even remotely similar to this one.  Instead, they

14    are content to rely on general statements regarding bankruptcy

15    jurisdiction, how it is derived from district court

16    jurisdiction and is constitutionally limited, legal

17    propositions which are not terribly controversial or even

18    applicable to these facts.

19    There are several arguments -- I mean, there are several

20    reasons, Your Honor, why Movants' arguments fail.  Initially,

21    Movants have not cited any authority, any statute, or any rule

22    which would allow this Court to revisit the January 9th and

23    July 16th orders.  As I will discuss in a moment, Your Honor,

24    *Republic v. Shoaf*, a case the Court is very familiar in and

25    relied on in connection with plan confirmation, bars a

Case 22-03052-sgj   Doc 32   Filed 07/26/22   Entered 07/26/22 14:17:26   Desc Main
Case 3:22-cv-02280-S   Document 4   Filed 10/18/22   Page 39 of 231   PageID 2881

35

 1   collateral attack on these orders under the doctrine of res

 2   judicata.

 3        Similarly, as the Court remarked on June 8th, the Supreme

 4   Court's *Espinosa* decision, which rejected an attack based upon

 5   Federal Rule of Civil Procedure 60(b)(4) to a prior order that

 6   may have been unlawful, prohibits the Court from now

 7   reconsidering the January 9th and July 16th orders.

 8        But even if Your Honor rules that res judicata does not

 9   apply, there are two independent reasons why the orders were

10   not an unlawful extension of the Court's jurisdiction.  The

11   first is because the Court had jurisdiction to enter both of

12   those orders as the ability to determine the colorability of

13   claims is within the jurisdiction of the Court.  The second is

14   because the orders are justified by the *Barton* doctrine.

15        Lastly, Your Honor, Movants' argument that the Court may

16   not act as a gatekeeper to determine the colorability of a

17   claim for which it may not have jurisdiction is incorrect, and

18   as Your Honor has mentioned and as Mr. Bridges unconvincingly

19   tried to distinguish, the Fifth Circuit *Villegas v. Schmidt*

20   case is a case on point and resolves that issue.

21        Turning to res judicata, Your Honor, it prevents the Court

22   from revisiting these governance orders.  CLO Holdco had

23   formal notice of the Seery CEO motion and the opportunity to

24   respond.  It failed to do so.  It is clearly bound.

25        As reflected on Debtor's Exhibit 4, CLO Holdco is a

Case 22-03052-sgj    Doc 32    Filed 07/26/22    Entered 07/26/22 14:17:26    Desc Main
Case 3:22-cv-02280-S    Document 14    Filed 09/04/2865    Page 40 of 231    PageID 2882

36

1   wholly-owned subsidiary of the DAF.  The DAF is its sole

2   shareholder.  There is no dispute about that.  Importantly, at

3   the time of both the January and July orders, Grant Scott was

4   the only human being authorized to act on behalf of CLO Holdco

5   and the DAF.  The DAF did not respond to the Seery CEO motion,

6   either.

7        And why is that important, Your Honor?  It's because

8   Movants argue in their reply that the DAF cannot be bound by

9   res judicata because they did not receive notice of the July

10  16th order.  However, Your Honor, that is not the law.  Res

11  judicata binds parties to the dispute and their privies, and

12  the DAF is bound to the prior orders even though it did not

13  receive notice.

14       There are several cases, Your Honor, that stand for this

15  unremarkable proposition.  First I would point Your Honor to

16  the Fifth Circuit's opinion of *Astron Industrial Associates v.*

17  *Chrysler*, found at 405 F.2d 958, a Fifth Circuit case from

18  1968.  In that case, Your Honor, the Fifth Circuit held that

19  the appellant was barred by the doctrine of res judicata from

20  bringing a claim because its parent, which was its sole

21  shareholder, would have been bound by res judicata.

22       *Astron* is consistent with the 1978 Fifth Circuit case of

23  *Pollard v. Cockrell*, 578 F.2d 1002 (1978).  And the Northern

24  District of Texas in 2000 case of *Bank One v. Capital*

25  *Associates*, 2000 U.S. Dist. LEXIS 11652, found that a parent

37

 1   and a sole shareholder of an entity couldn't assert res

 2   judicata as a defense when those claims could have been

 3   brought against its wholly-owned subsidiary.

 4        And lastly, Your Honor, the 2011 Southern District of

 5   Texas case, *West v. WRH Energy Partners*, 2011 LEXIS 5183, held

 6   that res judicata applied with respect to a partnership's

 7   general partner because the general partner was in privity

 8   with the partnership.

 9        These cases are spot on and make sense.  DAF is CLO

10   Holdco's parent.  Grant Scott was the only live person to

11   represent these entities in any capacity at the relevant

12   times.  Accordingly, just as CLO Holdco is bound, DAF is

13   bound.

14        Allowing DAF to assert a claim when its wholly-owned and

15   controlled subsidiary is barred would allow entities to

16   transfer claims amongst their related entities in order to

17   relitigate them and they would never be finality.  And, of

18   course, Jim Dondero, as we know, consented to the January 9th

19   order, which provided Mr. Seery protection in a variety of

20   capacities.

21        And as Your Honor has pointed out, and as Mr. Bridges

22   didn't have an answer for, neither CLO Holdco nor the DAF or

23   any other party appealed any of the governance orders.  And

24   nobody challenged the validity of these orders at the

25   confirmation hearing, where the terms of these orders were

38

1    front and center.

2        And importantly, Your Honor, the orders are clear and

3    unambiguous.  They require a Bankruptcy Court [sic] to seek

4    Bankruptcy Court approval before they commence or pursue an

5    action against the independent board, the CEO, CRO, or their

6    agents.  And they clearly and unambiguously set the standard

7    of care for actions prospectively:  gross negligence or

8    willful misconduct.

9        The Bankruptcy Court had jurisdiction to enter the

10   governance orders, which, as expressly indicated in the

11   orders, were core proceedings dealing with the administration

12   of the estate.  No one challenged this finding of core

13   jurisdiction.  And as I will discuss later, the failure to

14   challenge core jurisdiction is waived under applicable Supreme

15   Court and Fifth Circuit precedent.

16       Your Honor, the Court [sic] does not argue that Movants

17   have waived their right to seek adjudication of a lawsuit that

18   passes through the colorability gate by an Article III Court.

19   The issue is not before the Court, but the changes to the

20   order that the Debtor agreed to make clearly -- clearly will

21   provide Mr. Bridges' clients the ability to make that

22   determination.

23       The Debtor is, however, arguing that the Movants have

24   waived their right to contest the core jurisdiction of the

25   Bankruptcy Court to make the determination that the claims are

1   colorable in the first place, and to challenge the exculpation

2   provisions provided to the beneficiaries of those orders.

3        Accordingly, Your Honor, the elements of res judicata are

4   satisfied.  Both proceedings involve the same parties.  The

5   prior judgment was entered by a court of competent

6   jurisdiction.  The prior order was a final judgment on its

7   merits.  And they involved the same causes of action.

8        Importantly, the members of the independent board,

9   including Jim Seery, relied on the protections contained in

10  the January 9th and July 16th orders and would not have

11  accepted these appointments if the protections weren't

12  included.  And how do we know this?  Because each of them,

13  both Mr. Seery and Mr. Dubel, both testified at the

14  confirmation hearing on this very topic.

15       And I would like to put up on the screen an excerpt from

16  Mr. Seery's testimony at confirmation, which is testimony

17  included in the February 2nd, 2021 transcript, which is

18  Exhibit 2 of the Debtor's exhibits.

19            THE COURT:  Okay.

20            MR. POMERANTZ:  And I would like to just read this,

21  Your Honor.

22       "Q   Okay.   You mentioned that there were certain

23       provisions of the January 9th order that were important

24       to you and the other independent directors.  Do I have

25       that right?"

40

1          MR. POMERANTZ:  A little bit later on, Mr. Seery

2     testifies:

3          "A   And then ultimately there'll be another provision

4          in the agreement here, I don't see it off the top of my

5          head, but a gatekeeper provision.  And that provision"

6          --

7          "Q   Hold on one second, Mr. Seery."

8          MR. POMERANTZ:  Please scroll.

9          "Q   So, Paragraph 4 and 5, were those -- were those --

10         were those provisions put in there at the insistence of

11         the prospective independent directors?

12         "A   Yes.

13         "Q   Okay.  Can we go to Paragraph 10, please?  There

14         you go."

15         Mr. Morris:  Is this the other provision that you were

16    referring to?

17         "A   This is -- it's become to be known as the

18         gatekeeper provision, but it's a provision that I

19         actually got from other cases -- again, another very

20         litigious case -- that I thought it was appropriate to

21         bring it into this case.  And the concept here is that

22         when you are dealing with parties that seem to be

23         willing to engage in decade-long litigation and

24         multiple forums, not only domestically but even

25         throughout the world, it seemed important and prudent

41

1    to me and a requirement that I set out that somebody

2    would have to come to this Court, the Court with

3    jurisdiction over these matters, and determine whether

4    there was a colorable claim.  And that colorable claim

5    would have to show gross negligence and willful

6    misconduct -- i.e., something that would not otherwise

7    be indemnifiable" --

8        MR. POMERANTZ:  Hold on one second.

9    "A   So, basically, it set an exculpation standard for

10   negligence.   It exculpates the directors from

11   negligence, and if somebody wants to bring a cause

12   against the directors, they have to come to this Court

13   first to get a finding that there's a colorable claim

14   for gross negligence or willful misconduct."

15   "Q   Would you have accepted the engagement as an

16   independent director without the Paragraphs 4, 5, and

17   10 that we just looked at?

18   "A   No, these were very specific requests.   The

19   language here has been smithed, to be sure, but I

20   provided the original language for Paragraph 10 and

21   insisted on the guaranty provisions above to ensure

22   that the indemnity would have some support.

23   "Q   And ultimately did the Committee and the Debtor

24   agree to provide all the protections afforded by

25   Paragraphs 4, 5, and 10?

Case 22-03052-sgj   Doc 32   Filed 07/26/22   Entered 07/26/22 14:17:26   Desc Main
Case 3:22-cv-02280-S   Document 14   Filed 09/02/22   Page 46 of 231   PageID 2888

42

1      "A    Yes."

2           MR. POMERANTZ:  So, Your Honor, these -- this

3      testimony also applied to as well as the CEO.

4           The testimony was echoed by Mr. Dubel, another member of

5      the board.  And I'm not going to put his testimony on the

6      screen, but it can be found at Pages 272 to 281 of Exhibit 2,

7      which is the February 2nd transcript.

8           Movants argue, however, that res judicata doesn't apply

9      because the Court didn't have jurisdiction to enter these

10     orders.  And they argue that the order stripped the District

11     Court of this jurisdiction.  As I previously described, the

12     Debtor is prepared to modify the governance orders to provide

13     that the Court shall retain jurisdiction to -- on claims that

14     pass through the gate only to the extent legally permissible.

15     The modification does not appear to be good enough for the

16     Movants.  They continue to argue that the Bankruptcy Court

17     can't even act as the exclusive gatekeeper to determine

18     whether such actions are colorable as a prerequisite for

19     commencing or pursuing an action.

20          The problem Movants run into is the Fifth Circuit's

21     opinion of *Republic v. Shoaf* and various Supreme Court

22     decisions, including *Espinosa*.

23          In *Shoaf*, the Fifth Circuit held that a party cannot

24     subsequently challenge a confirmed plan that clearly and

25     unambiguously released a third party, even if the Bankruptcy

App. 00676
002730

43

 1   Court lacked jurisdiction to approve the release in the first

 2   place.  Movants' proper recourse was to appeal the governance

 3   orders, not to seek to collaterally attack them.

 4        In *Shoaf*, the Fifth Circuit held that the confirmed plan

 5   was res judicata with respect to a suit by the creditor

 6   against the guarantor.  And in so ruling, the Fifth Circuit

 7   says that the prong of res judicata standard that requires an

 8   order, prior order to be made by a court of competent

 9   jurisdiction is satisfied regardless of whether the issue was

10   actually litigated.  This is because whenever a court enters

11   an order, it does so by implicitly making a finding of its

12   jurisdiction, a determination that can't be attacked.  And in

13   fact, in the January 9th and the July 16th orders, it wasn't

14   implicit, the Court's jurisdiction; it was set out that the

15   Court had core jurisdiction.

16        Movants try to brush *Shoaf* aside, arguing that is the only

17   case the Debtor cites to support res judicata argument and is

18   a narrow opinion that has been questioned and distinguished.

19   That's just not correct, Your Honor.  Movants ignore that we

20   have cited two United States Supreme Court cases, *Stoll v.*

21   *Gottleib* and *Chicot County Drainage District*, upon which the

22   Fifth Circuit based its *Shoaf* decision.  In each case, the

23   U.S. Supreme Court gave res judicata effect to a Bankruptcy

24   Court order that made a ruling party -- that a ruling party

25   later claimed was beyond the Court's jurisdiction to do so.

44

1    In *Stoll*, it was a release of guaranty without jurisdiction,

2    like *Shoaf*.  In *Chicot*, it was an extinguishment of a bond

3    claim without jurisdiction.

4         Similarly, Your Honor, the U.S. Supreme Court held in

5    *Espinosa* that a party was not entitled to reconsideration of a

6    Bankruptcy Court order under Federal Rule of Civil Procedure

7    60(b)(4) discharging a student loan without making the

8    required statutory finding of undue hardship in an adversary

9    proceeding.  And the Supreme Court reasoned in that opinion as

10   follows:  A judgment is not void, for example, simply because

11   it may have been erroneous.  Similarly, a motion under

12   60(b)(4) is not a substitute for a timely appeal.  Instead,

13   60(b)(4) applies only in the rare instance where a judgment is

14   premised either on a certain type of jurisdictional error or a

15   violation of due process that deprives a party of notice or

16   the opportunity to be heard.

17        Federal courts considering Rule 60(b)(4) motions that

18   assert a judgment is void because of a jurisdictional defect

19   generally have reserved it only for the exceptional case in

20   which the court that rendered the judgment lacked even an

21   arguable basis for jurisdiction.  This case is not the

22   exceptional -- exceptional circumstance that was referred to

23   by *Espinosa*.

24        In addition, we argue in our brief, and I'll get to in a

25   few moments, that both of the orders are justified under the

45

1   *Barton* doctrine.

2        Actually, before I go to that, Your Honor, I think Movants

3   are really trying to distinguish *Espinosa* by arguing that the

4   Court's order exculpating Mr. Seery for negligence liability

5   did not provide people, mom-and-pop investors, with the due

6   process informing them that they would not be able to assert

7   duty claims based upon mere negligence.  I think that's the

8   core of Mr. Bridges' argument, that, hey, you entered an

9   order, you gave this exculpation, it was inappropriate, and it

10  couldn't be done.

11       There are several problems with Movants' argument.  First,

12  Movants mischaracterize both the facts and the law in

13  connection with the Debtor's relationship with its investors.

14  The Debtor is the registered investment advisor for HCLOF as

15  well as approximately 15 to 18 CLOs.  The only investor in

16  HCLOF other than the Debtor is CLO Holdco.  The investors in

17  the CLOs are the retail funds advised by the Dondero advisors

18  and the other -- and other institutional investors.

19  Accordingly, the thousands of investors, the mom-and-pop

20  investors whose due process rights have allegedly been

21  trampled by the January 9th and July 16th orders, are not

22  investors in any funds managed by the Debtor.

23       And, of course, I have mentioned, as I've mentioned

24  before, no non -- non-Dondero investor, be it a mom-and-pop

25  investor, another institutional investor, anyone unrelated to

46

1   Mr. Dondero, has ever appeared in this Court to challenge the

2   Debtor's activities.

3        But more fundamentally, Your Honor, the Debtor does not

4   owe fiduciary duties to investors in any of the funds that the

5   Debtor advises.  The fiduciary duty that the Debtor owes is to

6   the funds themselves, not the investors in the funds.

7        And while Movants point to Mr. Seery's prior testimony to

8   support the argument that the Debtor owes a duty to investors,

9   Mr. Seery was not testifying as a lawyer and his testimony

10  just cannot change the law.

11       As to each of the funds that the Debtor manages, HCLOF and

12  the CLOs, they were each provided with actual notice of the

13  January 16th -- the July 16th order and didn't object.  And as

14  Your Honor will recall, the Trustees for the CLOs, the party

15  that could potentially have claims for breach of fiduciary

16  duty, they participated in the January 9th hearing.  They came

17  to the Court and were concerned about the protocols that the

18  Debtor was agreeing to with the Committee.  We revised them.

19  The Trustees didn't object.  They didn't object then; they

20  didn't object now.  And, in fact, they consented to the

21  assumption of the contracts between the Debtor and the CLOs.

22       So the argument that the orders, by having this

23  exculpation for future conduct, violated due process rights of

24  anyone and is the type -- essentially, the type of order that

25  *Espinosa* would have contemplated could be attacked, is --

47

```
 1   relies on faulty legal and factual premises.  No duty to

 2   investors.  No private right of action.  And both -- and all

 3   the funds received due process.

 4        In addition, Your Honor, as we argue in our brief and I'll

 5   get to in a few moments, both of the orders are justified

 6   under the *Barton* doctrine, as Mr. Seery is entitled to

 7   protection based upon how courts around the country have

 8   interpreted the *Barton* doctrine.  As such, Mr. Seery is

 9   performing his role both as an agent of the independent board

10   under the January 9th order, as a CEO under the July 16th

11   order, as a quasi-judicial officer.  And as Your Honor

12   examined in the *Ondova* opinion which you mentioned, trustees

13   are entitled to qualified immunity for damage to third parties

14   resulting from simple negligence, provided that the trustee is

15   operating within the scope of his duties and is not acting in

16   an *ultra vires* manner.

17        So, exculpating the independent directors, their agents,

18   and the CEO in the January 9th and July 16th orders was a

19   recognition by this Court that they would be entitled to

20   qualified immunity, much in the same way trustees are.

21        No doubt that Movants contend that this was error and that

22   the Court overreached.  However, the remedy for that overreach

23   was an appeal, not a reconsideration 16 months later.  The

24   Court's orders based upon the determination that in this

25   highly contentious case that these court officers needed to be
```

App. 00681
002735

Case 22-03052-sgj   Doc 32   Filed 07/26/22   Entered 07/26/22 14:17:26   Desc Main
Case 3:22-cv-02280-S   Document 4   Filed 10/06/22   Page 52 of 231   PageID 2894

48

1   protected from negligence suits is not the exceptional case

2   where the Court lacked any arguable basis for jurisdiction.

3   Accordingly, this Court must follow *Espinosa*, *Shoaf*, *Stoll*,

4   and *Chicot* and reject the attack on the prior court orders.

5        The only case Movants cite to challenge the Supreme

6   Court's decision -- to challenge the Supreme Court precedent I

7   mentioned and the Fifth Circuit's *Shoaf* decision is the

8   *Applewood* case.  *Applewood* is totally consistent with *Shoaf*.

9   *Applewood* also involved a plan that purported to release a

10  guaranty claim that the guarantor argued was res judicata in

11  subsequent litigation regarding the guaranty.  The Fifth

12  Circuit held in that case that the plan was not res judicata.

13  It made that ruling because the plan did not contain clear and

14  unambiguous language releasing the guaranty.  In that way, the

15  Fifth Circuit distinguished *Shoaf*.

16       *Applewood* and *Shoaf* are consistent.  A Bankruptcy Court

17  order will be given res judicata effect, even if the Court

18  didn't have jurisdiction to enter it, if the order was clear

19  and unambiguous.  In *Shoaf*, the release was.  In *Applewood*, it

20  wasn't.

21       Movants argued on June 8th and argue now that the

22  *Applewood* case really argues -- really deals with prospective

23  exculpation of claims.  I went back and read Mr. Bridges'

24  comments carefully of June 8th.  He said *Applewood*,

25  exculpation.  Well, that's just not correct.  *Applewood* is all

49

1   about requiring specificity of a (garbled) to give it res

2   judicata effect.  Claims that existed at that time, were they

3   described clearly and unambiguously?  Yes?  *Shoaf* applies.

4   No?  *Applewood* does -- applies.

5       So how should the Court apply these principles here?  The

6   Court approved a procedure for certain claims in the

7   governance orders.   The procedure:  come to Bankruptcy Court

8   before pursuing a claim against the independent directors and

9   Seery or their agents so that the Court can make a

10  colorability determination.  Clear and unambiguous.  The

11  governance orders each provide that the Bankruptcy Court had

12  jurisdiction to enter the orders, and the orders were not

13  appealed.

14      Movants attempt to confuse the Court and argue *Applewood*

15  is on point because the January 9th and July 16th orders do

16  not clearly identify specific claims that Movants now have

17  that are being released.  And because they're not specific,

18  then basically it's an ambiguous release and *Applewood*

19  applies.

20      The problem with the Movants' argument is that neither the

21  January 9th or July 16th orders released claims that existed

22  at that time.  If they did, and if there wasn't an adequate

23  description, I might agree with Mr. Bridges that *Applewood*

24  applied.  But there were no claims.  It was prospective.  It

25  was a standard of care.  The Court clearly and unambiguously

50

```
 1   said what the standard of care would be going forward.

 2   Clearly, under Shoaf and Supreme Court precedent, they are

 3   entitled to res judicata because it's a clear and unambiguous

 4   provision.  Applewood just simply doesn't apply.

 5       Mr. Phillips at the last hearing made an impassioned plea

 6   to the Court for a narrow interpretation of the exculpation

 7   provisions in the January 9th and July 16th orders, and he

 8   argued that the Court could not possibly have intended for the

 9   exculpation for negligence to apply on a go forward basis.  He

10   thus argued to the Court that the Court should construe the

11   exculpation narrowly and only apply it to potential claims of

12   harm caused to the Debtor, as opposed to harm caused to third

13   parties, which he said included thousands of innocent

14   investors.

15       Of course, Mr. Phillips made those arguments unburdened by

16   the actual facts and the prior proceedings which led to the

17   entry of these orders, because, as he was the first to admit,

18   he only became involved in the case a month ago.

19       As the Court recalls, and as reinforced by Mr. Seery's and

20   Mr. Dubel's testimony I just mentioned, the exculpation

21   provisions were included precisely to prevent Mr. Dondero,

22   through any one of the entities he's owned and controlled, the

23   Movants being two of those, from asserting baseless claims

24   against the beneficiaries of those orders, exactly the

25   situation Mr. Seery now finds himself in.
```

Case 22-03052-sgj   Doc 32   Filed 07/26/22   Entered 07/26/22 14:17:26   Desc Main
Case 3:22-cv-02280-S   Document 14   Filed 09/02/22   Page 55 of 231   PageID 2897

51

1      And, again, it bears emphasizing:  throughout this case,

2   not one of the purported public investors Mr. Phillips

3   lamented would be prevented from holding Mr. Seery responsible

4   for his conduct has ever appeared in this case to object about

5   anything.  And none of the directors of the funds, the funds

6   where the Debtor acts as an investment adviser, have ever

7   stepped foot in this court, either.

8      Even if the Court declines to apply res judicata, Your

9   Honor, to prevent challenges to the governance orders, the

10  Court has the jurisdiction, had the jurisdiction to include

11  the gatekeeping provisions in those orders.  The Bankruptcy

12  Court derives its jurisdiction from 28 U.S.C. Section 157, and

13  bankruptcy jurisdiction is divided into two parts:  core

14  matters, which are those arising in or arising under Title 11,

15  and noncore matters, those matters which are related to a

16  Chapter 11 case.

17     Bankruptcy Courts may enter final orders in core

18  proceedings, and with the consent of parties, noncore

19  proceedings.  If a party does not consent to a final judgment

20  in the noncore matters or waives its right to consent, then

21  the Bankruptcy Court -- or does not waive its right to

22  consent, then the Bankruptcy Court issues a report and

23  recommendation to the District Court.

24     The seminal Fifth Circuit case on bankruptcy court

25  jurisdiction is the 1987 case of *Wood v. Wood*, 825 F.2d 90.

Case 22-03052-sgj   Doc 32   Filed 07/26/22   Entered 07/26/22 14:17:26   Desc Main
Case 3:22-cv-02280-S   Document 14   Filed 06/00/22865   Page 56 of 231   PageID 2898

52

1    There, the Fifth Circuit held that the Bankruptcy Court has

2    related to jurisdiction over matters if the outcome of that

3    proceeding could conceivably have any effect on the estate

4    being administered in the bankruptcy.

5        More recently, the Fifth Circuit, in the 2005 case, in

6    *Stonebridge Tech's*, elaborated on when a matter has a

7    conceivable effect on the estate such as to confer Bankruptcy

8    Court jurisdiction.  There, the Fifth Circuit held that an

9    action is related to bankruptcy if the outcome could alter the

10   debtor's rights, liabilities, options, or freedom of action,

11   either positively or negatively, and which in any way impacts

12   upon the handling and the administration of the bankruptcy

13   estate.  It is against this backdrop, Your Honor, that the

14   Court should evaluate its jurisdiction to have entered the

15   orders.

16       So, again, what did the orders do?  They established

17   governance over the Chapter 11 debtor with new independent

18   directors being approved.  They established the procedures and

19   protocols of how transactions were going to be presented to

20   and approved by the Committee.  They vested in the Committee

21   certain related-party claims, and they provided for the

22   procedures parties would have to follow to assert any claims

23   against the independent directors and the CRO and the agents

24   and advisors.

25       Your Honor, it's hard to imagine that there is a more core

Case 22-03052-sgj   Doc 32   Filed 07/26/22   Entered 07/26/22 14:17:26   Desc Main
Case 3:22-cv-02280-S   Document 4   Filed 10/12/22   Page 57 of 231   PageID 2899

53

1   order than the entry of these orders.  At the time the orders

2   were entered, the Court was well aware of the potential for

3   acrimony from Mr. Dondero and his related entities, and

4   included the gatekeeper provisions to prevent the Debtor's

5   estate from being embroiled in frivolous litigation against

6   the board and the CEO.

7        Such protections were clearly within the Court's

8   jurisdiction, both to protect the administration of the estate

9   but also under applicable Fifth Circuit law dealing with

10  vexatious litigants, as set forth in the *Baum* and *Carroll*

11  cases that the Court cited in its confirmation order.

12       Not that it was hard to predict, but the last several

13  months have reinforced how important the gatekeeping

14  provisions in the order are and how important similar

15  provisions in the plan are.

16       The Court heard extensive testimony at the confirmation

17  hearing regarding the havoc continued litigation by Mr.

18  Dondero and his related entities would cause, which

19  predictions have unfortunately been borne out by the

20  unprecedented blizzard of litigation involving Mr. Dondero and

21  his related entities that has consumed the Court over the last

22  several months and caused the estate to incur millions of

23  dollars in fees that could have been used to pay its

24  creditors.

25       And these attacks are continuing.  As I mentioned before,

54

1  in addition to the DAF lawsuit, Sbaiti & Co. filed an action

2  against the Debtor on behalf of PCMG, another related entity,

3  alleging postpetition mismanagement of the Select Fund.

4      And to complete the hat trick, they are the lawyers

5  seeking to sue Acis in the Southern District of New York for

6  allegedly post-confirmation matters.

7      The Court knew then and certainly knows now that the

8  potential for sizable indemnification claims could consume the

9  estate.  The Court used that as the potential basis for

10  determining that the orders were within its jurisdiction, just

11  as it used that potential to justify the exculpation

12  provisions in the plan as being consistent with *Pacific*

13  *Lumber*.

14      Movants also ignore the cases -- and we cited in our

15  opposition -- where courts in this district, including Judge

16  Lynn in *Pilgrim's Pride* in 2010 and Judge Houser in the *CHC*

17  *Group* in 2016, approved gatekeeper provisions that provided

18  the Bankruptcy Court with exclusive jurisdiction to adjudicate

19  claims against postpetition fiduciaries.

20      Movants also ignore cases outside this district, including

21  *General Motors* and *Madoff*, which we cited in our brief as

22  examples of cases where Bankruptcy Courts have been used as

23  gatekeepers to determine if claims are colorable or being

24  asserted against the correct entity.

25      And there's another reason, Your Honor, why Movants may

Case 22-03052-sgj   Doc 32   Filed 07/26/22   Entered 07/26/22 14:17:26   Desc Main
Case 3:22-cv-02280-S   Document 14   Filed 09/08/22   Page 59 of 231   PageID 2901

55

1    now not contest the Court's jurisdiction to have entered those

2    orders.  Each of those orders, as I said before, include a

3    finding that the Court had core jurisdiction to enter the

4    orders.  No party contested that finding or refused to consent

5    to the core jurisdiction.

6        Under well-established Supreme Court precedent, parties

7    can waive their right to challenge the Bankruptcy Court's

8    jurisdiction, core jurisdiction, by failing to object.  In

9    *Wellness v. Sharif* in 2015, the Supreme Court expressly held

10   that Article III was not violated if parties knowingly and

11   voluntarily consented to adjudication of *Stern v. Marshall*-

12   type alter ego claims, and that the consent need not be

13   express, so long as it was knowing and voluntary.

14       And *Wellness* confirmed the pre-*Stern* opinion of the Fifth

15   Circuit in the 1995 *McFarland* case, which held that a person

16   who fails to object to the Bankruptcy Court's assumption of

17   core jurisdiction is deemed to have consented to the entry of

18   a final order by the Bankruptcy Court.

19       Your Honor, I'd now like to turn to the *Barton* doctrine.

20   The Court also has jurisdiction to have entered the orders

21   based upon the *Barton* doctrine.  The *Barton* doctrine dates

22   back to an old United States Supreme Court case and provides

23   as a general rule that, before a suit may be brought against a

24   trustee, consent from the appointing court must be obtained.

25       Movants essentially make two arguments why the *Barton*

Case 22-03052-sgj   Doc 32   Filed 07/26/22   Entered 07/26/22 14:17:26   Desc Main
Case 3:22-cv-02280-S   Document 14   Filed 04/06/22   Page 60 of 231   PageID 2902

56

1   doctrine doesn't apply.

2       First, Movants, without citing any authority, argue that

3   it does not apply to Mr. Seery because he is not a trustee or

4   receiver and was not appointed by the Court.  Although the

5   doctrine was originally applied to receivers, it has been

6   extended over time to cover various court-appointed

7   fiduciaries and their agents in bankruptcy cases, including

8   debtors in possession, officers and directors of the debtor,

9   and the general partner of the debtor.  And although Mr.

10  Bridges says he couldn't find one case that applied the *Barton*

11  doctrine to a court-retained professional, I will now talk

12  about several such cases.

13      In *Helmer v. Pogue*, a 2012 case cited in our brief, the

14  District Court for the Northern District of Alabama

15  extensively analyzed the *Barton* doctrine jurisprudence from

16  the Eleventh Circuit and beyond and concluded that it applied

17  to debtors in possession.  The *Helmer* Court relied in part on

18  a prior 2000 decision of the Eleventh Circuit in *Carter v.*

19  *Rodgers*, which held that the doctrine applies to both court-

20  appointed and court-approved officers of the debtor, which is

21  consistent with the law in other circuits.

22      And subsequently, the Eleventh Circuit again considered --

23  and in that case, the distinction of a court-appointed as a

24  court-retained professional was -- was not persuasive to the

25  Court, and the Court held that a court-retained professional

57

1  can still have *Barton* protection, notwithstanding that he

2  wasn't appointed, the argument that Mr. Bridges tries to make.

3      And subsequently, --

4          THE COURT:  I wonder, was that -- was that Judge

5  Clifton Jessup, by chance?  Or maybe Bennett?

6          MR. POMERANTZ:  Your Honor, this was -- this was the

7  Eleventh Circuit *Carter v. Rodgers*, so I think Judge Jessup

8  was --

9          THE COURT:  Oh, I thought you were still talking

10 about the Alabama case.  No?

11         MR. POMERANTZ:  Yeah, the Alabama -- well, the

12 Alabama case referred to the Eleventh Circuit case, *Carter v.*

13 *Rodgers*, --

14         THE COURT:  Okay.

15         MR. POMERANTZ:  -- and the appointment and -- or

16 retention issue was discussed in the *Carter v. Rodgers* case.

17         THE COURT:  Okay.

18         MR. POMERANTZ:  And subsequently, the Eleventh

19 Circuit again considered the contours of the *Barton* doctrine

20 in *CDC Corp.*, a 2015 case, 2015 U.S. App. LEXIS 9718.  In that

21 case, which Your Honor referenced in your *Ondova* opinion,

22 which I will discuss in a few moments, the Eleventh Circuit

23 held that a debtor's general counsel who had been approved by

24 the Court, who was appointed by a chief restructuring officer

25 who was also approved by the Court, was covered by the *Barton*

58

1  doctrine for acts taken in furtherance of the administration

2  of the estate and the liquidation of the assets.

3      And the Eleventh Circuit last year, in *Tufts v. Hay*, 977

4  F.3d 204, reaffirmed that court-approved counsel who function

5  as the equivalent of court-appointed officers are entitled to

6  protection under *Barton*.  While the Court in that case

7  ultimately ruled that counsel could be sued without first

8  going to the Bankruptcy Court, it did so because it determined

9  that the suit between two sets of lawyers would not have any

10 effect on the administration of the estate.

11     So, Your Honor, not only is there authority, there is

12 overwhelming authority that Mr. Seery is entitled to the

13 protections.

14     In *Gordon v. Nick*, a District -- a case from 1998 from the

15 Fourth Circuit, the Court that the *Barton* doctrine applied to

16 a lawsuit against a general partner who was responsible for

17 administering the bankruptcy estate.

18     And as I mentioned, Your Honor, and as Your Honor

19 mentioned, Your Honor had reason to look at the *Barton*

20 doctrine in length and in depth in the 2017 *Ondova* opinion.

21 And in the course of the opinion, Your Honor discussed one of

22 the policy rationales for the doctrine, which you took from

23 the Seventh Circuit's *Linton* opinion, and you said as follows:

24 "Finally, another policy concern underlying the doctrine is a

25 concern for the overall integrity of the bankruptcy process

59

1  and the threat of trustees being distracted from or

2  intimidated from doing their jobs.  For example, losers in the

3  bankruptcy process might turn to other courts to try to become

4  winners there by alleging the trustee did a negligent job."

5      Here, the independent board was approved by the Court as

6  an alternative to the appointment of a Chapter 11 trustee.

7  And it and its agent, including Mr. Seery as the CEO, even

8  before the July 16th order, were provided protections in the

9  form of the gatekeeper order and exculpation.

10     I'm sure the Court has a good recollection of the January

11 9th hearing -- we've talked about it a lot in the proceedings

12 before Your Honor -- where the Debtor and the Committee

13 presented the governance resolution to Your Honor.  And as

14 Your Honor will recall, the appointment of the board was a

15 hotly-contested issue among the Debtor and the Committee and

16 was heavily negotiated.  And the appointment of the

17 independent board was even contested by the United States

18 Trustee at a hearing on January 20th, 2020.

19     I refer the Court to the transcripts of the hearings on

20 January 9th and January 20th of 2020, which clearly

21 demonstrate that appointing this board and giving it the

22 rights and protections and its agents the rights and

23 protections was not your typical corporate governance issue,

24 but it was essentially the Court's alternative to appointing a

25 trustee.  And recognizing that the members of the independent

60

1  board were essentially officers of the Court, the Court

2  approved the gatekeeper provision, requiring parties first to

3  come and seek the Court's permission before suing them, in

4  order to prevent them from being harassed by frivolous

5  litigation.

6      And the independent board was given the responsibility in

7  the January 9th order to retain a CEO it deemed appropriate,

8  and it did so by retaining Mr. Seery.

9      Recognizing the *Barton* doctrine as it applies to Mr. Seery

10 is consistent with a legion of cases throughout the United

11 States, and Movants' argument that Mr. Seery is not court-

12 appointed is just wrong.

13     Second, Your Honor, Movants cite without any authority,

14 argue that even if the *Barton* doctrine applied there is an

15 exception which would allow it to pursue a claim against Mr.

16 Seery without leave of the Court.

17     The Debtor agrees the 28 U.S.C. § 959 is an exception to

18 the *Barton* doctrine.  Section 959(a) provides that trustees,

19 receivers, or managers of any property, including debtors in

20 possession, may be sued without leave of the court appointing

21 them with respect to any of their acts or transactions in

22 carrying on business connected with such property.

23     As the Court also pointed out at the June 8th hearing, and

24 Mr. Bridges alluded to in his argument, the last sentence of

25 959(a) provides that such actions -- clearly referring to

Case 22-03052-sgj    Doc 32    Filed 07/26/22    Entered 07/26/22 14:17:26    Desc Main
Case 3:22-cv-02280-S    Document 4    Filed 09/02/22    Page 65 of 231    PageID 2907

61

1    actions that may be pursued without leave of the appointing

2    court -- shall be subject to the general equity power of such

3    court, so far as the same may be necessary to the ends of

4    justice.

5        And Mr. Bridges made a plea, saying you can't take away my

6    jury trial right there.  You just cannot do that.  Well, I

7    have two answers to that, Your Honor.  One, they relinquished

8    their jury trial right.  We've established that.  Okay?

9        The second is allowing Your Honor to act as a gatekeeper

10    has nothing to do with their jury trial right.  Allowing Your

11    Honor to act as a gatekeeper allows you to determine whether

12    the action could go forward, and it'll either go forward in

13    Your Honor's court or some other court.

14        And the argument that the exculpation was essentially a

15    violation of 959 is just -- is just -- it just is twisting

16    what happened.  You have an exculpation provision.  We already

17    went through the authority the Court had to give an

18    exculpation.  With respect to these litigants who are before

19    Your Honor -- we're not talking about anyone else who's coming

20    in to try to get relief from the order; we're talking about

21    these litigants -- we've already established that they were

22    here, they're bound by res judicata.  So their 959 argument

23    goes away.

24        And as the Court -- and separate and apart from that, the

25    issue at issue in the District Court litigation is -- is not

62

1   even subject to 959.

2        Mr. Bridges says, well, of course it is because it deals

3   with the administration of the estate.  I'd like to refer to

4   what the Court said -- this Court said in its *Ondova* opinion:

5   The exception generally applies to situations in which the

6   trustee is operating a business and some stranger to the

7   bankruptcy process might be harmed, such as a negligence claim

8   in a slip-and-fall case, and is inapplicable to suits based

9   upon actions taken to further the administering or liquidating

10  the bankruptcy estate.

11       And your *Ondova* opinion is consistent with the Third and

12  Eleventh Circuit opinions Your Honor cited in your opinion, as

13  well as numerous other --

14       (Interruption.)

15            MR. POMERANTZ:  -- from the -- from around the

16  country, including cases from the First, Second, Sixth,

17  Seventh, and Ninth Circuits.  And I'm not going to give all

18  the cites to those cases, but it's not a -- it's not a

19  remarkable proposition that Your Honor relied on in *Ondova*.

20       In addition, several of these cases, including the

21  Eleventh Circuit's *Carter* opinion, have been cited with

22  approval by the Fifth Circuit in *National Business Association*

23  *v. Lightfoot*, a 2008 unpublished opinion for this very point.

24  The *Barton* exception of 959 does not apply to actions taken in

25  the administration of the case and the liquidation of assets

63

 1   in the estate.

 2        Suffice it to say that it's clear that the Section 959

 3   exception to *Barton* has no applicability in this case.

 4   Movants, hardly strangers to the bankruptcy case, want to sue

 5   Mr. Seery for acts taken relating to a settlement of very

 6   complex and significant claims against the estate.  They want

 7   to sue a court-appointed fiduciary for doing his job,

 8   resolving claims against the estate and his management of the

 9   bankruptcy estate.  And they want to do this outside of the

10   Bankruptcy Court.

11        Settlement of the HarbourVest claim, which is where this

12   claim arises under -- whether it's a collateral attack now or

13   not, and we say it is, is for another issue -- but it clearly

14   arises in the context of settlement of the HarbourVest claim,

15   is the quintessential act to further the administration and

16   liquidation of the bankruptcy estate, and certainly doesn't

17   fall within the 959 exception.

18        Movants seem to be arguing that 959(a) makes a distinction

19   between claims against Mr. Seery that damaged the Debtor and

20   claims against Mr. Seery that damaged third parties.  However,

21   the Movants make up that distinction, and it's not in the

22   statute, it's not in the case law.  The focus is not on who

23   the conduct damages, but it's rather on whether the conduct

24   was taken in connection with the administration or the

25   liquidation of the estate.

64

1       And even if the Debtor is wrong, Your Honor, which it's

2   not, the savings clause allows the Court to determine whether

3   leave to be -- sue will be granted.  Given that these claims

4   are asserted by Dondero-related entities, if not controlled

5   entities, no serious argument exists that the equities do not

6   permit this Court to determine if leave to sue is appropriate.

7       Accordingly, Movants' argument that the orders create this

8   tension with 959 is simply an over-dramatization.  And in any

9   event, Your Honor, there's a basis independent of *Barton* that

10  supports the jurisdiction to enter the orders, as I mentioned.

11      But even if the orders only relied on *Barton*, there is an

12  easy fix to Movants' concerns:  let them come to court and

13  argue that the type of suit they are bringing allegedly falls

14  within the exception of 959.

15      Your Honor, Movants argue that the Bankruptcy Court may

16  not act as a gatekeeper if it would not have jurisdiction to

17  deal with the underlying action.  They essentially argue that

18  an Article I judge may not pass on the colorability of a

19  claim, that it should be decided by an Article III judge.

20  This is the same argument, Your Honor, that Your Honor

21  rejected in connection with plan confirmation and which I

22  touched on earlier.

23      And the reason why Your Honor rejected it is because

24  there's no law to support it.  In fact, there is Fifth Circuit

25  law that holds to the contrary.  And we talked about a little

Case 22-03052-sgj    Doc 32    Filed 07/26/22    Entered 07/26/22 14:17:26    Desc Main
Case 3:22-cv-02280-S    Document 14    Filed 07/08/22 2865 Page 69 of 231    PageID 2911

65

1    bit the Fifth Circuit case decided is *Villegas v. Schmidt* in

2    2015.  And *Villegas* is a simple case.  Schmidt was appointed

3    trustee over a debtor and liquidated its estate and the

4    Bankruptcy Court approved his final fees.  Four years later,

5    Villegas and the prior debtor sued Schmidt in District Court,

6    the district in which the Bankruptcy Court was pending,

7    arguing that he was negligent in the performance of his

8    duties.  The District Court dismissed the case because

9    Villegas failed to obtain Bankruptcy Court approval to bring

10   the suit under the *Barton* doctrine.

11       On appeal, Villegas argued *Barton* didn't apply for two

12   reasons.  First, that *Stern v. Marshall* created an exception

13   to the *Barton* doctrine for claims that the Bankruptcy Court

14   would not have the jurisdiction to adjudicate.  And second,

15   that *Barton* did not apply if the suit is brought in the

16   District Court, which exercises supervisory authority over the

17   Bankruptcy Court that appointed the trustee.  Pretty much the

18   argument that was made by Movants at the contempt hearing.

19       The Fifth Circuit rejected both arguments.  It held that

20   the existence of a *Stern* claim does not impact the Bankruptcy

21   Court's authority because *Stern* did not overrule *Barton* and

22   the Supreme Court had cautioned circuit courts against

23   interpreting later cases as impliedly overruling prior cases.

24       More importantly, the Fifth Circuit pointed to a post-

25   *Stern* 2014 case, *Executive Benefits v. Arkison*, 573 U.S. 25

Appx 000899
002753

66

1   (2014), which held that *Stern* does not decide how a Bankruptcy

2   Court or District Courts should proceed when a *Stern* creditor

3   is identified, as support for the argument that *Barton* is

4   still good law, even dealing with a *Stern* claim.

5        Second, the Fifth Circuit, joining every circuit to have

6   addressed the issue, ruled that the District Court and the

7   Bankruptcy Court are distinct from one another and the

8   Bankruptcy Court has the exclusive authority to determine the

9   colorability of *Barton* claims and that the supervisory

10  District Court does not.

11       Movants didn't address *Villegas* in their reply.  Briefly

12  tried to distinguish it, unconvincingly, today.  The bottom

13  line is *Villegas* is directly applicable.  Your Honor cited it

14  in the *Ondova* opinion for precisely the proposition that

15  *Barton* applies whether or not the Court has authority to

16  adjudicate the claim.

17       Accordingly, Your Honor, it was within the Court's

18  jurisdiction to require a party to seek approval of Your Honor

19  on the colorability of a claim before an action may be

20  commenced or pursued against the protected parties, even if

21  Your Honor wouldn't have authority to adjudicate the claim at

22  the end of the day.

23       In fact, some courts have even addressed the proper

24  procedure for doing so, requiring the putative plaintiff to

25  not only seek leave of Bankruptcy Court but also to provide a

67

1    draft complaint and a basis for the Court to determine if the

2    claim is colorable.

3         Movants have done neither, and they should not be

4    permitted to modify the final orders of the Court as a

5    workaround.

6         Your Honor, that concludes my presentation.  I'm happy to

7    answer any questions Your Honor may have.

8              THE COURT:  All right.  Not at this time.  All right.

9    I'm going to figure out, do we need a break or not, depending

10   on what Mr. Bridges tells me.  I assume we're just doing this

11   on argument today.  I think that's what I heard.  No witnesses

12   or exhibits.

13             MR. BRIDGES:  That is correct, Your Honor.

14             THE COURT:  Okay.  Mr. Bridges, how long do you

15   expect your rebuttal to take so I can figure out does the

16   Court need a break?

17             MR. BRIDGES:  Fifteen minutes plus whatever it takes

18   to submit agreed-to exhibits.

19             THE COURT:  Okay.  Let's take a five-minute bathroom

20   break.  We'll come back.  It's -- what time is it?  It's 1:11

21   Central time.  We'll come back in five minutes.

22             THE CLERK:  All rise.

23        (A recess ensued from 1:11 p.m. until 1:17 p.m.)

24             THE CLERK:  All rise.

25             THE COURT:  All right.  Please be seated.  We're

68

1    going back on the record in the Highland matters.

2        Mr. Bridges, time for your rebuttal.  I want to ask you a

3    question right off the bat.  Mr. Pomerantz pointed out

4    something that was on my list that I forgot to ask you when

5    you made your initial presentation.  What is the authority

6    you're relying on?  You did not cite a statute or a rule *per*

7    *se*, but I guess we can probably all agree that Bankruptcy Rule

8    9024 and Federal Rule 60 is the authority that would govern

9    your motion, correct?

10        MR. BRIDGES:  I don't agree, Your Honor.  I don't

11    believe this is a final order that we're contesting here.  And

12    I think that's demonstrated by the Court's final confirmation

13    -- plan -- plan confirmation order that seeks to modify this

14    order or will modify this order upon being -- being effective.

15    So I don't think so.

16        In the alternative, if we are challenging a final order,

17    then I think you're right as to the rules that would be

18    controlling.

19        THE COURT:  All right.  Well, let me back up.  Why

20    exactly do you say this would be an interlocutory order as

21    opposed to a final order?

22        MR. BRIDGES:  Because of its nature, Your Honor.

23    While the appointment in the order or the approval of the

24    appointment in the order might, as a separate component of the

25    order, have -- have finality, the provisions -- the provisions

69

1    in it relating to gatekeeping and exculpation are, we think,

2    by their very nature, quite obviously interlocutory and not

3    permanent.  They don't seem to indicate an intention by any of

4    the parties that, 30 years from now, if Mr. Seery is still CEO

5    at Highland, long after the bankruptcy case has ended, that

6    nonetheless parties would be prohibited from bringing claims,

7    strangers to this action would be prohibited from bringing

8    claims related to his CEO role.

9        I think the nature of it demonstrates that, the

10   modifications to it, and even the inclusion of it in the final

11   plan confirmation, as well as -- can't read that.

12           THE COURT:  Can you give me some authority?  Because

13   as we know, there's a lot of authority out there in the

14   bankruptcy universe on what discrete orders are interlocutory

15   in nature that a bankruptcy judge might routinely enter and

16   which ones are final.  You know, it would just probably, if I

17   flipped open *Collier's*, I could -- you know, it would be mind-

18   numbing.

19       So what authority can you rely on?  I mean, is there any

20   authority that says an employment order is not a final order?

21   That would be shocking to me if you have cases to that effect,

22   but, I mean, of course, sometimes we do interim on short

23   notice and then final.  But this would be shocking to me if

24   there is case authority to support the argument this is not a

25   final order.  But I learn something new every day, so maybe I

70

1    would be shocked and there is.

2         MR. BRIDGES:  Your Honor, I'd point you to *In re*

3    *Smyth*, 207 F.3d 758, and *In re Royal Manor*, 525 B.K. 338

4    [sic], for the proposition that retaining a bankruptcy

5    professional is an interlocutory order.

6         THE COURT:  Okay.  Stop for a moment.  The *Smyth*

7    case.  Which court is that?

8         MR. BRIDGES:  Fifth Circuit.

9         THE COURT:  Okay.  So tell me the facts.  I'm

10   surprised I don't know about this case.  But, again, I don't

11   know every case.  So, it held that an employment order is an

12   interlocutory order?

13        MR. BRIDGES:  Appointing counsel.  A professional in

14   the bankruptcy context, Your Honor.

15        THE COURT:  Counsel for a debtor-in-possession?  An

16   order approving counsel was an interlocutory order?

17        MR. BRIDGES:  Yes, or the Trustee's counsel.

18        THE COURT:  Or the Trustee's counsel?  Okay.  What

19   were the circumstances?  Was this on an expedited basis and

20   there wasn't a follow-up final order, or what?

21        MR. BRIDGES:  Your Honor, I don't have -- I don't

22   have that at the tip of my memory.  I'm sorry.

23        THE COURT:  Okay.  And the other one, 525 B.R. 338,

24   what court was that?

25        MR. BRIDGES:  It's a Bankruptcy Court within the

Case 22-03052-sgj    Doc 32    Filed 07/26/22    Entered 07/26/22 14:17:26    Desc Main
Case 3:22-cv-02280-S   Document 4   Filed 07/09/22865   Page 75 of 231   PageID 2917

71

 1   Sixth Circuit.  I'm not certain which district.

 2         THE COURT:  All right.  Well, maybe one of you two

 3   over there can look them up and give me the context, because

 4   that is surprising authority.  Or other lawyers on the WebEx

 5   maybe can do some quickie research.

 6      Okay.  We'll come back to that.  But assuming that this

 7   was a final order, which I have just been presuming it was,

 8   Rule 60 is the authority you're going under?  9024 and Rule

 9   60, correct?

10         MR. BRIDGES:  Your Honor, we have not invoked those

11   rules.  Alternatively, I think you're right that they would

12   control if we are wrong about the interlocutory nature of the

13   order.

14         THE COURT:  Well, you have to be going under certain

15   -- some kind of authority when you file a motion.  So I'm --

16         MR. BRIDGES:  As an alternative --

17         THE COURT:  I'm approaching this exactly, I assure

18   you, as the District Court or a Court of Appeals would.  You

19   know, you start out, what is the legal authority that is being

20   invoked here?

21         MR. BRIDGES:  Well, --

22         THE COURT:  So I just assume Rule 60.  I can't, you

23   know, come up with anything else that would be the authority.

24         MR. BRIDGES:  Yes, Your Honor.  You also have

25   inherent power to modify orders that are in violation of the

Case 22-03052-sgj   Doc 32   Filed 07/26/22   Entered 07/26/22 14:17:26   Desc Main
Case 3:22-cv-02280-S   Document 1-4   Filed 10/01/22   Page 76 of 231   PageID 2918

72

 1   law.  And we pointed you to --

 2          THE COURT:  Now, is that right?  Is that really

 3   right?  Why do we have Rule 60 if I can just willy-nilly, oh,

 4   I feel like I got that wrong two years ago?  I can't do that,

 5   can I?  Rule 60 is the template for when a court can do that.

 6   Parties are entitled to rely on orders of courts.  And that's

 7   why we have Rule 60, right?  So, --

 8          MR. BRIDGES:  Your Honor, I think -- I think that

 9   we're miscommunicating.  I'm trying not to rely on Rule 60 in

10   the first instance because in the first instance we view this

11   as not a final order.  So, in the first instance, --

12          THE COURT:  I got that.  And I've got my law clerks

13   looking up your cases to see if they convince me.  But I'm

14   asking you to go to layer two.  Assuming I don't agree with

15   you these are final orders, what is your authority for the

16   relief you're seeking?

17          MR. BRIDGES:  Yes, Your Honor.  Rule 60 would apply

18   in the alternative.

19          THE COURT:  All right.

20          MR. BRIDGES:  That's correct.

21          THE COURT:  So, which provision?  Which provision of

22   Rule 60?  (b) what?

23          MR. BRIDGES:  Your Honor, I'm not prepared to concede

24   any of them.  I don't have the rule in front of me.

25          THE COURT:  You're not prepared to concede what?

Case 22-03052-sgj   Doc 32   Filed 07/26/22   Entered 07/26/22 14:17:26   Desc Main
Case 3:22-cv-02280-S   Document 14   Filed 07/06/22865   Page 77 of 231   PageID 2919

73

 1              MR. BRIDGES:  Any of the provisions of Rule 60.  Just

 2     (b)(1), (b)(2), especially, but I'm -- I'm -- Rule 60 is our

 3     basis, as is the particulars (b)(1), (2), (6) --

 4         (Garbled audio.)

 5              THE COURT:  Okay.  You're breaking up.  Can you

 6     restate?

 7              MR. BRIDGES:  (b)(1), (2), and (6), as -- as well as

 8     any other provision, Your Honor, of Rule 60.

 9              THE COURT:  Okay.  Well, so (1), mistake,

10     inadvertence, surprise, excusable neglect.  Which one of

11     those?

12              MR. BRIDGES:  All of the above, Your Honor.

13              THE COURT:  Surprise?  Who's surprised?

14              MR. BRIDGES:  Your Honor, I think every potential

15     litigant who discovers that your order purports to bar

16     prospective unaccrued claims at the time the order issued

17     would be surprised.

18         Frankly, I think Mr. Seery would be surprised, given his

19     testimony that he owes fiduciary duty -- duties that he must

20     abide by and that he appears to have, as I continue to

21     represent to clients, to advisees, and to the SEC, that those

22     duties are owing.

23              THE COURT:  Okay.  I'm giving you one more chance

24     here to make clear on the record what provision of Rule 60(b)

25     are you relying on, okay?  I need to know.  It's not in your

74

 1   pleading.

 2           MR. BRIDGES:  Your Honor, --

 3           THE COURT:  So tell me specifically.  I can only --

 4           MR. BRIDGES:  -- (b)(1) --

 5           THE COURT:  -- come up with a result here if I know

 6   exactly what's being presented.

 7           MR. BRIDGES:  Your Honor, (b)(1), (b)(2), and (b)(6)

 8   --

 9           THE COURT:  Which, okay, there are multiple parts to

10   (1).  You're saying somebody's surprised by the ruling.  I

11   don't know who.  Really, all that matters is your client, the

12   Movants.  You're saying, even though they participated, --

13           MR. BRIDGES:  Yes, Your Honor.

14           THE COURT:  -- got notice, they're somehow surprised?

15   Why are they surprised?

16           MR. BRIDGES:  Yes, Your Honor.

17           THE COURT:  Do you have evidence of their surprise?

18           MR. BRIDGES:  Your Honor, our brief shows the

19   intentions of all involved were not the interpretation of that

20   order being advanced at this -- at this point in time.  And

21   so, yes, I believe that is evidence.  The transcripts of the

22   hearings I believe evidence that as well, that the

23   understanding of everyone involved was not that future --

24   unspecified future claims that had not accrued yet would be

25   released under (b)(1).  Yes, Your Honor.

Case 22-03052-sgj   Doc 32   Filed 07/26/22   Entered 07/26/22 14:17:26   Desc Main
Case 3:22-cv-02280-S   Document 14   Filed 08/02/22   Page 79 of 231   PageID 2921

75

1          THE COURT:  Okay.

2          MR. BRIDGES:  Under (b)(2), --

3          THE COURT:  I don't have any evidence of that.  All I

4     have is the clear wording of the order.  Okay.  Let me just --

5     just let me go through this.

6        Assuming Rule 60 (1) through (6) are what you're arguing

7     here, what about Rule 60(c):  a motion under Rule 60(b) must

8     be made within a reasonable time?  We're now 11 months --

9          MR. BRIDGES:  Your Honor, --

10         THE COURT:  We're now 11 months past the July 2020

11    order.  What is your authority for this being a reasonable

12    time?

13         MR. BRIDGES:  Yes, Your Honor.  If I may back up one

14    step before answering your question.  Under (b)(2), we're

15    relying on newly-discovered evidence that was discovered in

16    late March and caused both the filing of this motion and the

17    filing of the District Court action.

18       Under (b)(4), we believe that the order is --

19         THE COURT:  Let me stop.  Let me stop.  What is my

20    evidence that you're putting in the record that's newly

21    discovered?

22         MR. BRIDGES:  The evidence is detailed in the

23    complaint that is in the record.  You know, --

24         THE COURT:  That's not evidence.

25         MR. BRIDGES:  -- honestly, Your Honor, --

76

```
 1              THE COURT:  That is not evidence.  Okay?  A lawyer-
 2   drafted complaint in another court is not evidence.  Okay?
 3              MR. BRIDGES:  Your Honor, I think, to be technical,
 4   that there is not a record yet, that we have evidence yet to
 5   be admitted on our exhibit list.  I believe in this
 6   circumstance -- I understand that, in general, allegations in
 7   a pleading are not evidence.  In this instance, when we're
 8   talking about whether or not new facts led to the filing of a
 9   lawsuit, I do believe that the allegations in the lawsuit are
10   evidence of those new facts.
11              THE COURT:  All right.  Go on.
12              MR. BRIDGES:  Under (b)(4), we believe the order is,
13   in part, void.  It is void because of the jurisdictional and
14   other defects noted in our argument.
15       And also, under (b)(6) (garbled) ground for relief that
16   we're appealing to the equitable powers of this Court to
17   correct errors and manifest injustice towards not just the
18   litigants here but to correct the order of the Court to make
19   it comply with -- with the law, with the statutes promulgated
20   by Congress and to respect the jurisdiction of the District
21   Court.
22              THE COURT:  All right.  Do you agree with Mr.
23   Pomerantz that the case law standard for Rule 60(b)(4) is
24   exceptional circumstances?  It's only applied so that a
25   judgment is voided in exceptional circumstances.  Do you
```

77

```
 1   disagree with that case authority?

 2        MR. BRIDGES:  I would -- I would agree, in part, that

 3   unusual circumstances is not the ordinary case.  I'm not

 4   entirely sure what you mean by exceptional, but I think we're

 5   on the same page.

 6        THE COURT:  Okay.  It's not what I mean.  That's just

 7   the case law standard.  And I'm asking, do you agree with Mr.

 8   Pomerantz that that is the standard set forth in case law when

 9   applying 60(b)(4)?  There have to be some sort of exceptional

10   circumstances where there's just basically no chance the Court

11   had authority to do what it did.

12        MR. BRIDGES:  Out of the ordinary would be the phrase

13   I would use, Your Honor.

14        THE COURT:  Okay.  So I guess then I'll go from

15   there.  Is it your argument that gatekeeping provisions in the

16   bankruptcy world are out of the ordinary?

17        MR. BRIDGES:  The exculpation of Mr. Seery for

18   liability falling short of gross negligence or intentional

19   wrongdoing in connection with his continuing to conduct the

20   business of the Debtor as an investment advisor subject to the

21   Advisers Act, yes, I would say that is out of the ordinary,

22   that it is extraordinary, that it is --

23        THE COURT:  Okay.  What is your authority or evidence

24   on that?  Because this Court approves exculpation provisions

25   regularly in connection with employment orders, and pretty
```

78

1   much every judge I know does.  In fact, I'm wondering why this

2   isn't just a term of compensation.  You know, he's going to do

3   x, y, z in the case.  His compensation is going to be a, b, c,

4   d, e.  And by the way, we're going to set a standard of

5   liability for his performance as CEO or investment banker,

6   financial advisor, whatever, so that no one can sue him

7   regarding his performance of his job duties unless it rises to

8   the level of gross negligence, willful misconduct.

9       It's a term of employment that, from my vantage point,

10   seems to be employed all the time.  So it would be anything

11   but exceptional circumstances.  Do you have authority or

12   evidence --

13             MR. BRIDGES:  Your Honor, frankly, --

14             THE COURT:  -- to the contrary?

15             MR. BRIDGES:  Your Honor, frankly, I'm astonished at

16   your view of that situation, that it would merely be a term of

17   his employment, that vitiates the entire fiduciary duty

18   standard created by the Advisers Act that tells him, with

19   hundreds of millions of dollars of assets under management for

20   people he's advising as a registered investment advisor,

21   people he's advising who believe that he has a fiduciary duty

22   to them and that it's enforceable, that the SEC, who monitors,

23   believes he has an enforceable fiduciary duty to those people,

24   and that he's testified that he has fiduciary duties to those

25   people, and that Your Honor is saying no, just as a regular

Case 22-03052-sgj   Doc 32   Filed 07/26/22   Entered 07/26/22 14:17:26   Desc Main
Case 3:22-cv-02280-S   Document 14   Filed 07/06/22   Page 83 of 231   PageID 2925

79

1  term of employment we have undone the Advisers Act's

2  imposition of an unwaivable fiduciary duty.

3      Your Honor, the order is void to the extent that it

4  attempts to do so.

5      This is not an ordinary employment agreement, Your Honor.

6  This is an attempt to exculpate someone from the key thing

7  that our entire investment system depends upon, regulation by

8  the SEC and the requirement in investment advisors to act as

9  fiduciaries when they manage the money of another.

10     It would be the equivalent of telling lawyers who are

11  appointed in a bankruptcy proceeding that they don't have any

12  duties to their client, or at least not fiduciary duties.

13  That the lawyers merely owe a duty not to be grossly negligent

14  to their clients.  That's not an ordinary term of employment,

15  Your Honor.

16         THE COURT:  All right.  So I guess we're back to my

17  question, was this brought within a reasonable time under Rule

18  60(c)?

19         MR. BRIDGES:  It was brought very quickly after the

20  new evidence was discovered at the end of March, Your Honor,

21  yes.

22         THE COURT:  Okay.  Well, I guess I'll just ask you

23  one more question before you continue on with your rebuttal

24  argument.  I mean, again, I want your best argument of why

25  *Villegas* doesn't absolutely permit the gatekeeping provisions

Case 22-03052-sgj   Doc 32   Filed 07/26/22   Entered 07/26/22 14:17:26   Desc Main
Case 3:22-cv-02280-S   Document 14   Filed 07/08/22865 Page 84 of 231   PageID 2926

80

 1   that you're challenging.  And many cases were cited by Mr.

 2   Pomerantz in his brief where courts have extended the *Barton*

 3   doctrine to persons other than trustees.  And so what is your

 4   best rebuttal to that?

 5           MR. BRIDGES:  Your Honor, we've already given it.

 6   I'm afraid --

 7           THE COURT:  Okay.  If you don't want to say more, --

 8           MR. BRIDGES:  -- what I have is not --

 9           THE COURT:  -- I'm not going to make you say more.

10           MR. BRIDGES:  I --

11           THE COURT:  I'm just telling you what's on my brain.

12           MR. BRIDGES:  I do.  I want to -- I am apologizing in

13   advance for repeating, but yes, *Villegas*, *Villegas*, however

14   that case is pronounced, says that *Stern* is not an exception

15   to the *Barton* doctrine.

16           THE COURT:  Uh-huh.

17           MR. BRIDGES:  959(a) is an exception to the *Barton*

18   doctrine.  You are not operating under the *Barton* doctrine

19   here.  Even counsel's brief, the Debtor's brief, doesn't say

20   *Barton* applies.  It says it's consistent with *Barton*.

21       Your Honor, in our previous hearing, you directed me to

22   the second sentence of 959(a) because you believe it's what

23   empowers you to do the gatekeeping.  It limits the gatekeeping

24   that you can do by protecting jury rights, the right to trial,

25   says you cannot discharge, undo, deprive a litigant of their

Case 22-03052-sgj   Doc 32   Filed 07/26/22   Entered 07/26/22 14:17:26   Desc Main
Case 3:22-cv-02280-S   Document 14   Filed 09/02/22   Page 85 of 231   PageID 2927

81

 1  right to a trial, a jury trial.

 2          THE COURT:  Well, you mentioned it again, jury trial

 3  rights.  Do you have any argument --

 4          MR. BRIDGES:  Yes, Your Honor.

 5          THE COURT:  -- of why that hasn't flown out the

 6  window?

 7          MR. BRIDGES:  Yes, Your Honor.  I am told that

 8  Section 14(f) that counsel for the Debtor referred to is not a

 9  waiver of jury rights at all.  It is an arbitration agreement.

10  Your Honor is probably familiar how arbitration agreements

11  work, is that they need not be elected.  They need not be

12  invoked by the parties.  When they are, they create a

13  situation where arbitration may be required.  But a waiver of

14  a jury right outside of arbitration is not part of this

15  arbitration clause, or of any.  The issue is not briefed or in

16  evidence before the Court.  We're relying on representations

17  of counsel as to what that provision contains.  That Mr. Seery

18  wasn't even a party to that agreement, the advisory agreement,

19  with the Charitable DAF.  The arbitration agreement is subject

20  to defenses that are not at issue here before the Court.  That

21  Movants' rights, their contractual rights to invoke the

22  arbitration clause, also appear to be terminated by the

23  orders' assertion of sole jurisdiction in this matter.

24      Your Honor, yes, our jury rights survive Section 14(f) in

25  the advisory agreement with the DAF for all of those potential

82

1   reasons.

2       On top of that, it doesn't go to all of our causes of

3   action.  It goes to the contract cause of action.  And to the

4   extent they can argue that the other claims are subject to

5   arbitration, that also is a defense and -- defensible and

6   complex issue requiring the application of the Federal

7   Arbitration Act, requiring consideration of the Federal

8   Arbitration Act, which this Court doesn't have jurisdiction to

9   do under 157(d).

10          THE COURT:  What?  Repeat that.

11          MR. BRIDGES:  Yes.  This Court does not have

12  jurisdiction to determine whether or not arbitration --

13  arbitration is enforceable due to the mandatory withdrawal of

14  the reference provisions of 157(d).

15          THE COURT:  That's just not consistent with Fifth

16  Circuit authority.  *National Gypsum*.  What are some of these

17  other arbitration cases?  I've written an article on it.  I

18  can't remember them.  That's just not right.  Bankruptcy

19  courts look at arbitration clauses all the time.  Motions to

20  compel arbitration.

21          MR. BRIDGES:  Your Honor, under 157(d), in the

22  circumstances of this case, if the Court is going to take into

23  consideration an arbitration clause under the Federal

24  Arbitration Act, when that clause is not in evidence and is

25  not before the Court, then Movants respectfully move to

83

 1  withdraw the reference of your consideration of that issue and

 2  of any proceeding and ask that you would issue only a report

 3  and recommendation rather than an order on that issue.

 4          THE COURT:  Okay.  I regret that we even got off on

 5  this trail.  I'm sorry.  So just proceed with your rebuttal

 6  argument as you had envisioned it, Mr. Bridges.

 7          MR. BRIDGES:  Thank you, Your Honor.

 8      Debtor's counsel says there's no private right of action

 9  under the Advisers Act.  That is both inaccurate and

10  misleading.  The Advisory Act creates, imposes fiduciary

11  duties that state law provides the cause of action for.  It is

12  a state law breach of fiduciary duty claim regarding --

13  regarding fiduciary duties imposed as a matter of law by the

14  Investment Advisers Act that is Count One in the District

15  Court action.

16      Furthermore, that Act does create a private right of

17  action for rescission.  That would be rescission of the

18  advisory agreement with the Charitable DAF, not rescission of

19  the HarbourVest settlement.

20      Second, Your Honor, the notion that this Court has related

21  to jurisdiction is irrelevant and beside the point.  I would

22  like to note for the record that the District Court civil

23  cover sheet that omitted to state that this was a related

24  action has been corrected, has been amended, and that that has

25  taken place.

84

1      Counsel for the Debtor also appears to agree with us that

2  the order ought to be modified for having asserted exclusive

3  jurisdiction over colorable claims to the extent it's not

4  legally permissible to do.  And in trying to invoke the

5  discussions between us as to how the orders might be fixed,

6  what counsel does is tries to cabin the legally-permissible

7  caveat to just the second half of the paragraph at issue.  It

8  is both -- both portions, the gatekeeping and the subsequent

9  hearing of the claims, that should be limited to the extent it

10  would be impermissible legally for this Court to make those

11  decisions.

12      On top of that, Your Honor, merely stating "to the extent

13  legally permissible" would result in a considerable amount of

14  ambiguity in the order that would lead it, I fear, to be

15  unenforceable as a matter of law.

16      Next, Your Honor, when Debtor's counsel talks about the

17  authority in this case, it feels like we're ships passing in

18  the night.  He says that we're wrong in asserting that no case

19  we can find involves both the *Barton* doctrine and the

20  application of the business judgment rule where the Court is

21  asked to defer, and he mentions cases that apply the *Barton*

22  doctrine to an approval rather than an appointment.  The Court

23  is asked to --

24      (Garbled audio.)

25          THE COURT:  I lost you for a moment.  Could you

App. 00718
002772

85

1    repeat the last 30 seconds?

2            MR. BRIDGES:  Thank you, Your Honor.  Yes.  He points

3    -- opposing counsel points us to case law where the *Barton*

4    doctrine has been applied despite the Bankruptcy Court having

5    merely approved rather than appointed the trustee or the, I'm

6    sorry, the professional.  But in doing so, he doesn't

7    reference any case that has done so in the context of business

8    judgment rule deference.  It's like we're ships passing in the

9    night.

10           What we're saying isn't that a mere approval can never

11   rise to the level of the *Barton* doctrine.  What we're saying

12   is that, in combination with the business judgment rule

13   deference, the two cannot go together.  There's no authority

14   for saying that they do.

15           We -- I further feel like we're ships passing in the night

16   when he talks about *Shoaf*.  Counsel says that in *Shoaf* there

17   was a confirmed final plan and it specifically identified the

18   released guaranty.  And yeah, that distinguishes it from this

19   case, just as it distinguished -- just as the *Applewood Chair*

20   case distinguished it when there's not that specific

21   identification.  And here, we don't even have a final plan

22   confirmation at the time these orders are being issued.

23   Without that express -- express notion of what the claims are

24   being discharged, *Shoaf* doesn't apply.

25           There, there was a guaranty to a party on a specific

Case 22-03052-sgj   Doc 32   Filed 07/26/22   Entered 07/26/22 14:17:26   Desc Main
Case 3:22-cv-02280-S   Document 4   Filed 12/06/22   Page 90 of 231   PageID 2932

86

1   indebtedness that was listed, identified with specificity, and

2   disappeared as a result of the judgment, as a result of the

3   judgment in the underlying case.  Here, we're talking about

4   any potential claim that might arise in the future.  As of the

5   July order's issuance, it didn't apply on its -- either it

6   didn't apply to future claims that had not yet accrued or else

7   in violation of *Applewood Chair*, it was releasing claims

8   without identifying them.

9       Who does Seery owe a fiduciary duty to?  Is it, as

10  Debtor's counsel says, only to the funds and not to the

11  investors, or does he also owe those duties to the investors

12  as well?  Your Honor, that is going to be a hotly-contested

13  issue in this litigation, and it involves -- it requires

14  consideration of the Advisers Act and the multitude of

15  accompanying regulations.  To just state that his fiduciary

16  duties are limited in a way that couldn't affect anyone that

17  is -- whose claims are precluded by the July order is both

18  wrong on the law and is invoking something that will be a

19  hotly-contested issue that falls under 157(d), where, again,

20  this Court doesn't have the jurisdiction to decide that, other

21  than in a report and recommendation.

22      The order is legally infirm because it's issued without

23  jurisdiction for doing that as well.

24      Finally, Your Honor, I think (garbled) wrong direction

25  with a statement that suggests that Mr. Seery is an agent of

87

1    the independent directors under the January order.  He is, in

2    fact, not an independent agent -- not an agent of any of the

3    independent directors, but, at most, of the company that is

4    controlled by the board, not -- not of individual directors

5    who could confer on him -- who could confer on him any

6    immunity that they have obtained from the January order just

7    by having appointed him.

8        The proposed order from the other side failed to address

9    either the ambiguity in the order or its attempt to exculpate

10   Mr. Seery from the liability, including liability for which

11   there is a jury trial right, and it is not a fix to the

12   problem for that reason.

13       In order to make the order enforceable and to fix its

14   infirmities, the Court would have to do significantly more.

15   It would have to both apply the caveat from the final

16   confirmation plan order, rope that caveat to the first part of

17   the relevant paragraph, as well as the second part, and it

18   would have to provide directive clarity to be enforceable

19   rather than too vague.

20       Your Honor, I think that's all I have.

21           THE COURT:  Okay.  Just FYI, my law clerk pulled the

22   *Smyth* case from 21 years ago from the Fifth Circuit.  And

23   while it more prominently deals with the issue of whether

24   trustees -- in this case, it was a Chapter 11 trustee -- could

25   be subjected to personal liability for damages to the

88

1  bankruptcy estate --

2      (Echoing.)

3          THE COURT:  Someone, put your phone on mute.  I don't

4  know who that is.

5      It dealt with, you know, the standard of liability, that

6  the trustee could not be sued for matters not to the level of

7  gross negligence.

8      But it does say, in the very last paragraph, to my shock

9  and amazement, that -- it's just one sentence in a 10-page

10  opinion -- orders appointing counsel -- and it was talking

11  about the trustee's lawyer he hired to handle appeals to the

12  Fifth Circuit -- orders appointing counsel under the

13  Bankruptcy Code are interlocutory and are not generally

14  considered final and appealable.  And it cites one case from

15  1993, the Middle District of Florida.  Live and learn.  There

16  is one sentence in that opinion that says that.  But I don't

17  know that it's hugely impactful here, but I did not know about

18  that opinion and I'm rather surprised.

19      All right.  You were going to walk me through evidence,

20  you said?

21          MR. BRIDGES:  Well, do I -- Your Honor, do you want

22  to do that first before I submit --

23          THE COURT:  Yes, please.

24          MR. BRIDGES:  -- my rebuttal argument?

25          THE COURT:  Please.

App. 00722
002776

89

1           MR. BRIDGES:  Okay.

2           THE COURT:  Uh-huh.

3           MR. BRIDGES:  Your Honor, we would submit and offer

4    Exhibits 1 through 44, with the exception of those that have

5    been withdrawn, that are 2, 13 --

6           THE COURT:  Okay.  Slow down.  Slow down.  I need to

7    get to the docket entry number we're talking about.  Are we

8    talking -- are your -- the Debtor's exhibits are at 2412.  But

9    Nate, I misplaced my notes.  Where are Charitable DAF and

10   Holdco's?

11          THE CLERK:  I have 2411.

12          THE COURT:  2411?  Is that it?

13          MR. BRIDGES:  2420, Your Honor.

14          THE COURT:  2420?  Okay.  Give me a minute.  (Pause.)

15   2420?

16          MR. BRIDGES:  Yes, Your Honor.

17          THE COURT:  Okay, I'm there.  And it's which

18   exhibits?

19          MR. BRIDGES:  It's Exhibits 1 through 44, Your

20   Honor, with four exceptions.  We have agreed to withdraw

21   Exhibit 2, 13, 14, and 29.

22          THE COURT:  All right.

23          MR. BRIDGES:  Also, Your Honor, we'd like to submit

24   Debtor's Exhibit 1, which is under Exhibit 49 on our list,

25   would be anything offered by the other side.  But we'd like

90

 1    to make sure that Debtor's Exhibit 1 gets in the record as

 2    well.

 3            THE COURT:  Let me back up.  When I pull up the

 4    docket entry you just told me, I have Exhibits 44, 45, and 46

 5    only.  Am I misreading this?

 6            MR. BRIDGES:  I have a chart showing Exhibits 1

 7    through 49 titled Docket 2420 filed 6/7/21.

 8            THE COURT:  Okay.  The docket entry number you told

 9    me, 2420, it only has three exhibits:  44, 45, and 46.  So,

10    first off, I understand -- are you offering 45 and 46 or not?

11            MR. BRIDGES:  No, Your Honor.

12            THE COURT:  Okay.  So you said you were offering 1

13    through 44 minus certain ones.  44 is here.

14            MR. BRIDGES:  Yes.

15            THE COURT:  But I've got to go back to a different

16    docket number.

17            THE CLERK:  It's actually 2411.

18            THE COURT:  It's at 2411.  That has all the others?

19            THE CLERK:  Yes.

20            THE COURT:  Okay.

21        So, Mr. Pomerantz, do you have any objection to Exhibits

22    1 through 44, which he's excepted out 2, 13, 14, and 29, and

23    then he's added Debtor's Exhibit 1?  Any objection?

24            MR. POMERANTZ:  I don't believe so.  I just would

25    confirm with John Morris, who has been focused on the

91

 1 | exhibits, just to confirm.

 2 |       THE COURT:  Mr. Morris?

 3 |       MR. MORRIS:  No objection, Your Honor.  It's fine.

 4 |       THE COURT:  Okay.  They're admitted.

 5 |    (Movants' Exhibits 1, 3 through 12, 15 through 28, and 30

 6 | through 44 are received into evidence.  Debtor's Exhibit 1 is

 7 | received into evidence.)

 8 |       THE COURT:  So, any --

 9 |       MR. BRIDGES:  Thank you, Your Honor.

10 |       THE COURT:  Anything you wanted to call to my

11 | attention about these?

12 |       MR. BRIDGES:  Your Honor, the things that we

13 | mentioned in the argument, for sure, but especially that the

14 | word "trustee" is not used in the January hearing's

15 | transcript, nor is it under discussion in that transcript

16 | that it would be a trustee-like role being played by the

17 | Strand directors, as well as the transcript of the July

18 | hearing on the order at issue here, Your Honor, where you are

19 | asked to defer both in that transcript and in the motion, the

20 | motion that was at issue in that hearing, you are asked to

21 | defer to the business judgment of the company.

22 |    And finally, Your Honor, I'd ask you to look at the

23 | allegations in the District Court complaint.

24 |       THE COURT:  All right.

25 |    Mr. Pomerantz or Morris, let's see what exhibits you're

92

1    wanting the Court to consider.  Your exhibits, it looks like,

2    are at Docket Entry 2412.

3              MR. MORRIS:  As subsequently amended at 2423.

4              THE COURT:  Oh.  All right.  So which ones are you

5    offering?

6              MR. MORRIS:  We're offering all of the exhibits on

7    2423, which is 1 through 17.

8         (Echoing.)

9              THE COURT:  Whoops.  We got some distortion there.

10   Say again?

11             MR. MORRIS:  Yeah.  All of the exhibits that are on

12   2423, which are Exhibits 1 through 17.  But I want to make

13   sure that, as I did earlier, that that has the exhibits that

14   we're relying on.  Does that --

15        (Pause.)

16             THE COURT:  Okay.  Let me make sure I know what's

17   going on here.  You're double-checking your exhibits, Mr.

18   Morris?

19             MR. MORRIS:  Yes, Your Honor.

20             THE COURT:  Okay.

21        (Pause.)

22             MR. MORRIS:  Your Honor, we start with Docket No.

23   2419, --

24             THE COURT:  Okay.

25             MR. MORRIS:  -- which was the amended exhibit list.

93

 1   And that actually had Exhibits 1 through 17.  And then that

 2   was amended at Docket 2423.  So, the exhibits on both of

 3   those lists.

 4          THE COURT:  Well, they're one and the same, it looks

 5   like, right?

 6          MR. MORRIS:  Yes.

 7          THE COURT:  Okay.  So you're offering those?

 8          MR. MORRIS:  I think -- yeah.

 9          THE COURT:  Any objection?

10          MR. BRIDGES:  No objection.

11          THE COURT:  All right.  They're admitted.

12      (Debtor's Exhibits 1 through 17 are received into

13   evidence.)

14          MR. POMERANTZ:  Your Honor, if I may take a few

15   moments to respond to Mr. Bridges' reply?

16          THE COURT:  All right.  Is he still within his hour

17   and a half?

18          THE CLERK:  At an hour and one minute.

19          THE COURT:  Okay.  All right.  You have a little

20   time left, so go ahead.

21          MR. POMERANTZ:  Thank you, Your Honor.

22      So look, I -- it sort of was really not fair to us.  Mr.

23   Bridges was really making things up on the fly.  He was

24   changing the theories of his case and responding to Your

25   Honor.  But I'm going to do my best to respond to the

94

1   arguments made, many of which I sort of anticipated.

2       I'll first start with the issue that Your Honor raised,

3   which was whether this is under Rule 60 or not.  Mr. Bridges

4   identified a couple of cases, said that the order was

5   interlocutory, said that somehow the orders have anything to

6   do with a plan confirmation order.  They do not.  Your Honor

7   didn't hear that argument at the plan confirmation.  The

8   January 9th and July 16th orders are old and cold.  There's

9   an exculpation provision in the plan.  There's a gatekeeper

10  in the plan.  The provisions do not overlap entirely.  The

11  gatekeeper applies prospectively.  The exculpation provision

12  includes additional parties.

13      So the arguments that basically the plan had anything to

14  do -- and the fact that the plan is not a final order -- has

15  anything to do with the January 9th and July 16th orders is

16  just wrong.  It's just wrong.

17      More fundamentally, Your Honor, as Your Honor pointed

18  out, the *Smyth* case is a professional employment order.  And

19  ironically, if you abide by the *Smyth* case, that order is

20  never appealable because it's interlocutory.

21      But more fundamentally, Your Honor, that's dealing with

22  327 professionals.  And again, there's not much analysis in

23  the *Smyth* case, but we're not dealing with a 327

24  professional.  We're dealing with orders that were approved

25  under 363.

95

1       So the premise of the argument that Rule 60(b) -- 60

2   doesn't apply and they have other arguments just doesn't make

3   any sense.

4       Okay.  So now that gets us to Rule 60.  And Your Honor,

5   Your Honor hit the nail on the head.  They haven't presented

6   any evidence.  Allegations in a complaint aren't evidence.

7   They can't stand up there and say surprise evidence.  They

8   had the opportunity -- and this hearing's been continued a

9   few weeks -- they had the opportunity to bring it up, and

10  it's -- they had the opportunity to claim that there was

11  surprise, but they just didn't.  Okay?

12      So to go on to the Rule 60 arguments.  Surprise.

13  Surprise and reasonable delay are really -- go hand in hand

14  with Mr. Bridges' argument.  He says, well, we didn't find

15  out that -- months after the order was entered that he

16  violated a duty to us, so we are surprised by that, and it's

17  a reasonable time.  Well, Your Honor, the order provided for

18  an exculpation.  CLO Holdco and DAF knew that it applied to

19  an exculpation.  They were bound.  They knew based upon that

20  order that they would not be able to bring claims for normal

21  negligence.  There is no surprise.

22      If you take Mr. Bridges' argument to its conclusion, he

23  could wait until the end of the statute of limitations after

24  an order and have come in four years from now and say, Your

25  Honor, we just found out facts so we should go back four

96

 1  years before.  That, Your Honor, that's not how the surprise

 2  works.  That's not how the reasonable time works.

 3      Mr. Bridges did not contest that they're bound by res

 4  judicata.  He did not contest that the exculpation itself was

 5  clear and unambiguous.  Of course he argued Your Honor

 6  couldn't enter an order saying there was exculpation, again,

 7  with no authority.  And he seemed surprised, as I suspect he

 8  should, since he's not a bankruptcy lawyer, that retention

 9  orders, whether it's investment bankers, financial advisors,

10  include exculpations all the time.  So there's no grounds

11  under surprise.

12      There's no grounds -- the motions are late under 60(c).

13      And they're not void.  I went through a painstaking

14  analysis, Your Honor, and I described in detail what the

15  *Espinosa* case held, and the exceptional circumstances which

16  Mr. Bridges tried to get away from as much as he could.

17  Maybe he can try to get away from language in a district

18  Court opinion, in a Bankruptcy Court opinion, in a Circuit

19  Court opinion.  You can't get away from language in a Supreme

20  Court opinion.  The Supreme Court opinion said exceptional

21  circumstances, where there was arguably no basis for

22  jurisdiction for what the Court did.  They have not even come

23  close to convincing Your Honor that there was absolutely no

24  basis.

25      Now, they disagree.  We granted, we think it's a good-

97

 1  faith disagreement, but they haven't come close to

 2  establishing the *Espinosa* standard, so their motion under 60

 3  does not -- it fails.

 4       And I don't think -- look, these are good lawyers.  Mr.

 5  Bridges and Mr. Sbaiti are good lawyers.  They didn't just

 6  inadvertently not mention Rule 60.  They never mentioned it

 7  because they knew they had no claim under Rule 60.

 8       Your Honor, Mr. Bridges has made comments about the

 9  fiduciary duty of Mr. Seery, about what the Investor's Act

10  provides.  He's just wrong on the law.  Now, Your Honor

11  doesn't have to decide that.  Whichever court adjudicates the

12  DAF lawsuit will have to decide it.  But there is no private

13  cause of action for damages.  There are no fiduciary duties to

14  the investors.

15       And what Mr. Bridges doesn't even mention, in that the

16  investment agreement that's so prominent in his complaint,

17  they waived claims other than willful misconduct and gross

18  negligence against Highland.  They waived those claims.  So

19  for Mr. Bridges to come in here and argue that there's some

20  surprise, when he hasn't even bothered to look at the document

21  that's underlying the contractual relationship between the DAF

22  and the Debtor, is -- you know, I'll just say it's

23  inadvertence.

24       Your Honor, Mr. Bridges tried to argue that Mr. Seery is

25  not a beneficiary of the January 9th order.  He's not an

App. 00031
002785

98

1    agent.  Well, again, Your Honor, Mr. Bridges wasn't there.

2    Your Honor and we were.  On January 9th, an independent board

3    was picked, and at the time Mr. Dondero ceased to become the

4    CEO.  So you have three gentlemen coming in -- Mr. Seery, Mr.

5    Dubel, and Mr. Nelms -- coming in to run Highland, in a very

6    chaotic time.  They had to act through their agents.  There

7    was no expectation that this board was going to actually run

8    the day-to-day operations of the Debtor.  Of course not.  They

9    needed someone to run.  And they picked Mr. Seery.  And the

10   argument that well, he's an agent of the company, he's not an

11   agent of the board, that just doesn't make sense.  The

12   independent board had to act.  The directors had to act.  And

13   the directors, how do they deal with that?  They acted through

14   Mr. Seery.  So he is most certainly governed by the January

15   9th order.

16       Your Honor, I want to talk about the jury trial right.

17   Mr. Bridges said that Paragraph 14 is an arbitration clause

18   and not a jury trial waiver.  Now, again, I will forgive Mr.

19   Bridges because I assume he didn't read the provision, okay,

20   and he -- somebody told him that, and that person just got it

21   wrong.  But what I would like to do is read for Your Honor

22   Paragraph 14(f).  It doesn't have to do with arbitration.

23   It's a waiver of jury trial.  14(f), Jurisdiction Venue,

24   Waiver of Jury Trial.  The parties hereby agree that any

25   action, claim, litigation, or proceeding of any kind

99

1   whatsoever against any other party in any way arising from or

2   relating to this agreement and all contemplated transactions,

3   including claims sounding in contract, equity, tort, fraud,

4   statute defined as a dispute shall be submitted exclusively to

5   the U.S. District Court for the Northern District of Texas, or

6   if such court does not have subject matter jurisdiction, the

7   courts of the State of Texas, City of Dallas County, and any

8   appellate court thereof, defined as the enforcement court.

9   Each party ethically and unconditionally submits to the

10  exclusive personal and subject matter jurisdiction of the

11  enforcement court for any dispute and agrees to bring any

12  dispute only in the enforcement court.  Each party further

13  agrees it shall not commence any dispute in any forum,

14  including administrative, arbitration, or litigation, other

15  than the enforcement court.  Each party agrees that a final

16  judgment in any such action, litigation, or proceeding is

17  conclusive and may be enforced through other jurisdictions by

18  suit on the judgment or in any manner provided by law.

19       And then the kick, Your Honor, all caps, as jury trial

20  waiver always are:  Each party irrevocably and unconditionally

21  waives to the fullest extent permitted by law any right it may

22  have to a trial by jury in any legal action, proceeding, cause

23  of action, or counterclaim arising out of or relating to this

24  agreement, including any exhibits, schedules, and appendices

25  attached to this agreement or the transactions contemplated

100

1   hereby.  Each party certifies and acknowledges that no

2   representative of the owner of the other party has represented

3   expressly or otherwise that the other party won't seek to

4   enforce the foregoing waiver in the event of a legal action.

5   It has considered the implications of this waiver, it makes

6   this waiver knowingly and voluntarily, and it has been induced

7   to enter into this agreement by, among other things, the

8   mutual waivers and certifications in this section.

9       Your Honor, I will forgive Mr. Bridges.  I assume he just

10  did not read that.  But to represent to the Court that that

11  language does not contain a jury trial waiver is -- is just

12  wrong.

13          THE COURT:  All right.  I'm going to stop right

14  there.  And you were reading from the Second Amended and

15  Restated Shared Services Agreement between Highland --

16          MR. POMERANTZ:  Not shared services.  I'm reading

17  from the Second Amended and Restated Investment Advisory

18  Agreement --

19          THE COURT:  Investment --

20          MR. POMERANTZ:  -- between the Charitable DAF, the

21  Charitable DAF GP, and Highland Capital Management.  The

22  agreement whereby the Debtor was the investment advisor to the

23  Charitable DAF Fund and the Charitable DAF GP.

24          THE COURT:  All right.  Well, Mr. Bridges, I'm going

25  to bounce quickly back to you.  This is your chance to defend

101

1   your honor.

2          MR. BRIDGES:  Yeah, we're -- we're looking at a

3   different agreement, where -- where literally the words that

4   were read to you are not in the agreement in front of us and

5   it is news to me.  So, Your Honor, this is a problem --

6          THE COURT:  What is the agreement you're looking at?

7          MR. BRIDGES:  It is the Amended -- I assume that

8   means First Amended -- Restated Advisory Agreement.

9          MR. POMERANTZ:  Your Honor, we are happy to file this

10  agreement with the Court so the Court has the benefit of it in

11  connection with Your Honor's ruling.

12         THE COURT:  Okay.  I would like you to do that.  Uh-

13  huh.

14         MR. BRIDGES:  I'd like -- I'd like to request -- I'll

15  withdraw that.

16         THE COURT:  Okay.  Go on, Mr. Pomerantz.

17         MR. POMERANTZ:  Mr. Bridges, if you could put us on

18  mute.  If you could put us on mute, Mr. Bridges, so I don't

19  hear your feedback.  Thank you.

20      Mr. Bridges also complains about the language "to the

21  extent permissible by law."  As Your Honor knows and as has

22  been my practice over 30 years, that language is probably in

23  every plan where there's a retention of jurisdiction:  to the

24  extent permissible by law.  And Mr. Bridges says that this

25  will create ambiguity in the order that couldn't be enforced.

102

1    There's no basis for that.  Our including the language "to the

2    extent permissible by law" in the orders, as we are prepared

3    to do, is consistent with the plan confirmation order where we

4    addressed that issue.  And we addressed that issue because we

5    didn't want to put Your Honor in a position where thereby Your

6    Honor may have an action before Your Honor that passes the

7    colorability gate that Your Honor may not be able to assert

8    jurisdiction.  And since jurisdiction can't be waived in that

9    regard, we will agree to amend that.

10       There's nothing ambiguous about that, and there's no

11   reason, though, that clause has to modify the Court's ability

12   to act as a gatekeeper, because, as we've argued *ad nauseam*,

13   gatekeeper provisions where the Court has that ability is not

14   only part of general bankruptcy jurisprudence but also part of

15   the Bankruptcy Code.

16       Counsel says that *Barton* doesn't apply because the

17   business judgment of Your Honor was used in retaining Mr.

18   Seery as opposed to in some other capacity.  There's no basis

19   for that, Your Honor.  A court-appointed -- a court-approved

20   CEO, CRO, professional, they are all entitled to protection

21   under the *Barton* act.  And the argument -- and again, this is

22   separate and apart from whether he's entitled to protection

23   under the January 9th order. But the argument that because it

24   was the business judgment -- again, business judgment in doing

25   something that Your Honor expressly contemplated under the

103

1   January 9th corporate governance order -- there's just no law

2   to support that.  And I guess he's trying to get around the

3   plethora of cases that deal with the situation where *Barton*

4   has been extended.

5        Your Honor, Mr. Bridges, again, in arguing that we're

6   ships passing in the night on *Shoaf* and *Applewood* and

7   *Espinosa*, no, we're not ships passing in the night.  We have a

8   difference in agreement on what these cases stand for.  These

9   cases stand for the proposition that a clear and unambiguous

10  provision, plain and simple, if it's clear and unambiguous, it

11  will be given res judicata effect.  The release in *Shoaf*,

12  clear and unambiguous.  The release in *Applewood*, not.  The

13  issue here is the exculpation language.  That was clear and

14  unambiguous.  It applied prospectively.  The argument makes no

15  sense that we didn't identify -- we didn't identify claims

16  that might arise in the future, so therefore an exculpation

17  clause doesn't apply?  That doesn't make any sense.

18       Your Honor clearly exculpated parties.  Mr. Dondero knew

19  it.  CLO Holdco knew it.  The DAF knew it.  So the issue Your

20  Honor has to decide is whether that exculpation was a clear

21  and unambiguous provision such that it should be entitled to

22  res judicata effect.  And we submit that the answer is

23  unequivocally yes.

24       That's all I have, Your Honor.

25           THE COURT:  All right.  Well, --

APP 002737
002791

104

1              MR. MORRIS:  Your Honor?  I apologize.

2              THE COURT:  Okay.

3              MR. MORRIS:  This is John Morris.

4              THE COURT:  Yes?

5              MR. MORRIS:  I just want to, with respect to the

6    exhibits, I know there was no objection, but I had cited to

7    Docket Nos. 2419 and 2423.  The original exhibit list is at

8    Docket No. 2412.  So it's the three of those lists together.

9    2412, as amended by 2419, as amended by 2423.  Thank you very

10   much.

11             THE COURT:  All right.  Thank you.  All right.

12             MR. BRIDGES:  Your Honor, I still have no objection

13   to that, but may I have the last word on my motion?

14             THE COURT:  Is there time left?

15             THE CLERK:  Yes.

16             THE COURT:  Okay.  Go ahead.

17             MR. BRIDGES:  I just need a minute, Your Honor.  They

18   agreed to change the order.  They proposed it to us.  They

19   proposed it in a proposed order to you.  They can't also say

20   that it cannot be changed.

21        Secondly, Your Honor, in *Milic v. McCarthy*, 469 F.Supp.3d

22   580, the Eastern District of Virginia points out that the

23   Fourth Circuit treats appointment of estate professionals as

24   interlocutory orders as well.

25        That's all.  Thank you, Your Honor.

105

 1          THE COURT:  All right.  Here's what we're going to

 2    do.  We've been going a very long time.  I'm going to take a

 3    break to look through these exhibits, see if there's anything

 4    in there that I haven't looked at before and that might affect

 5    the decision here.  So we will come back at 3:00 o'clock

 6    Central Time -- it's 2:22 right now -- and I will give you my

 7    bench ruling on this.  All right.

 8        So, Mike, they can all stay on the line, right?

 9        Okay.  You can stay on, and we'll be back at 3:00 o'clock.

10          THE CLERK:  All rise.

11    (A recess ensued from 2:22 p.m. to 3:04 p.m.)

12          THE CLERK:  All rise.

13          THE COURT:  All right.  Please be seated.  All right.

14    Everyone presented and accounted for.  We're going back on the

15    record.

16          MR. POMERANTZ:  Your Honor, before you start, this is

17    Jeff Pomerantz.  We had sent to your clerk, and hopefully it

18    got to you, a copy of the Second Amended and Restated

19    Investment Advisory Agreement.  We also copied Mr. Sbaiti with

20    it as well.  And we would also like to move that into

21    evidence, just so that it's part of the Court's record.

22          THE COURT:  All right.

23          MR. BRIDGES:  We would object to that, Your Honor.

24    We haven't had an opportunity to even verify its authenticity

25    yet.

002793

106

 1            THE COURT:  All right.  Well, I'll tell you what.

 2    I'm going to address this in my ruling.  So it's not going to

 3    be part of the record for this decision, and yet -- well, I'll

 4    get to it.

 5       All right.  So we're back on the record in Case Number 19-

 6    34054, Highland Capital.  The Court has deliberated, after

 7    hearing a lot of argument and allowing in a lot of documentary

 8    evidence, and the Court concludes that the motion of CLO

 9    Holdco, Ltd. and The Charitable DAF to modify the retention

10    order of James Seery, which was entered almost a year ago, on

11    July 16th, 2020, should be denied.

12       This is the Court's oral bench ruling, but the Court

13    reserves discretion to supplement or amend in a more fulsome

14    written order what I'm going to announce right now, pursuant

15    to Rule 7052.

16       First, what is the Movants' authority to request the

17    modification of a bankruptcy court order that has been in

18    place for so many months, which was issued after reasonable

19    notice to the Movants, and after a hearing, which was not

20    objected to by the Movants, or appealed, when the Movants were

21    represented by sophisticated counsel, I might add, and which

22    order was relied upon by parties in this case, most notably

23    Mr. Seery and the Debtor, and in fact was entered after

24    significant negotiations involving a sophisticated court-

25    appointed Unsecured Creditors' Committee with sophisticated

Case 22-03052-sgj   Doc 32   Filed 07/26/22   Entered 07/26/22 14:17:26   Desc Main
Case 3:22-cv-02280-S   Document 34-1   Filed 02/05/23   Page 111 of 231   PageID 2953
Document   Page 745 of 865

107

 1   professionals and sophisticated members, and after negotiation

 2   with an independent board of directors, court-appointed, one

 3   of whose members is a retired bankruptcy judge?  What is the

 4   Movants' authority?

 5      Movants fumbled a little on that question, in that the

 6   exact authority wasn't set forth in the motion.  But Movants'

 7   primary argument is that Movants think the Seery retention

 8   order was an interlocutory order and that the Court simply has

 9   the inherent authority to modify it as an interlocutory order.

10      The Court disagrees with this analysis.  I do not think

11   the Fifth Circuit's *Smyth* case dictates that the Seery

12   retention order is still interlocutory.  The Seery retention

13   order was an order entered pursuant to Section 363 of the

14   Bankruptcy Code, not a Section 327 professionals to a debtor-

15   in-possession, professionals to a trustee employment order

16   such as the one involved in the *Smyth* case.

17      But even if the Seery retention order is interlocutory --

18   the Court feels strongly that it's not, but even if it is --

19   the Court believes it would be an abuse of this Court's

20   inherent discretion or authority to modify that order almost a

21   year after the fact and under the circumstances of this case.

22      Now, assuming Rule 60(b) applies to the Movants' request,

23   the Court determines that the Movants have not made their

24   motion anywhere close to within a reasonable time, as Rule

25   60(c) requires, nor do I think the Movants have demonstrated

108

1   any exceptional circumstances to declare the order or any of

2   its provisions void.  The Movants have put on no evidence that

3   constitutes surprise or constitutes newly-disputed evidence.

4   So why are there no exceptional circumstances here such that

5   the Court might find, you know, a void order or void

6   provisions of an order?

7       First, this Court concludes that there's no credible

8   argument that the Court overreached its jurisdiction with the

9   gatekeeping provisions in the order.  Gatekeeping provisions

10  are not only very common in the bankruptcy world -- in

11  retention orders and in plan confirmation orders, for example

12  -- but they are wholly consistent with the *Barton* case, the

13  U.S. Supreme Court's *Barton's* case, and its progeny that has

14  become known collectively as the *Barton* doctrine.  Gatekeeping

15  provisions are wholly consistent with 28 U.S.C. Section

16  959(a)'s complete language.

17      The Fifth Circuit has blessed gatekeeping provisions in

18  all sorts of contexts.  It has blessed them in the situation

19  of when *Stern* claims are involved in the *Villegas* case.  It

20  even blessed Bankruptcy Courts' gatekeeping functions a long

21  time ago, in 1988, in a case that I don't think anyone

22  mentioned in the briefing, but as I've said, my brain

23  sometimes goes down trails, and I'm thinking of the *Louisiana*

24  *World Exposition* case in 1988, when the Fifth Circuit blessed

25  there a procedure where an unsecured creditors' committee can

Case 22-03052-sgj   Doc 32   Filed 07/26/22   Entered 07/26/22 14:17:26   Desc Main
Case 3:22-cv-02280-S   Document 34   Filed 07/07/23   Page 113 of 231   PageID 2955

109

1   bring causes of action against persons, such as officers and

2   directors or other third parties, if they first come to the

3   Bankruptcy Court and show a colorable claim.  They have to

4   come to the Bankruptcy Court, show they have a colorable claim

5   and they're the ones that should be able to pursue them.  Not

6   exactly on point, but it's just one of many cases that one

7   could cite that certainly approve gatekeeper functions of

8   various sorts of Bankruptcy Courts.

9        It doesn't matter which court might ultimately adjudicate

10  the claims; the Bankruptcy Court can be the gatekeeper.

11       And the Court agrees with the many cases cited from

12  outside this circuit, such as the case in Alabama, in the

13  Eleventh Circuit, and there was another circuit-level case, at

14  least one other, that have held that the *Barton* doctrine

15  should be extended to other types of case fiduciaries, such as

16  debtor-in-possession management, among others.

17       Finally, as I pointed out in my confirmation ruling in

18  this case, gatekeeping provisions are commonplace for all

19  types of courts, not just Bankruptcy Courts, when vexatious

20  litigants are involved.  I have commented before that we seem

21  to have vexatious litigation behavior with regard to Mr.

22  Dondero and his many controlled entities.

23       Now, as far as the Movants' argument that there was not

24  just improper gatekeeping provisions but actually an improper

25  discharge in the Seery retention order of negligence claims or

Case 22-03052-sgj   Doc 32   Filed 07/26/22   Entered 07/26/22 14:17:26   Desc Main
Case 3:22-cv-02280-S   Document 3-1   Filed 10/13/22   Page 114 of 231   PageID 2956

110

1   other claims that don't rise to the level of gross negligence

2   or willful misconduct, again, I reiterate there's nothing

3   exceptional in the bankruptcy world about exculpation

4   provisions like this.  They absolutely are a term of

5   employment very often.  Just like compensation, they're

6   frequently requested, negotiated, and approved.  They are

7   normal in the corporate governance world, generally.  They are

8   normal in corporate contracts between sophisticated parties.

9   And most importantly of all, even if this Court overreached

10  with the exculpation provisions in the Seery retention order,

11  even if it did, res judicata bars the attack of these

12  provisions at this late stage, under cases such as *Shoaf,*

13  *Republic Supply v. Shoaf* from the Fifth Circuit, the *Espinosa*

14  case from the U.S. Supreme Court, and even *Applewood*, since

15  the Court finds the language in this order was clear,

16  specific, and unambiguous with regard to the gatekeeping

17  provisions and the exculpation provisions.

18      Last, and this is the part where I said I'm going to get

19  to this agreement that has been submitted, the Second Amended

20  and Restated Investment Advisor Agreement or whatever the

21  title is.  I am more than a little disturbed that so much of

22  the theme of the Movants' pleadings and arguments, and I think

23  even representations to the District Court, have been they

24  have these sacred jury trial rights, these inviolate jury

25  trial rights, and an Article I Court like this Court should

111

1    have no business through a gatekeeping provision impinging on

2    the possible pursuit of an action where there's a jury trial

3    right.

4        I was surprised initially when I thought about this.  I

5    thought, wow, I've seen so many agreements over the months.  I

6    can't say every one of them waived the jury trial right, but I

7    just remembered seeing that a lot, and seeing arbitration

8    provisions, and so that's why I asked.  It just was lingering

9    in my brain.  So I'm going to look at what is submitted.  I'm

10   not relying on that as part of my ruling.  As you just heard,

11   I had a multi-part ruling, and whether there's a jury trial

12   right or not is irrelevant to how I'm choosing to rule on this

13   motion.  But I do want to see the agreement, and then I want

14   Movants within 10 days to respond with a post-hearing trial

15   brief either saying you agree that this is the controlling

16   document or you don't agree and explain the oversight, okay?

17   Because it feels like a gross omission here to have such a

18   strong theme in your argument -- we have a jury trial right,

19   we have a jury trial right, by God, the gatekeeping

20   provisions, among other things, impinge on our sacred pursuit

21   of our jury trial right -- and then maybe it was very

22   conspicuous in the controlling agreement that you'd waived

23   that, the Movants had waived that.

24       So, anyway, I'm requiring some post-hearing briefing, if

25   you will, on whether omissions, misrepresentations were made

Case 22-03052-sgj   Doc 32   Filed 07/26/22   Entered 07/26/22 14:17:26   Desc Main
Case 3:22-cv-02280-S   Document 3-1   Filed 12/30/22   Page 116 of 231   PageID 2958

112

 1 | to the Court.

 2 |     Anyway, so I reserve the right to supplement or amend this

 3 | ruling with a more fulsome written order.  I am asking Mr.

 4 | Pomerantz to upload a form of order that is consistent with

 5 | this ruling, and --

 6 |         MR. POMERANTZ:  Your Honor, we will do so.  I do have

 7 | one thing to bring to the Court's attention, unrelated to the

 8 | motion, before Your Honor leaves the bench.

 9 |         THE COURT:  All right.  So just a couple of follow-up

10 | things.  Have you -- I'm not clear I heard what you said about

11 | this agreement.  Did you email it to my courtroom deputy or

12 | did you file it on the docket?

13 |         MR. POMERANTZ:  We emailed it to your courtroom

14 | deputy.  We're happy to file it on the docket.  And we also

15 | provided a copy to Mr. Sbaiti.

16 |     I would note for the Court that it's signed both by The

17 | Charitable DAFs by Grant Scott, just for what it's worth.

18 |         THE COURT:  Okay.  All right.  Well, I'm trying to

19 | think what I want -- I do want you to file it on the docket,

20 | and I'm trying to think of what you label it.  Just call it

21 | Post-Hearing Submission or something and link it to the motion

22 | that we adjudicated here today.  And then, again, you've got

23 | 10 days, Mr. Bridges, to say whatever you want to say about

24 | that agreement.

25 |     I guess the last thing I wanted to say is we sure devoted

Case 22-03052-sgj   Doc 32   Filed 07/26/22   Entered 07/26/22 14:17:26   Desc Main
Case 3:22-cv-02280-S   Document 3-4   Filed 07/31/23   Page 117 of 231   PageID 2959

113

 1   a lot of time to this motion today.  We have -- this is a

 2   recurring pattern, I guess you can say.  We have a lot of

 3   things that we devote a lot of time to in this case that I get

 4   surprised, but it is what it is.  You file a motion.  I'm

 5   going to give it all the attention Movants and Respondents

 6   think it warrants.  I'm going to develop a full record,

 7   because, you know, there's a recurring pattern of appeals

 8   right now, 11 or 12 appeals, I think, not to mention motions

 9   to withdraw the reference.  If we're going to have higher

10   courts involved in the administration of this case, I'm going

11   to make a very thorough record so nobody is confused about

12   what we did, what I considered, what my reasoning was.

13        So I kind of think it's unfortunate for us to have to

14   spend case resources and so much time and fees on things like

15   this, but I'm going to make sure a Court of Appeals is not

16   ever confused about what happened and what we did.  So that's

17   just the way it's going to be.  And I feel like we have no

18   choice, given, again, the pattern of appeals.

19        All right.  So, with that, Mr. Pomerantz, you had one

20   other case matter, you said?

21             MR. POMERANTZ:  Yes.  But before I get to that, Your

22   Honor, I assume that, in response to the Movants' submission

23   on the agreement, that we would have right at four or seven

24   days to respond if we deem it's appropriate?

25             THE COURT:  I think that's reasonable.  That's

APP 002801
002801

114

 1 | reasonable.

 2 |         MR. POMERANTZ:  Okay.  Thank you, Your Honor.

 3 |         THE COURT:  So let me think of how I want to do this.

 4 | I'll just do a short scheduling order of sorts that just, it

 5 | says in one or two paragraphs, at the hearing on this motion,

 6 | the Court raised questions about the jury trial rights and the

 7 | Debtor has now submitted the controlling agreements, I'm

 8 | giving the Movants 10 days to respond to whether this is

 9 | indeed a controlling agreement, and why, if it is, the Movants

10 | have heretofore taken the position they have jury trial

11 | rights.  And then I will give you seven days thereafter to

12 | reply, and then the Court will set a further status conference

13 | if it determines it's necessary.  Okay?

14 |     So, Nate, we'll do a short little order to that effect.

15 | Okay?

16 |         MR. POMERANTZ:  Thank you, Your Honor.

17 |     I -- again, before I raise the other issue, I want to pick

18 | up on a comment Your Honor just made towards the end.  I know

19 | the Court has been frustrated with the time and effort we've

20 | been spending.  The Debtor and the creditors have been

21 | extremely frustrated, because in addition to the time and

22 | effort everyone's spending, we're spending millions of

23 | dollars, millions of dollars on litigation that --

24 |         THE COURT:  It's one of the reasons you needed an

25 | exit loan, right?

115

 1            MR. POMERANTZ:  Right.  No, exactly.  That's

 2   frivolous, that we think is made in bad faith.

 3       And Your Honor, and everyone else who's hearing this on

 4   behalf of Mr. Dondero, should understand we're looking into

 5   what appropriate authority Your Honor would have to shift some

 6   of the costs.  Your Honor did that in the contempt motion.

 7   Your Honor can surely do that in connection with the notes

 8   litigation.  But all this other stuff that is requiring us to

 9   spend hundreds and hundreds of hours and spend millions of

10   dollars, we are clearly looking into whether it would be

11   appropriate and what authority there is.  I just wanted to let

12   Your Honor know that.

13       And in connection with that, the last point, Your Honor, I

14   can't actually even believe I'm saying this, but there was

15   another lawsuit filed -- we just found out in the break -- on

16   Wednesday night by the Sbaiti firm on behalf of Dugaboy in the

17   District Court.

18       Now, to make matters worse, Your Honor, the litigation

19   relates to alleged improper management by the Debtor of Multi-

20   Strat.  If Your Honor will recall, at many times I've told

21   this Court what Dugaboy's claims they filed in this case.

22   Dugaboy has a claim that is filed in this case for

23   mismanagement postpetition of Multi-Strat.  Now the Sbaiti

24   firm, in addition to representing CLO Holdco, in addition to

25   representing the DAF, and whatever the Plaintiffs' lawyers are

App. 00749
002803

1    in that other District Court, PCMG, and in connection with the

2    Acis matter, they've decided they haven't had enough.  They've

3    now filed another motion that -- you know, why they filed it

4    in District Court and there's a proof of claim on the same

5    issues, I don't know.  But I thought Your Honor should know.

6    I'm not asking Your Honor to do anything about it.  But we

7    will act aggressively, strongly, and promptly.

8        Thank you, Your Honor.

9            THE COURT:  All right.  Well, you've reminded me of

10   what came out earlier today about the entity -- I left my

11   notepad in my chambers -- PMC or PMG or something.

12       Mr. Bridges, we're not going to have a hearing right now

13   on me doing anything, but what are you thinking?  What are you

14   doing?

15           MR. BRIDGES:  Your Honor, I'm not trying to duck your

16   question.  I literally have no involvement with any other

17   claim, and we would have to ask Mr. Sbaiti to answer your

18   questions.

19           THE COURT:  All right.  Is he there?

20           MR. BRIDGES:  He is.

21           THE COURT:  I'll listen.

22           MR. BRIDGES:  I'll switch seats and give him this

23   chair.

24           MR. SBAITI:  Sorry, Your Honor.  We had two computers

25   going and weren't able to use the sound on one, so we ended up

Case 22-03052-sgj    Doc 32    Filed 07/26/22    Entered 07/26/22 14:17:26    Desc Main
Case 3:22-cv-02280-S    Document 34    Filed 07/15/22    Page 121 of 231    PageID 2963

117

1   turning that off.

2       Your Honor, I'm not sure what the question is about when

3   you say what are we thinking.  We have a client that's asked

4   us to file something, and when we're advised by bankruptcy

5   counsel that it's not prohibited for us to do so, and don't

6   know why we're precluded from doing so, and when the time

7   comes I'm sure we'll be able to explain to Your Honor --

8   someone will be able to explain to Your Honor why what we're

9   doing, despite Mr. Pomerantz's exacerbation, or excuse me,

10  exasperation, why that wasn't improper.  It's our belief that

11  it wasn't improper or a violation of the Court's rule.

12          THE COURT:  Just give me a quick shorthand *Readers'*

13  *Digest* of why you don't think it's improper.

14          MR. SBAITI:  Sure.  My understanding is, Your Honor,

15  there's not a rule that says we can't file it against the

16  Debtor for postpetition actions.  So that, that's as -- that's

17  as much as I understand.  And I'm going to -- I'm not trying

18  to duck it, either.  And if I'm wrong about that and someone

19  wants to correct me on our side offline and if we have to

20  explain to the Court why that's so or what rule has been

21  violated, I'm sure we'll be able to put together something for

22  that.  But that's what I've been advised.

23          THE COURT:  Have you done thorough --

24          MR. POMERANTZ:  Your Honor, I think what --

25          MR. SBAITI:  (garbled), Your Honor.

Appx 00751
002805

118

1          THE COURT:  Have you done thorough research yourself?

2     Your Rule 11 signature is on the line, not some bankruptcy

3     counsel you talked to.  Have you done the research yourself?

4          MR. SBAITI:  Well, Your Honor, I've relied on the

5     research and advice of people who are experts, and I believe

6     my Rule 11 obligations also allow me to do that, so yes.

7          MR. POMERANTZ:  Your Honor, I think we're entitled to

8     know if it's Mr. Draper's firm who has been representing

9     Dugaboy.  He's the bankruptcy counsel.  I don't think it's an

10    attorney-client privilege issue.  If Mr. Sbaiti is going to be

11    here and sort of say, hey, bankruptcy counsel said it was

12    okay, I think we would like to know and I'm sure Your Honor

13    would like to know who is that bankruptcy counsel.

14         THE COURT:  Yes.  Fair enough.  Mr. Sbaiti?

15         MR. SBAITI:  Your Honor, in consultation with Mr.

16    Draper and with consultation with other counsel that we've

17    spoken to, that has been our understanding.

18         THE COURT:  Who's the other counsel?

19         MR. SBAITI:  Well, we've talked to Mr. Rukavina about

20    some of these things for the PCMG and the Acis case.  We've

21    talked to the people who, when they tell us you can't do this

22    because they're bankruptcy counsel for our client, then we

23    don't do something.  So, and I'm not trying to throw anybody

24    under the bus, but my understanding of what goes on in

25    Bankruptcy Court is incredibly limited, so, you know, and if

119

 1  it's a mistake then I'll own it, if I have a mistaken

 2  understanding, but I also wasn't anticipating having to make a

 3  presentation about this right here right now, so --

 4          THE COURT:  Well, you're filing lawsuits that involve

 5  this bankruptcy case during the hearing, so --

 6          MR. SBAITI:  Oh, we didn't file it during the

 7  hearing, Your Honor.  It was filed last night, I believe.

 8          THE COURT:  Okay.  Well, I assume that you're going

 9  to go back and hit the books, hit the computer, and be

10  prepared to defend your actions, because your bankruptcy

11  experts, they may think they know a lot, but the judge is not

12  very happy about what she's hearing.

13          MR. POMERANTZ:  Your Honor, if I may ask when Your

14  Honor intends to issue the contempt ruling in connection with

15  the June 8th hearing?  I strongly believe -- and, obviously,

16  this has nothing to do with the contempt hearing; this

17  happened after -- but I strongly believe that sending a

18  message that Your Honor is inclined to hold counsel in

19  contempt, which obviously is one of the violators we said

20  should be held in contempt, it may be important to do that

21  sooner rather than later so that people know that Your Honor

22  is serious.

23          THE COURT:  All right.  Well, I understand and

24  respect that request.  And let me tell you all, I had a seven-

25  day -- okay.  You all were here on that motion June 8th.  I

120

1   had a seven-day, all-day, every-day, 9:00 to 5:00, 45-minute

2   lunch break, in-person hearing with a dozen or so live

3   witnesses that I just finished Tuesday at 5:00 o'clock.  So

4   you all were here on the 8th, and then -- what day was that --

5   what was -- Tuesday, I finished.  Tuesday was the 22nd.  So I

6   started on the 14th, okay?  So you all were here on the 8th

7   and I had a live jury trial -- I mean, not jury trial, a live

8   bench trial -- live human beings in the courtroom, beginning

9   June 14th.  So you're here the 8th.  June 14th through 22nd, I

10  did my trial.  And here we are on the 25th.  And guess what, I

11  have another live human-being bench trial next week, Monday

12  through Friday.

13      So we've been working in other things like this in between

14  those two.  So I'm telling you that not to whine, I'm just

15  telling you that, that's the only reason I didn't get out a

16  quick ruling on this, okay?

17          MR. POMERANTZ:  And Your Honor, I was not at all

18  making that comment to imply anything about the Court.

19          THE COURT:  Well, --

20          MR. POMERANTZ:  The time and effort that you have

21  given to this case is extraordinary, --

22          THE COURT:  Okay.

23          MR. POMERANTZ:  -- so please don't misunderstand my

24  comment.

25          THE COURT:  Okay.  And I didn't mean to express

121

1    annoyance or anything like that.  I guess what I'm trying to

2    do is I don't want anyone to mistake the delay in ruling on

3    the contempt motion to mean I'm just not that -- you know, I'm

4    not prioritizing it, other things are more serious to me or

5    important to me, or I'm going to take two months to get to it.

6    It's literally been I've been in trial almost all day long

7    every day since you were here.  But trust me, I'm about as

8    upset as upset can be about what I heard on June 8th, and I'm

9    going to get to that ruling, and I know what I'm going to do.

10   And, well, like I said, it's just a matter of figuring out

11   dollars and whom, okay?  There's going to be contempt.  I just

12   haven't put it on paper because I've been in court all day and

13   I haven't come up with a dollar figure.  Okay?

14       So I hope -- I don't know if that matters very much, but

15   it should.

16       All right.  We stand adjourned.

17       (Proceedings concluded at 3:35 p.m.)

18                              --oOo--

19

20                            CERTIFICATE

21       I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23    **/s/ Kathy Rehling**                        **06/29/2021**

24   _____      _____

     Kathy Rehling, CETD-444                      Date
25   Certified Electronic Court Transcriber

122

INDEX
*Excerpt*
*11:33 a.m. to 3:35 p.m.*

PROCEEDINGS                                                              3

OPENING STATEMENTS

- By Mr. Bridges                                                         3
- By Mr. Pomerantz                                                      23

WITNESSES

-none-

EXHIBITS

Movants' Exhibits 1, 3 through 12, 15 through      Received 91
28, and 30 through 44

Debtor's Exhibit 1                                 Received 91
Debtor's Exhibits 1 through 17                     Received 93

RULINGS                                                               106

END OF PROCEEDINGS                                                    121

INDEX                                                                 122

# EXHIBIT 22

App. 00757
002811

```
                 UNITED STATES BANKRUPTCY COURT
                NORTHERN DISTRICT OF TEXAS (DALLAS)

IN RE:                      .    Case No. 19-34054-11(SGJ)
                            .
HIGHLAND CAPITAL            .
MANAGEMENT, L.P.,           .
                            .
                            .
         Debtor.            .
. . . . . . . . . . . . . . .
                            .    Adv. No. 21-03067(SGJ)
CHARITABLE DAF FUND, LP,    .
et al.,                     .
                            .
         Plaintiffs,        .    Earle Cabell Federal Building
                            .    1100 Commerce Street
         v.                 .    Dallas, Texas  75242
                            .
HIGHLAND CAPITAL,           .
MANAGEMENT, L.P., et al.,   .
                            .
         Defendants.        .    Tuesday, November 23, 2021
. . . . . . . . . . . . . . .    9:40 a.m.


                  TRANSCRIPT OF HEARING ON
      PLAINTIFFS' MOTION TO STAY ALL PROCEEDINGS (55);
   PLAINTIFFS' MOTION TO STRIKE REPLY APPENDIX (47); AND
      DEFENDANTS' MOTION TO DISMISS COMPLAINT (26)

            BEFORE HONORABLE STACEY G. JERNIGAN
            UNITED STATES BANKRUPTCY COURT JUDGE
```

TELEPHONIC APPEARANCES CONTINUED ON NEXT PAGE.

Audio Operator:         Hawaii S. Jeng

 Proceedings recorded by electronic sound recording, transcript
                 produced by a transcript service.

---

                      **LIBERTY TRANSCRIPTS**
                      **7306 Danwood Drive**
                      **Austin, Texas 78759**
              **E-mail:  DBPATEL1180@GMAIL.COM**
                       **(847) 848-4907**

2

TELEPHONIC APPEARANCES:

For CLO Holdco, Ltd.:          Sbaiti & Company PLLC
                               BY:  MAZIN AHMAD SBAITI, ESQ.
                               JP Morgan Chase Tower
                               2200 Ross Avenue, Suite 4900 W
                               Dallas, Texas 75201

For Highland Capital          Pachulski Stang Ziehl & Jones LLP
Management:                    BY:  JOHN MORRIS, ESQ.
                               780 3rd Avenue, 34th Floor
                               New York, NY 10017

                               Pachulski Stang Ziehl & Jones LLP
                               BY:  JEFFREY N. POMERANTZ, ESQ.
                               10100 Santa Monica Blvd., 13th Floor
                               Los Angeles, California 90067

For Highland CLO              Brobeck Phleger & Harrison
Funding, Ltd.:                BY:  JONATHAN W. JORDAN, ESQ.
                               4801 Plaza on the Lake
                               Austin, Texas 78746

                               King & Spalding LLP
                               BY:  PAUL RICHARD BESSETTE, ESQ.
                               500 West 2nd Street, Suite 1800
                               Austin, Texas 78701

**WWW.LIBERTYTRANSCRIPTS.COM**

3

**INDEX**

                                                                    <u>PAGE</u>

PLAINTIFFS' MOTION TO STAY ALL PROCEEDINGS (55)
  Court's Ruling - Denied                                            29

PLAINTIFFS' MOTION TO STRIKE REPLY APPENDIX (47)
  Court's Ruling - Denied                                            32

DEFENDANTS' MOTION TO DISMISS COMPLAINT (26)
  Court's Ruling - Under Advisement                                  103

**WWW.LIBERTYTRANSCRIPTS.COM**

4

1           THE COURT:  Good morning.  Please be seated.

2           All right.  We have a setting in the Charitable DAF

3    Fund, et al., v. Highland, Adversary 21-3067.  We have three

4    motions that are set.

5           Let me get appearances from the Plaintiffs' counsel

6    first.  Go ahead.

7           MR. SBAITI:  Good morning, Your Honor.  This is Mazin

8    Sbaiti for the Plaintiffs.

9           THE COURT:  Okay.  Thank you.

10          Now for the Defendants, who do we have appearing?

11          MR. POMERANTZ:  Good morning, Your Honor.  It's Jeff

12   Pomerantz and John Morris from Pachulski Stang Ziehl & Jones.

13   Your Honor, before -- I understand Your Honor is going to take

14   up the motion to stay first.

15          Before Your Honor does so, I have a procedural issue

16   relating to that motion that I would like to address the Court

17   after appearances are made.

18          THE COURT:  All right.  I assume that's all the

19   lawyer appearances for this adversary.

20          MR. JORDAN:  Your Honor?

21          THE COURT:  Oh, go ahead.

22          MR. JORDAN:  Your Honor, we are a nominal defendant,

23   but John Jordan on behalf of Highland CLO Funding, Ltd.

24          THE COURT:  Okay.  Thank you.  Sorry about that.

25          MR. BESSETTE:  And, Your Honor, Paul Bessette, Mr.

5

1  Jordan's colleague is on the phone, as well.

2          THE COURT:  Okay.  Thank you.

3          All right.  Anyone else I missed?

4      (No audible response)

5          THE COURT:  All right.  Mr. Pomerantz, your

6  procedural issue?

7          MR. POMERANTZ:  Thank you, Your Honor.

8          Your Honor, I must once again bring to this Court's

9  attention a violation of the Court Rules by the various counsel

10 representing Mr. Dondero.  This time it's by Mr. Sbaiti.

11         When the district court entered its order granting

12 Highland's motion to enforce the reference and referring this

13 matter to Your Honor, there were three matters on the Court's

14 docket, district court's docket that got transferred.  First

15 was the motion to dismiss, second was the motion to stay, and

16 third was the motion to strike, which essentially has been

17 rendered moot.

18         The briefing was complete with respect to the first

19 two matters, the motion to dismiss and the motion to stay.  And

20 all that remained for the Court to do was to set a hearing and

21 have oral argument.  Your Honor, on October 13th, Your Honor

22 set a hearing for today for each of those two motions.

23 Nevertheless, on November 10th, almost a month after the Court

24 set the matters for hearing and after pleadings were closed,

25 Plaintiffs filed what they called their amended motion to stay.

App. 00702
002816

6

1          As an initial matter, Your Honor, the amended motion

2   was not even filed in this adversary proceeding initially.  It

3   was filed in the main case, and there was an error that Mr.

4   Sbaiti corrected on November 18th, five days before this

5   hearing.  Plaintiff did not ask for leave of court to file any

6   further pleadings.  They did not provide the time under the

7   local rules for response.  And, in fact, they raised additional

8   arguments in their amended motion.

9          Well, Your Honor, we can certainly argue to the Court

10  that the amended motion constitutes a new motion, is untimely,

11  and the hearing should be continued to allow us to file a

12  response.  We're not going to do that, Your Honor.  As I will

13  discuss when it's my time to response substantively to the

14  motion, the new arguments to stay the proceedings, the amended

15  motion are equally as frivolous as the arguments contained in

16  the original motion.

17         But I bring this to the Court's attention because,

18  again, it's extremely frustrating to have the lawyers

19  representing Mr. Dondero's related entities continue to act as

20  if the rules do not apply to them.  Your Honor will recall just

21  a week or so ago, Your Honor made a -- we had a similar issue

22  in connection with the motion to dismiss.  Failure to follow

23  the rules is unprofessional, and it's disrespectful not only to

24  Highland's professionals but also to the Court and it

25  interferes with Your Honor's ability to control your docket and

App. 00762
002817

7

1   sufficiently prepare for contested matters.

2          At some point, Your Honor, there should be real

3   consequences for the continued violation of the rules.  Having

4   said that, Your Honor, we are prepared to go forward with the

5   motion to stay today.

6          THE COURT:  All right.  Mr. Sbaiti, what say you?

7   I'm looking at Docket Entry Number 69 in the adversary

8   proceeding that was filed last Thursday.  So, obviously, very,

9   very late in the game, shall we say.  What is your response to

10  this?

11         MR. SBAITI:  Your Honor, that was not filed in the

12  adversary as an error.  When we asked one of our paralegals to

13  file it, we're not as familiar with the bankruptcy court system

14  and it was an error.  It was corrected once the lawyers

15  realized it, which was last -- which was on November the 18th.

16  It was filed in, I guess in the main case.  But it was simply

17  an inadvertent error, Your Honor.

18         MR. POMERANTZ:  I would add, Your Honor, the original

19  motion filed inadvertently was November 10th.  It still was not

20  timely.  I think Mr. Sbaiti needs to answer the question of why

21  that was filed untimely, okay.

22         THE COURT:  All right.  Thank you, Mr. Sbaiti.

23         So, one of my pet peeves in life is people blaming

24  paralegals, by the way.  But be that as it may, as Mr.

25  Pomerantz points out that it was still untimely the motion

App. 00794
002818

8

1  filed in the underlying bankruptcy case November 10th.  So what

2  is your --

3       MR. SBAITI:  Your Honor, when we looked at the motion

4  and looked at the progression of the case, we filed an amended

5  motion simply to clarify our position.  And really I don't

6  think we've changed our arguments all that much.  We simply

7  clarified our position.  We've seen amended motions filed in

8  the bankruptcy in our prior dealings, and so at that point, we

9  felt like there wasn't a rule explicitly saying we couldn't

10 have an amended motion.

11      But if it's untimely, Your Honor, you know, we don't

12 think it changes the underlying arguments.  As Mr. Pomerantz

13 said, we don't think there's any prejudice to Highland either.

14      THE COURT:  All right.  Well, just to be clear, you

15 know, it's one thing in an underlying bankruptcy case to file

16 an amended motion after you've gotten a motion set for hearing

17 that might slightly adjust, you know, facts or relief sought.

18 And, of course, we independently look at it when it happens in

19 an underlying case to see do we need more notice to affected

20 parties.

21      But in an adversary proceeding, you know, you just

22 don't do this.  All right?  If you have some sort of

23 exceptional circumstances, you can file I guess a motion to

24 amend because I got to include this new information that didn't

25 exist.  But you just don't do this, okay?

9

1      So I don't -- could you be clear what was the new

2 information?  What was the new information that had to be

3 brought before the Court suddenly?

4      MR. SBAITI:  Your Honor, there wasn't new

5 information.  We were simply giving notice of our understanding

6 of where the legal arguments were going.  The reason being is

7 that after those motions were filed and recently, the debtor

8 took the position in two other cases that they should be

9 dismissed pursuant to the permanent injunction.

10      And so that clarified for us at least a couple of

11 arguments that were unclear to us where the debtor stood on

12 whether or not the permanent injunction would be a basis to

13 dismiss or stay any of the claims that were pending.  There are

14 two other claims pending in district court.  Since we had filed

15 that motion, the debtor filed a motion to reconsider the stays

16 that were granted in those two courts.  And then they also

17 moved to dismiss on the basis of the permanent injunction.

18      And so given that the debtor took the position that

19 they were willing to dismiss those cases based upon the

20 permanent injunction, it in many ways contravenes the position

21 they took in response to our motion which is that the -- for

22 example, they somewhat take the position in Paragraph 22, it

23 wasn't as clear then but it's clear -- it seems clearer now

24 that the permanent injunction is not relevant to whether or not

25 the case can go forward in any capacity.

Appx 002820
002820

10

1     And so we simply wanted to incorporate that, but it's

2  mainly legal argument about the choices that are before the

3  Court.  That was really it.  I mean, theoretically, I would

4  have made them for the first time during oral argument and we

5  thought we were doing something good by giving -- apprising the

6  Court in writing and giving notice of these arguments to the

7  other side by filing an amended motion.  We didn't add new

8  evidence or anything like that.

9     MR. POMERANTZ:  Your Honor, that argument is

10  completely disingenuous because our motion to dismiss and

11  motion for reconsideration that Mr. Sbaiti refers to is several

12  weeks ago, okay.  It wasn't November 10th.  It was several

13  weeks ago.

14     I will respond substantively why Mr. Sbaiti is wrong

15  and there's no inconsistent positions when it's my time to

16  speak.  But for Mr. Sbaiti to say he was doing us a favor and

17  he was reacting to recent new information is just wrong, Your

18  Honor.  And they should just not be continued to allowed to get

19  away with flouting the rules.

20     THE COURT:  All right.  Well, let me just say I'm

21  confused, maybe I should say baffled, about this amended

22  motion.  You know, the motion to dismiss that is before the

23  Court for oral argument today isn't about the injunction, isn't

24  about the plan injunction.  It's about res judicata and other

25  12(b)(6) arguments.

APPX 00767
002827

11

 1          So I'm confused and I think, you know, it's been
 2     clear for many months in this adversary proceeding, in
 3     particular, the debtor's position on the plan injunction,
 4     particularly, you know, in the whole argument on the motion to
 5     leave to add Mr. Seery as a defendant.

 6          So I'm confused, but we're going to go forward on the
 7     argument today, whatever argument you want to make.  And you've
 8     been, I guess, forewarned.  I will say that these last-minute
 9     amended motions are not going to be tolerated, are not going to
10     be considered.  And so, you know, I hope you won't do it again.
11     Your firm has already been sanctioned once in this adversary
12     proceeding.  I'm sure we all remember.

13          So, you know, I'm just kind of baffled why you would
14     take a chance filing an amended motion without leave or somehow
15     getting it to the attention of the Court or running it by the
16     other parties for their consent to you doing it.  But we're
17     going to go forward and just hear the arguments, okay.  And so
18     --

19          MR. SBAITI:  Thank you.

20          THE COURT:  -- I'll hear your argument.

21          I'm letting people know I don't know where this time
22     estimate came on the calendar today, three hours.  I don't know
23     if someone specifically expressed that.  But I'm letting you
24     know at noon I have a swearing-in ceremony that I'm doing back
25     in my chambers.  So I will stop at noon Central time.

App. 00508
002822

12

 1          And so does anyone think that's going to be a

 2   problem?

 3          MR. SBAITI:  It should not be, Your Honor, from our

 4   perspective.

 5          THE COURT:  Mr. Pomerantz?

 6          MR. POMERANTZ:  I don't believe so.  Mr. Morris is

 7   going to handle the motion to dismiss which is going to be the

 8   bulk.  My presentation on the motion to stay is only going to

 9   be around ten minutes or so.

10          THE COURT:  Okay.  Thank you.

11          Mr. Sbaiti, your argument on the motion for stay.

12          MR. SBAITI:  Thank you, Your Honor.

13          Your Honor, may I share my screen?

14          THE COURT:  You may.

15          MR. SBAITI:  I have a PowerPoint that can kind of --

16          THE COURT:  Okay.  You may.

17          MR. SBAITI:  -- walk us through.  Thank you.

18          Is Your Honor able to see my screen?

19          THE COURT:  I can, yes.

20          MR. SBAITI:  Thank you, Your Honor.

21          Your Honor, what I would point you to is, first, the

22   injunction language.  This is what Your Honor's permanent

23   injunction says, and this is really what animates our motion to

24   stay.  Out motion to stay is derived specifically because my

25   clients and I feel like our case has been enjoined by this

App. 00789
002823

13

1   injunction, if not completely disposed of.

2          The language says that we're an enjoined:

3          "An enjoined party is permanently enjoined from

4          commencing, conducting, or continuing in any manner

5          any suit, action, or other proceeding of any kind

6          including any proceeding in a judicial, arbitral,

7          administrative, or other forum against or affecting

8          the debtor or the property of the debtor."

9          And then (v) of that injunction says:

10         "or acting or proceeding in any manner in any place

11         whatsoever that does not conform to or comply with

12         the provisions of the plan."

13         One of the things that was suggested in Paragraph 22

14  of their response was that the DAF and Holdco are not enjoined

15  parties.  But the final plan defines an enjoined party in

16  Article 1(b)(56) as any entity who has or -- all entities who

17  have held, hold, or may hold claims against the debtor; any

18  entity that has appeared and/or filed any motion, objection, or

19  other pleading in this Chapter 11 case regardless of the

20  capacity in which such entity appeared and any other party in

21  interest.  And, five, the related persons of each of the

22  foregoing.

23         Article 1(b)(22) defines a claim as any claim that's

24  defined in Section 1015 of the Bankruptcy Code.  And Section

25  1015 of the Bankruptcy Code defines a claim as a right to

App. 00574
002824

14

 1  payment whether or not such right is reduced to judgment,

 2  liquidated, unliquidated, fixed, contingent, matured,

 3  unmatured, disputed, undisputed, legal, equitable, secured, or

 4  unsecured.

 5          So given this definition, when we've read this

 6  injunction, we believed that we were enjoined parties, the DAF

 7  and Holdco were both enjoined parties.  They had appeared in

 8  the -- they have claims.  Obviously, those are the claims being

 9  asserted here.

10          And so going back to the injunction language, we

11  believe this lawsuit has been disposed of by this permanent

12  injunction.  We believe there's really only one or two things

13  that should probably happen with this lawsuit.  Either it could

14  be dismissed based upon the permanent injunction or what we

15  proposed in our motion to stay is that the Court exercise its

16  inherent authority to simply stay the case pending the appeal

17  of this language, which is up on appeal in the Fifth Circuit

18  right now.

19          If that language, and if the injunction gets affirmed

20  by the Fifth Circuit, then certainly the dismissal can happen

21  once that affirmance happens and there's no harm, no foul, and

22  no one's wasted any time.

23          If they're not, if it's overturned, then, obviously,

24  the injunction would be vacated, presumably by the Fifth

25  Circuit.  And at some point, if the Court decides not to enter

App. 0071
002825

15

1 a similar injunction that would likewise dispose of this case,

2 then the case could proceed on the merits.

3        The issue we've identified both in our original

4 motion and as we fleshed out in our -- as a matter of law in

5 our amended motion to simply put a finer point on it is that

6 the merits are now -- have been disposed of.  This injunction

7 ends this case, at least as far as we read it.  It ends this

8 case irrespective of the underlying merits of the lawsuit,

9 which means that the lawsuit merits themselves have become moot

10 and any opinion or any attempt to resolve it is obviously an

11 advisory opinion by the Court.

12        So we really only see two ways that this could go

13 right now without either gutting the injunction or

14 circumventing it completely, which is to say that either the

15 case should be dismissed based upon the permanent injunction or

16 the case should be stayed based upon the permanent injunction.

17        Mr. Pomerantz or the debtors' brief suggests that,

18 well, the injunction doesn't prevent hearing pending motions.

19 But I would respectfully disagree with that.  If you look at

20 the language, "commencing, conducting, or continuing in any

21 manner in any suit, action, or other proceeding against or

22 affecting the debtor."

23        As 12(b)(6) hearing, I would imagine, was intended to

24 fall under the umbrella of a proceeding.  And us arguing a

25 12(b)(6) motion would us be conducting and maybe even

App. 00772
002826

16

1  continuing the suit because we're trying to protect the merits

2  of the suit, which as I said are at this juncture already moot.

3         And so it comes down to I think a very simple

4  question, which is what do we do at this juncture.  Do we just

5  simply dismiss the lawsuit in light of this permanent

6  injunction or stay the lawsuit in light of this permanent

7  injunction?

8         The debtor makes a lot of hay out of the fact that,

9  well, there are special rules that apply when you're trying to

10  stay a case pending appeal.  But if you look at all of their

11  case law, it has to do with different circumstances where an

12  appeal -- where there's a matter on appeal that could

13  substantially affect the resolution of the case, which here we

14  think it actually could.  But in those cases, those appeals

15  would affect the resolution of the case on the merits; whereas,

16  here, the question goes to whether or not a permanent

17  injunction that really has stopped us all in our tracks.

18         As soon as we understood this injunction and its

19  scope, we're the ones who reached out to the debtor's counsel

20  and asked them on a meet-and-confer whether or not they would

21  just agree to stay the matter.  And we were a little bit

22  surprised by their reaction when they first didn't think that

23  this applied to our case, and we didn't understand how.  And

24  then they changed their mind, said it did apply to our case but

25  they didn't think that we should stay the case.  And they

App. 002827
002827

17

1  didn't suggest let's just dismiss it based upon the permanent

2  injunction.

3       So it kind of comes down to the same small -- same

4  simple issue, Your Honor.  There's this permanent injunction,

5  and I don't think there's any way for us to get around it at

6  this juncture.

7       THE COURT:  Mr. Pomerantz:

8       MR. POMERANTZ:  Yes, Your Honor.

9       I'm going to respond to several of the arguments Mr.

10 Sbaiti made in his motion, which apparently he's abandoned

11 because he only is focused on the injunction.  And I'm also

12 going to tell Your Honor, what our arguments are because

13 despite Mr. Sbaiti's efforts, he's completely misquoted them.

14      So in the motion and the amended motion, the

15 Plaintiffs make several arguments why this Court should stay

16 the matter.  First, they argue they're entitled to a stay

17 because the exculpation provision in the plan prohibits them

18 from proceeding against the Defendants in the action.  And

19 there are several problems with that argument.

20      First, Mr. Sbaiti and the Plaintiffs don't even

21 attempt to meet the Fifth Circuit's standards for a stay

22 pending appeal because, of course, they can't.  Mr. Sbaiti's

23 trying to sidestep the grounds for a stay pending appeal by

24 arguing it doesn't apply just is incorrect.

25      They would have to show that there is a likelihood of

App.2 00774
002828

18

1  success on the merits, they would suffer irreparable harm, the

2  debtor wouldn't suffer irreparable harm, and there is -- public

3  interest supports a stay.  They can't do any of them.

4         In fact, as Your Honor is well aware, Your Honor

5  denied the actual appellants in that suit, in that order, the

6  confirmation order, a stay pending appeal and that was denied

7  by the district court and also denied by the Fifth Circuit

8  Court of Appeals.

9         The Plaintiffs didn't object to the plan, they are

10  not parties to the appeal, and they never sought a stay pending

11  appeal.  So they really can't explain why they as really

12  strangers to the appeal are entitled to a stay of the

13  effectiveness of the plan when the actual appellants to that

14  order were denied a stay pending appeal up through the

15  appellate ladder.

16         Second, notwithstanding Mr. Sbaiti's arguments in the

17  motion, the exculpation provision is neither as broad nor does

18  it affect all the parties that are subject to this litigation.

19  There are three Defendants in the complaint.  The only

20  Defendant that is covered by the exculpation provision is the

21  debtor.  The exculpation provision does not apply HCF Advisors,

22  and it does not apply to Highland CLO Funding.

23         Also, while the exculpation provision does apply to

24  the debtor, it only exculpates the debtor from claims of

25  negligence.  The complaint raises a variety of causes of action

19

1   that have nothing to do with negligence and would not be

2   covered by the exculpation provision.

3          But, Your Honor, the biggest problem with their

4   argument that the exculpation provision supports a stay is that

5   the exculpation -- the appeal of the exculpation provision has

6   nothing to do with this case.  Why?  Because the Fifth Circuit

7   appeal concerns whether the exculpation provision is

8   appropriate for parties other than the debtor.  The debtor is

9   the only Defendant in this case that obtains the benefit of the

10  exculpation.

11         And there is no dispute, there was no dispute at

12  confirmation, there's no dispute in the case law, there's no

13  dispute in Pacific Lumber, there's no dispute in the appeal

14  that a plan can exculpate the debtor.  So the Fifth Circuit

15  appeal doesn't implicate the exculpation provision and cannot

16  support a basis for a stay.

17         The next argument Mr. Sbaiti makes is the injunction

18  provision, and the injunction provision is on appeal to the

19  Fifth Circuit.  But the aspect of the appeal of the injunction

20  is not the provision that Mr. Sbaiti points to.

21         And, again, as with the exculpation provision, the

22  same arguments about failure to obtain a stay, failure to be

23  party to the appeals, and failure to object to the plan apply,

24  as well.  But as is the case with the exculpation provision,

25  the resolution of the appeal of the injunction provision will

Appx 00376
002830

20

1  not affect this case in any way.

2           They point to the portion of the injunction that

3  prohibits enjoined parties from directly or indirectly

4  continuing, commencing, or conducting in any manner any suit or

5  action proceeding against the debtor.  They argue that they

6  cannot proceed without violating the injunction because the

7  injunction was intended to put all litigation against the

8  debtor to an end.

9           But, of course, Your Honor, that is not true.  That

10  is not what the injunction is.  The issue on appeal before the

11  Fifth Circuit as it relates to the injunction is whether the

12  injunction impermissibly enjoins parties from enforcing their

13  rights with respect to post-effective date commercial

14  relationships with the reorganized debtor.  And, of course, we

15  argue that it's appropriate, but it has nothing to do with the

16  provision Mr. Sbaiti identified.

17          The appeal does not impact in any way whether a plan

18  can enjoin prosecution of claims that arose prior to the

19  effective date.  And, of course, such a plan provision is

20  completely appropriate and is customary.  The plan provided the

21  debtor as the plan provides all debtors with a fresh start and

22  enjoins litigation against the debtor.

23          But importantly, Your Honor, that does not mean as

24  Plaintiffs argue that any liability for pre-effective date

25  conduct just goes away and that creditors are left without a

App. 00377
002837

21

1   remedy to pursue claims against the debtor for pre-effective

2   date conduct.

3         Rather, if they have a pre-petition claim in lieu of

4   their litigation that's pending, they file a pre-petition claim

5   against the estate and that matter is resolved in the claims

6   objection procedure.  Or, as in the case here, when they make

7   an allegation that there is a post-petition claim, what do they

8   do?  They file a request for payment of an administrative

9   claim, and this Court addresses the validity of the

10  administration claim.  The lawsuit pending in another

11  jurisdiction stops, but the claim has to be resolved in the

12  bankruptcy court.

13        The only conduct that the injunction really prohibits

14  is them from proceeding with actions in other courts.  It does

15  not deny them a remedy.  Accordingly, their argument that they

16  cannot proceed with claims against the debtor because of the

17  injunction provision just lacks any merit and can't form the

18  basis for a stay.

19        Plaintiffs' next argument in their briefing is that

20  if the Court refuses to stay the complaint, they will file a

21  motion to withdraw the reference of this matter to the district

22  court.  Your Honor, this is the biggest head-scratcher of them

23  all given how this complaint ended up before Your Honor.  This

24  exact issue and Plaintiffs' arguments as to why the reference

25  should be withdrawn have already been fully briefed and decided

App. 00378
002832

22

1   by the district court.

2           As Your Honor may recall, the Plaintiff filed this

3   action in the district court, conveniently failing to include

4   the bankruptcy case as a related case or mentioning that the

5   bankruptcy courts have related jurisdiction in the filings.

6   Your Honor may have had occasion to review the underlying

7   complaint when the debtor brought a motion for contempt against

8   counsel for Plaintiffs for pursuing a claim against Mr. Seery

9   in violation of Your Honor's January 9th, 2020 and July 16th,

10  2020 orders.

11          Your Honor issued an order finding counsel and

12  various parties in contempt which order is, of course, subject

13  to appeal.  At the time we were litigating the contempt motion,

14  we filed two motions in district court.  The first was a motion

15  to enforce the reference and have the district court send that

16  complaint to Your Honor.  And that motion to enforce the

17  reference is now on Your Honor's docket at Number 22 and 23.

18          The second was the motion to dismiss which is before

19  Your Honor today.  Plaintiffs oppose the motion to enforce the

20  reference arguing that mandatory withdrawal was required

21  because the matter involved consideration of non-bankruptcy

22  federal law, specifically federal securities laws and the

23  Investment Advisors' Act.

24          Plaintiffs further argue to the district court why

25  would you refer the case to the bankruptcy court if it's only

**WWW.LIBERTYTRANSCRIPTS.COM**

23

 1  going to end up back in the district court upon mandatory

 2  withdrawal of the reference.  They argue to the district court

 3  that would be a complete waste of time.

 4          We filed our reply at Docket Number 42 explaining to

 5  the district court why mandatory withdrawal of the reference

 6  did not apply and why this case should be referred to Your

 7  Honor.  And what did the district court subsequently do?  It

 8  entered an order referring this action to Your Honor which is

 9  why we are here today.

10          Plaintiffs now flout the district court's order of

11  reference by telling the Court that if the Court does not stay

12  the matter, they will file a motion to withdraw the reference

13  before Your Honor, and they attach virtually identical pleading

14  that they filed in opposition to our motion to enforce the

15  reference.

16          Plaintiffs did not disclose in their amended motion

17  that there was a fully-briefed motion to enforce the reference

18  before the district court.  Plaintiffs' argument is

19  disingenuous and designed to mislead the Court.

20          The district court has only agreed that mandatary

21  withdrawal of the reference does not apply and this case

22  belongs in Your Honor.  And while we cannot stop the Plaintiffs

23  from filing any motion before this Court, we want to put them

24  on notice that if they do file a motion for withdrawal of the

25  reference in light of the facts as I just stated them, we will

App. 00380
002834

24

1  seek sanctions.

2          In any event, Your Honor, the fact that they may file

3  a motion for withdrawal of the reference at some point in the

4  future is not grounds to stay the matter.

5          Lastly, Your Honor, Plaintiffs argued in the opening

6  that Highland's position today in opposing the motion to stay

7  is inconsistent with positions Highland has taken in two other

8  lawsuits commenced by the Sbaiti firm.  Like all of their other

9  arguments, they misrepresent the facts and are frivolous.

10          The Sbaiti firm filed a complaint on behalf of the

11  DAF in the district court arguing that Highland mismanaged

12  (audio drop).  That complaint followed in the heels of an

13  almost identical complaint filed by Dugaboy asserting the same

14  claims.

15          And Your Honor may recall questioning Mr. Sbaiti at a

16  hearing in June how Dugaboy could pursue such a claim in the

17  district court if Dugaboy had a pending proof of administrative

18  claim on file in the bankruptcy case.  Well, soon after that

19  hearing, Your Honor, the Dugaboy complaint was dismissed, and a

20  few days later the DAF complaint was filed.  That complaint has

21  never been served on Highland.

22          The second lawsuit is also a lawsuit filed by the

23  Sbaiti firm on behalf of an entity called PCMG in the district

24  court.  And PCMG previously held less than five one-hundredths

25  of a percent interest in a certain fund managed by highland.

25

1  The lawsuit alleges that Highland acted improperly to sell

2  certain assets of the fund, thereby damaging PCMG.  That

3  complaint has also never been served on Highland.

4          The Plaintiffs sought a stay of those matters before

5  Highland could file a response, and the court -- the district

6  court's entered stays in those matters.  And Highland has filed

7  motions for reconsideration and the motions to dismiss because

8  they violate the injunction.

9          But, importantly, Your Honor, if you read the

10  motions, Highland does not argue that Plaintiffs do not have a

11  remedy for the alleged wrongs they say they suffer.  Rather,

12  Highland's argument is that any claims alleged in those

13  lawsuits, just like any claims alleged in the lawsuit before

14  Your Honor today, must proceed in bankruptcy court as part of

15  the claims objection process.  That's where they will have

16  their day in court.  The lawsuits don't go away.  The

17  injunction prevents them from continuing on in district court.

18          Accordingly, Highland is being totally consistent in

19  all matters, and the litigations may not proceed there but must

20  proceed before Your Honor.  And, of course, none of these three

21  matters are implicated by the Fifth Circuit appeal.

22          Your Honor, the amended motion was procedurally

23  improper and is substantively without merit.  And for all these

24  reasons, we request that the Court deny the stay motion and

25  proceed with the hearing on the motion to dismiss.

26

1          Thank you, Your Honor.

2          THE COURT:  All right.

3          Mr. Sbaiti, you get the last word.

4          MR. SBAITI:  Thank you, Your Honor.

5          Your Honor, the administrative claim process that was

6    described as being the way that these claims were supposed to

7    proceed, by the language of the order that we read, does not

8    allow for these claims.  Those claims are limited to a specific

9    category of claims that don't include the claims that are

10   alleged in this lawsuit.

11         And in any event, this lawsuit wasn't filed as an

12   administrative claim.  So if that's the case and it needs to be

13   refiled or reasserted as an administrative claim, then I think

14   that's a subject for another day.  All I know is that we have

15   this injunction right now that either should stay this case

16   pending the appeal, which I'll address the issue on appeal in a

17   moment, or it should be dismissed, perhaps without prejudice so

18   that it can be refiled properly as an administrative claim if

19   that's what's supposed to happen, because I guess this converts

20   the matter.

21         The appeal, the subject of the appeal as to the

22   injunction, Your Honor, the appeal actually encompasses many of

23   the issues that we're talking about in this case.  Now Mr.

24   Pomerantz tries to narrow the scope of what's up on appeal, and

25   that may indeed be the argument that they're going to present

Appx. 00382
002837

27

1 to the Fifth Circuit or that they've presented to the Fifth

2 Circuit.

3        But the actual issue up on appeal is the

4 enforceability and validity of the order for a variety of

5 reasons which includes the provision that we're talking about

6 and the enforceability of the provision that we're talking

7 about because it gets rid of particular claims.  And I guess

8 the argument back is, no, it doesn't because there's now an

9 alternative means of going there.

10       Mr. Pomerantz says that we shouldn't have proffered a

11 motion to enforce the reference.  That proffer, however, was

12 because Judge Boyle's reference to this Court didn't deal with

13 our motion to -- our cross-motion to withdraw the reference.

14 All it dealt with was their motion to enforce the reference as

15 a -- to enforce the standing order in the district court.  And

16 that's all she ordered was she cited the standing order and the

17 statutes, I think it's 157(a), and that's really all it did.

18       So it left open the question of whether she wanted

19 Your Honor to deal with the withdrawal of the reference

20 specifically as to the 12(b)(6) issue in the first instance.

21 It didn't resolve the question.  It doesn't purport to resolve

22 that question.  And it's not unheard of for the district court

23 then to send the matter to the bankruptcy court and then to

24 piecemeal which proceedings the withdrawal of the reference is

25 applicable to and then all the other proceedings would stay

Appx 00384
002838

28

1  with Your Honor or with the bankruptcy court.

2          So we weren't flouting the district court's order,

3  and we certainly weren't flouting any of the previous orders.

4  And the threat of a sanction for simply exercising our rights

5  in due course is not well taken.

6          Now Mr. Pomerantz says, well, the DAF and CLO Holdco

7  are not parties to the appeal.  I don't think that's relevant

8  because if the provision is struck by the Fifth Circuit, it's

9  not only struck for the appellants, it's struck as to all.

10 It's either valid or it's invalid.  And even if it's declared

11 to be invalid only as to the appellants, it's not suddenly

12 valid as to everyone else who didn't appeal.  That's not

13 generally how these appeals have worked.

14         If the Court doesn't stay this matter, Your Honor,

15 and doesn't dismiss it, we still maintain, Your Honor, that as

16 it stands today, the question on the merits have been mooted

17 and we cannot proceed.  I think what Mr. Pomerantz is hoping

18 for or the debtor is hoping for is a provision where our hands

19 are potentially tied to argue the motion.

20         And if the Court tells us they're not, then we'll

21 certainly argue the 12(b)(6).  But what I don't want to do is

22 argue a 12(b)(6) motion that on its face appears to violate the

23 permanent injunction and then be held in contempt for violating

24 that injunction.

25         And so that's why we've asked for the Court to either

Appx 00385

002839

29

1  stay the matter under its inherent jurisdiction or to -- if

2  you're going to -- if it's not going to be stayed, then we

3  believe it has to be dismissed according to the permanent

4  injunction as it stands right now.

5           THE COURT:  All right.

6           The motion to stay is denied.  The amended motion to

7  stay is likewise denied.  This is an odd argument.  I guess one

8  might say the traditional four-factor test for a stay of a

9  proceeding has really not been the subject of the argument here

10 for a stay.

11          So suffice it to say the four-prong test for a stay,

12 you know, hasn't been met here.  There hasn't been a showing of

13 substantial likelihood of success on the merits or irreparable

14 injury if the stay's not granted or a stay will not

15 substantially harm others or the stay would serve a public

16 interest.

17          But going on to the arguments that were focused on by

18 movant, I just don't think that you have shown that, you know,

19 either the exculpation clause or the injunction provisions of

20 the plan somehow tie your hands in arguing the 12(b)(6) motion,

21 defending against the 12(b)(6) motion today or I just think

22 that your arguments reflect, frankly, a misunderstanding of how

23 the injunction language and exculpation language applies here.

24          So the motion for stay is denied, and I will ask Mr.

25 Pomerantz to submit an order reflecting the Court's ruling.

App. 00786
002840

30

 1          So it looks like we have another procedural matter,

 2   Mr. Sbaiti.  You filed a motion to strike reply appendix of the

 3   Plaintiffs quite a while back.  So did you want to present

 4   that?

 5          MR. SBAITI:  Yes, Your Honor.  I think it's a very

 6   simple procedural issue.

 7          Generally, a party that files a 12(b)(6) is limited

 8   to the four corners of the complaint.  And if there's a

 9   contract incorporated or a document incorporated as an

10   intrinsic part of the complaint, you know, that's usually

11   considered under the 12(b)(6) motion.

12          What the Defendants did, what the debtor here did is

13   they filed a bunch of evidence in their 12(b)(6), essentially

14   attempting to argue it as a summary judgment.  We raised that

15   in our response.  So as part of our response, we objected to

16   all the evidence.  But then on the reply, they filed a bunch

17   more evidence both without leave and improperly, basically

18   sandbagged us.

19          And so we raised two points for striking that

20   evidence.  One was akin to the first argument, which is it's

21   not an evidentiary hearing.  It's not an evidentiary process in

22   the first instance.  A 12(b)(6) motion has to assume that the

23   facts pled are true, and then the question is whether they

24   state a claim.

25          And, secondly, adding them to the reply is especially

App. 00787
002847

Case 22-03052-sgj    Doc 32    Filed 07/26/22    Entered 07/26/22 14:17:26    Desc Main
Case 3:22-cv-02280-S  Document 1    Filed 2/03/23  Page 158 of 231    PageID 3000

31

1   egregious because the reply is the last word.  And we didn't

2   have an opportunity to respond, and we also don't think it's

3   relevant nor should we have to respond to a whole bunch of

4   extra evidence that was attached.

5          That's essentially the basis of our motion, Your

6   Honor.

7          MR. POMERANTZ:  Your Honor, the simple answer to the

8   issue is we filed the reply of the appendix in connection with

9   the motion to enforce the reference.  We didn't file it in

10  connection with the motion to dismiss.  The motion to enforce

11  the reference is moot.  So what Mr. Sbaiti, his whole argument

12  doesn't make any sense.

13         As a substantive matter, just there wasn't any

14  evidence.  It was pointing to court pleadings, orders, and

15  stuff.  So it's irrelevant.  I don't know why it's still on the

16  docket.  It shouldn't be on the docket since it related to the

17  motion to enforce the reference.

18         THE COURT:  All right.  Mr. Sbaiti, did you just

19  simply --

20         MR. SBAITI:  Your Honor, much of that evidence was --

21         THE COURT:  -- misunderstand or what?

22         MR. SBAITI:  I think we might have because it was

23  filed as a separate item, and it may have been miscalendared or

24  misapplied on our system.  But the way it was presented to us

25  when we got it was it appeared to be evidence in support of,

002842

32

 1  well, I guess both, but certainly evidence that was averted to

 2  in the reply.

 3          But if they're saying that the Court's not going to

 4  consider it, then that moots the motion and I think we can move

 5  on.

 6          MR. POMERANTZ:  Yes, Your Honor.  I had nothing to do

 7  with his motion.  I guess there was another mistake on their

 8  end.  I guess that stuff happens occasionally.

 9          THE COURT:  Okay.  All right.  So I'll deny it as

10  based on a mistake that's been acknowledged here.  And so with

11  that, let's have an order cleaning that up, as well, Mr.

12  Pomerantz, please.

13          With that, we'll move on to the Defendants' motion to

14  dismiss complaint.  I think, Mr. Pomerantz, you said Mr. Morris

15  will be making this argument?

16          MR. POMERANTZ:  That is correct, Your Honor.

17          THE COURT:  All right.

18          Mr. Morris, I'll hear your argument.

19          MR. MORRIS:  Good morning, Your Honor.  John Morris

20  for Pachulski Stang Ziehl & Jones for the reorganized debtor.

21  Can you hear me okay?

22          THE COURT:  I can.  Thank you.

23          MR. MORRIS:  Okay.

24          Your Honor, this is a bit like Groundhog's Day.  I

25  believe that we're going to spend the next half hour or an hour

Appx 00789
002843

33

1  discussing the very issues that were before the Court earlier

2  this year on the HarbourVest 9019 motion.

3        As the Court will recall from the June 8 hearing,

4  there is a complaint that's been filed ostensibly by the DAF

5  and CLO Holdco.  As Your Honor will recall, the testimony

6  established that Mark Patrick had just been installed as the

7  trustee, had no knowledge of the prior events, and Mr. Dondero

8  and Mr. Sbaiti spent quite some time together formulating this

9  particular complaint that is nothing less than a collateral

10  attack on the Court's prior order.

11        I'd like to, if I can, just walk through a PowerPoint

12  presentation to try to make the debtor's position quite clear,

13  if I may.

14        THE COURT:  You may.

15        MR. MORRIS:  And I would ask my assistant, Ms. Canty

16  (phonetic), to put up the first slide.

17        Your Honor, you'll recall that last December, the

18  debtor filed its motion under Rule 9019 for court approval of a

19  settlement.  The debtor was completely and utterly transparent

20  in what the terms of the settlement were.

21        Very briefly, as set forth in Appendix 2 or Exhibit 2

22  which was the motion itself, in Paragraph 32, Your Honor, the

23  debtor set forth the terms of the transaction for which it was

24  seeking approval.  Those terms included in the very first

25  bullet point a statement that HarbourVest shall transfer its

App. 00790
002844

34

1   entire interest in CLOF to an entity to be designated by the

2   debtor.

3           And that's an important point that we'll talk about

4   in a number of different contexts, Your Honor.  The debtor made

5   it very clear at the very first moment of this matter that it

6   was not going to acquire the asset but the asset was going to

7   be transferred to an entity to be designated by the debtor.

8   The debtor's motion filed last December clearly stated the

9   value of the interest that it would be acquiring in return.

10  That was also set forth in Paragraph 32 in a footnote.

11          It didn't say that it was the fair market value.  It

12  said the method of valuation was the net asset value and gave a

13  valuation date of December 1st so that all parties in interest

14  who received the motion understood the economics of the deal.

15  And the deal that the debtor was asking the Court to approve

16  was one whereby HarbourVest would receive certain claims and in

17  exchange for those claims, they were going to transfer their

18  interest in CLO -- HCLOF.

19          The debtor also filed on the docket for all to see a

20  copy of the settlement agreement.  The settlement agreement

21  sets forth the terms of the deal, including again the statement

22  that HarbourVest "will transfer all of its rights, title, and

23  interest in HCLOF."  It actually says to an affiliate or an

24  entity to be designated by the debtor.  And the transfer

25  agreement itself was also put on the docket.

App. 00791
002845

Case 22-03052-sgj    Doc 32    Filed 07/26/22    Entered 07/26/22 14:17:26    Desc Main
Case 3:22-cv-02280-S    Document 3-1    Filed 27/96/23    Page 162 of 231    PageID 3004

35

 1          So that's where things stood just before Christmas.

 2   I know that there's some due process and other type arguments

 3   that are in the Plaintiffs' opposition to the motion.  But, of

 4   course, the undisputed facts are that the debtor timely filed

 5   the motion.  The time period was consistent with all applicable

 6   rules.  Nobody ever asked the debtor for an extension of time.

 7   Nobody ever filed a motion for an extension of time.  And so

 8   those due process arguments I think carry no weight at all.

 9          So the debtor filed the motion.  And if we can go to

10   the next slide, we see what the responses were, and there were

11   several.  All of the responses, the only responses were

12   objections to the motion filed by Mr. Dondero and his certain

13   of his affiliated entities.

14          Mr. Dondero's objection can be summarized as follows.

15   He made the following observations and asserted the following

16   objections to the proposed settlement.  The first thing he said

17   is that the settlement far exceeds the bounds of

18   reasonableness.  Now, of course, one cannot make a

19   determination of reasonableness without having an understanding

20   of value.  The debtor was giving something and it was getting

21   something.

22          And so Mr. Dondero understood that the issue of value

23   was front and center.  If there was any mistake about it, he

24   also noted that he understood that as part of the settlement

25   and, again, I've written this incorrectly, HarbourVest will

Appx 00792
002846

Case 22-03052-sgj   Doc 32   Filed 07/26/22   Entered 07/26/22 14:17:26   Desc Main
Case 3:22-cv-02280-S   Document 3-4   Filed 10/13/22   Page 163 of 231   PageID 3005

36

1  transfer its entire interest in HCLOF to the debtor.  That is

2  not what Mr. Dondero understood.  In fact, Mr. Dondero

3  understood that it would transfer its entire interest in HCLOF

4  "to an entity to be designated by the debtor," again, making it

5  clear that he knew exactly what the debtor was doing here.  And

6  that can be found at Appendix 4 in Footnote 3 on Page 1 if you

7  want the exact quote from Mr. Dondero's pleading.

8          In the same footnote, he also specifically

9  acknowledges that he understood the valuation.  He understood

10 the method valuation.  He understood the valuation date of

11 December 1st.  And he urged the Court in his pleading to

12 scrutinize the settlement to make clear that the available

13 value of the investment should be realized by the debtor's

14 estate.

15         And this is such a critical point, Your Honor.  His

16 concern was that by placing the value in an entity other than

17 the debtor itself, that the Court wouldn't have jurisdiction

18 over that asset.  That was his concern.  So not only did he

19 understand that the asset was going to be transferred to an

20 affiliate, he wanted to make sure that this Court had

21 jurisdiction over the asset.

22         And, of course, Mr. Seery in his testimony and

23 otherwise, we provided the Court with all the comfort it needed

24 to know that even though it was being assigned to a special-

25 purpose vehicle wholly-owned by the debtor, it would

002847

37

1  nevertheless be subject to the Court's jurisdiction.

2          Mr. Dondero's trusts also filed an objection if we

3  can go to the next slide.

4          Dugaboy and Get Good represented by Douglas Draper

5  made the following observations and asserted the following

6  objections to the HarbourVest Settlement.  They, too, made

7  clear that they understood that the asset was going to be

8  transferred to an entity designated by the debtor.  They, too,

9  acknowledge that they understood that the debtor was valuing

10 the asset at approximately $22 million as of December 1st.  And

11 their objection was that the Court couldn't evaluate the

12 settlement without knowing how the asset was valued, without

13 knowing whether the debtor could acquire the asset, very

14 critical point.

15         These are the points that are made in the complaint.

16 These are the exact same points that are made in the complaint.

17 And also the Court couldn't evaluate the settlement unless they

18 understood that the value would be inure to the benefit of the

19 debtor's estate, again, mimicking Mr. Dondero's concern that by

20 placing the asset in an affiliate of the debtor, that it might

21 not be subject to the Court's jurisdiction.

22         Finally, and most importantly, if we can go to the

23 next slide.  The Plaintiff, CLO Holdco, filed an objection to

24 the 9019 motion.  And this is just so critical.  And this is

25 the Groundhog Day aspect that I specifically speak of.  CLO

App. 00794
002848

38

1  Holdco's objection was based solely on its assertion that it

2  had a superior right to the opportunity to acquire the asset

3  that was being transferred by HarbourVest.  It only made one

4  argument in support of its contention that it had a superior

5  right, but that argument was specifically premised on the

6  membership agreement, Section 6.1 and 6.2 of the membership

7  agreement.

8            CLO Holdco, the Plaintiff in the underlying action,

9  argued to this Court that HarbourVest had no authority to

10  transfer the asset without complying with the right of first

11  refusal that would give CLO Holdco the opportunity to take the

12  asset for itself.  That's what this Court was told.  CLO Holdco

13  didn't make this argument fleetingly.  They provided an

14  extraordinarily detailed analysis of Sections 6.1 and 6.2 of

15  the membership agreement and concluded "that HarbourVest must

16  effectuate the right of first refusal before it can transfer

17  its interest in HCLOF.  That was the objection.  Objections

18  have consequences, as Your Honor knows.

19            If we can go to the next slide.

20            By filing an objection, CLO Holdco and the trusts and

21  Mr. Dondero became participants in the litigation.

22  Notwithstanding the Plaintiffs' arguments to the contrary, when

23  they file the objections, they participate in what's called a

24  contested matter.  And in a contested matter, they had every

25  right to take all discovery on any issue that was related to

App. 00795
002849

39

1  the 9019 motion, including the transfer, the disposition of the

2  asset to an affiliate of the debtor, the valuation of the asset

3  that's being received, the merits of the settlement itself, the

4  causes of action, whether, you know, what communications that

5  were, the negotiations, what did Mr. Seery and Mr. Pugatch

6  discuss?  Right?

7          They could have taken any discovery they wanted.  And

8  they did avail themselves of discovery, in fact.  They did -- I

9  don't know why they did what they did, but they chose to take

10 one deposition, and that was Mr. Pugatch, okay.

11         His deposition transcript, I think is at Exhibit 7,

12 or Appendix Number 7, and it was a long deposition.  It really

13 was.  And they asked Mr. Pugatch at the deposition if he knew

14 what the value of the asset that was being transferred was.

15 And he said $22.5 million.  So it wasn't just Mr. Seery or the

16 debtor who was subscribing to this valuation.  The party on the

17 other side of an arm's length negotiation was subscribing to

18 the exact same valuation.

19         The Plaintiffs could have taken whatever discovery

20 they wanted.  This is a full and fair opportunity to

21 participate in the litigation.  We proceeded to trial.  Before

22 we got there, actually, the debtor filed its response to CLO

23 Holdco's objection and proffered its own very detailed and

24 apparently very persuasive analysis that CLO Holdco's objection

25 was without merit, that CLO Holdco had no right of first

App. 00796
002850

40

1  refusal under the facts and circumstances as they existed, and

2  with Grant Scott, Mr. Dondero's childhood friend at the helm,

3  we got to Court for the contested hearing on the debtor's 9019

4  motion, and CLO Holdco withdrew their objection.

5        And I've put up on the screen just an excerpt of the

6  transcript because, you know, when we talk about whether or *res*

7  *judicata* should apply, because was there a hearing on the

8  merits?  Was there a decision on the merits?  Just look at the

9  words of CLO Holdco's lawyer.  "CLO Holdco has had an

10  opportunity to review the reply briefing and after doing so has

11  gone back and scrubbed the HCLOF corporate documents based on

12  our analysis of Guernsey law."

13        And some of the arguments of counsel in those

14  pleadings and our review of the appropriate documents, counsel

15  obtained the authority from Mr. Scott to withdraw the CLO

16  Holdco objection based on the interpretation of the member

17  agreement.  We were grateful for that and the Court

18  specifically said in response, "That eliminates one of the

19  major arguments that we had anticipated this morning."

20        Apparently, the Plaintiffs believe that those events

21  have no meaning and that this Court's reliance on CLO Holdco's

22  substantive withdrawal of its objection has no meaning.  I

23  think they're wrong, and we'll get to that in a moment.

24        We proceeded with the hearing.  Mr. Seery and

25  Mr. Pugatch testified at length.  If you look at Footnote 3,

App. 00797
002851

Case 22-03052-sgj   Doc 32   Filed 07/26/22   Entered 07/26/22 14:17:26   Desc Main
Case 3:22-cv-02280-S   Document 3-4   Filed 02/02/23   Page 168 of 231   PageID 3010

41

1  you'll see Mr. Seery testified for almost 70 pages of

2  testimony.  Mr. Pugatch testified for almost 45 pages of

3  testimony.  His testimony was exhaustive.  And, again, any of

4  the objecting parties had the right to ask whatever questions

5  they want.

6          But I do want to just note a few things that aren't

7  up on the screen right now.  If you go to Appendix 9, Your

8  Honor, which is the transcript of the hearing, at Page 13, you

9  will see that the very first thing I discussed in my opening

10  statement was the economics and how with a valuation of $22.5

11  million this deal made sense for the debtor.

12          You will see from Pages 30 to 42 there is extensive

13  testimony from Mr. Seery about the amount and the value of the

14  asset.  But the most important part of Mr. Seery's testimony is

15  that he explains how it came to be that HarbourVest agreed to

16  transfer its interest in HCLOF to an affiliate of the debtor.

17  And that came about, not because Mr. Seery or the debtor was

18  initially at all interested in doing this.  The whole idea

19  originated with HarbourVest.

20          They wanted to extract themselves from the Highland

21  platform.  They wanted to give this piece up.  So there's no

22  conspiracy going on here.  The unrebutted testimony that all of

23  the objecting parties had an opportunity to challenge was that

24  the whole idea originated with Mr. Pugatch and with

25  HarbourVest.  I think that's an important point to take into

App. 002798
002852

42

1   account.

2           And finally, again, from the hearing, if you look at

3   at Appendix 9, you'd also find that Mr. Pugatch, again,

4   testified, as he had in his deposition, as to the value of the

5   interest being transferred.  So we completed the testimony.  We

6   rested our case having had a full and fair opportunity to

7   contest the motion.  The objecting parties rested as well.  And

8   we got to the point where we had to prepare the notice, and we

9   were discussing that at the hearing, if we can go to the next

10  slide.

11          And it's very important, because again, this was all

12  done transparently, and it was all done on the record.  And

13  after the close of evidence, I addressed the order that was

14  going to be prepared.  I specifically said that I wanted to

15  make clear that we were going to include a provision, "that

16  specifically authorizes the debtor to engage in, to receive

17  HarbourVest the asset, you know, the HCLOF interest," right.  I

18  wanted everybody to know that was what was going to happen, and

19  then I said, "The objection has been withdrawn."  I think the

20  evidence is what it is and we want to make sure that nobody

21  thinks they're going to go to a different court somehow to

22  challenge the transfer.  But yet, that is exactly what the

23  complaint seeks to do.

24          Having put everybody on notice as to where we were

25  going, as to what the evidence showed, the debtor drafted and

Appx 00799
002853

43

1  the Court adopted an order, and the order says, among other

2  things, that HarbourVest was authorized to transfer its

3  interest to the debtor.  Actually, it says, "to a wholly owned

4  and controlled subsidiary of the debtor," pursuant to the

5  transfer agreement, "without the need to obtain the consent of

6  any party or to offer such interest first to any other investor

7  in HCLOF."  So the Court heard the 9019 motion pursuant to a

8  Bankruptcy Rule and entered and order that was unambiguous and

9  that the Plaintiffs did not appeal from.

10              We can go to the next slide.

11              At a very high level, Your Honor, it is just crystal

12  clear that the complaint is just inextricably intertwined with

13  the 9019 proceedings and the order itself.  I think Mr. Sbaiti

14  would agree with me that but for the order that approved the

15  transfer of the asset and the testimony about the value of that

16  asset, they have no claims.

17              Every single claim is predicated on what happened in

18  the 9019 hearing.  Every single claim is predicated on the

19  Court's order approving the transfer of the asset and the

20  testimony and evidence that was adduced in relation to that

21  asset.

22              There were really only two issues that the Court -- I

23  mean, if you want to think about it at its most simplistic

24  level, the Court was being asked to assess, is it fair, is it

25  reasonable, is it legally permissible for the debtor to give

App. 00804
002854

44

1    something.  In this case, allowed claims and releases, and to

2    get something in return.  In this case, HarbourVest's interest

3    in HCLOF and releases in return.  And that is really the

4    gravamen of the complaint.

5            The complaint is based whether it's breach of

6    fiduciary duty or RICO or breach of contract or tortious

7    interference, whatever the claim is, none of them exist if the

8    debtor doesn't get this.  They just don't exist.  And that is

9    why the complaint and the proceeding are inextricably

10   intertwined.  And if you just take a look at just one paragraph

11   of the pleading, it says at the core of this lawsuit is the

12   fact that HCM, that's the then debtor, purchased the

13   HarbourVest interests in HCLOF for $22.5 million knowing that

14   they were worth far more than that.  There's not a cause of

15   action that exists in the complaint that isn't dependent on

16   Paragraph 36.

17           So if we can go to the next slide with that

18   background, I'd like to argue why under 12(b), the complaint

19   should be dismissed because the claim should be barred under

20   the doctrine of *res judicata*.  Luckily, Your Honor, there is at

21   least one area of agreement between the parties here, and that

22   is the purpose of the doctrine and the elements that have to be

23   satisfied in order to meet the burden of proof necessary to

24   have the claims barred.  And in Footnote 1, you can -- I've

25   tried to just be helpful to the Court to show that we may not

App. 00801
002835

45

1   cite to the exact same cases, but the parties agree that the

2   doctrine is intended to foreclose the re-litigation of claims

3   that were or could have been raised in a prior action and that

4   there's four elements that have to be satisfied for the

5   doctrine to apply.

6           The parties have to be either identical or at least

7   in privity, the judgment in the prior action had to have been

8   rendered by a court of competent jurisdiction.  Number three,

9   the prior action had to have been concluded by a judgment on

10  the merits.  And the last one is that the same claim or cause

11  of action was involved in both suits.  So I just want to spend

12  a few minutes now, Your Honor, going through those four

13  elements to show the Court how easily the reorganized debtor

14  meets this standard.

15          If we can go to the next slide, I can take care of

16  the first two elements very quickly.

17          The first element, the debtor asserted that the

18  Plaintiffs were parties or in privity with parties to the prior

19  proceeding.  That's at Paragraph 17 of the motion to dismiss.

20  The debtor relies on the deposition testimony of Grant Scott,

21  who was then the trustee of the DAF.

22          CLO Holdco is a wholly-owned subsidiary of the DAF,

23  or wholly controlled, in any event, and Mr. Scott's testimony

24  was that he was the only director and there were no employees

25  of either entity.  So we, in our motion, put forth evidence to

App. 002856
002856

46

 1  establish the first element, and I don't believe, maybe I've

 2  missed it.  I don't believe that the Plaintiffs have contested

 3  that element.  If they have, I think Mr. Scott's testimony will

 4  carry the day, in any event.

 5          The second element as to whether or not a court of

 6  competent jurisdiction is the entity or the court that rendered

 7  the ruling.  Of course, that's been met, too.  The Plaintiffs,

 8  in their opposition to the motion to dismiss, suggested that

 9  the bankruptcy court would have lacked jurisdiction if their

10  cross motion to withdraw the reference was granted.  They said

11  if the district court decides that mandatory withdrawal

12  applies, then it cannot find that the bankruptcy courts already

13  entered final judgment was rendered on Plaintiffs' causes of

14  action and had jurisdiction to do so.  I think that's just a

15  clear misstatement of the law.

16          But in any event, Your Honor, at this point, I

17  believe it's irrelevant because the district court, in fact,

18  sent the case back to Your Honor and back to this Court.  And

19  so, at the end of the day, Plaintiffs' argument doesn't hold

20  water because of the district court's ruling, which can be

21  found -- the order of reference can be found at Docket

22  Number 64.  And so I think that easily takes care of the second

23  prong.

24          The third prong is whether -- if we can go to the

25  next slide -- the prior proceeding resulted in a judgment on

App. 00802
002857

47

 1  the merits.  And this is really the critical point, Your Honor.

 2  As the Court knows, the whole doctrine of *res judicata* is

 3  designed to prevent, as the parties agree, the re-litigation of

 4  claims.  Stated another way, it's to bring finale.  It's to

 5  make sure that the Court doesn't hear the same claims and the

 6  same issues that either were brought or that could have been

 7  brought in a prior proceeding.  And so, we believe that we

 8  easily meet the standards set forth in the third prong.  The

 9  9019 order necessarily determined that the *quid pro quo* that I

10  described earlier was fair, reasonable, and legally

11  permissible.

12          Notwithstanding their assertions to the contrary, the

13  Plaintiffs are most definitely seeking to unwind at least one

14  half of the Court's order by belatedly claiming that they are

15  entitled to the benefit of the bargain while leaving Highland

16  burdened, frankly, with the claims that HarbourVest got as part

17  of the deal.  I will tell you, Your Honor, and this is

18  argument, the debtor would never have asked for, and I don't

19  believe that the Court would ever have granted, the 9019 motion

20  if they thought that there was a risk in the future that

21  Highland wouldn't get the benefit of the bargain and it was

22  incumbent upon CLO Holdco and the DAF, and frankly, any party

23  in interest, to stand up and be counted and tell the Court and

24  the debtor, why the debtor was not entitled to do this deal and

25  CLO Holdco did that.  They actually did.

App. 00804

002858

48

1    They stood up and they filed an objection and they

2  said we have a superior right to this asset in the form of a

3  right of first refusal.  They wound up folding in the face of

4  persuasive argument, and I respect the lawyer who did that.  I

5  just do.  But that was the time to speak up, and that's why it

6  is on the merits because that is exactly what *res judicata* is

7  intended to do.  It's intended to have everybody put your cards

8  on the table.  You don't put one card on the table and say, I'm

9  going to challenge this under 6.2 of the members agreement, but

10 I'm not going to tell you that I also think you owe me a

11 fiduciary duty under the Advisors Act or as the control party

12 or under any other theory that they had.  They can't do that.

13 That's exactly what the problem is here.

14    If we can go to the next slide.  Is it a judgment on

15 the merits?  The debtor and the Court relied on CLO Holdco's

16 representation that it was withdrawing its argument, its claim,

17 its contention, its assertion that it had a superior right to

18 obtain the HarbourVest interest in HCLOF.  Again, they did so

19 not whimsically, not because Mr. Kane was going to be out of

20 town and he couldn't make the hearing.  He did it after, and I

21 don't think this matters frankly, but I think it's worth noting

22 that he did it after an extremely careful analysis.  I would

23 tell you, Your Honor, that -- well, I would argue, Your Honor,

24 that even if Mr. Kane at CLO Holdco had never filed an

25 objection, if they'd never filed -- if they'd gotten notice

App. 002839

Case 22-03052-sgj   Doc 32   Filed 07/26/22   Entered 07/26/22 14:17:26   Desc Main
Case 3:22-cv-02280-S   Document 3-1   Filed 12/16/22   Page 176 of 231   PageID 3018

49

1  that this was happening and they sat silently, that would have

2  been enough for *res judicata* because the issue before the Court

3  was whether it was legally permissible for the debtor to

4  acquire this asset.

5        And if they had an obligation, if they owed a duty to

6  another party, it wouldn't have been legally permissible.  And

7  if somebody believed that it wasn't legally permissible because

8  a duty was owed to them, they had an obligation to speak up.

9  And so I think it's very important, particularly for the

10 collateral estoppel argument that I'll make in a moment, that

11 CLO Holdco did in fact file an objection.  It was based on the

12 breach of contract claim that's in their complaint.  It's the

13 exact same claim.  And they withdrew it.  I think it's very,

14 very important.  I think it highlights why *res judicata*

15 applies.  I think it is the linchpin of the collateral estoppel

16 argument.

17        But at the end of the day, I think if they say

18 nothing, they should be estopped or precluded under *res*

19 *judicata* from now asserting -- it would be like -- I was

20 thinking about this earlier, Your Honor.  If you'll remember

21 earlier this year, Mr. Dondero and his entities have kind of a

22 habit of withdrawing objections at the last minute.  We had a

23 couple of sale hearings earlier this year.  And the issue was

24 valuation, you know, and the process, and could the debtor meet

25 its burden of proving that the sale outside of the ordinary

App. 002806
002860

50

1  course of business was in the debtor's best interest.  And they

2  sold that restaurant.  And Mr. Dondero objected.  And at the

3  last second, they withdrew the objection.  Did they sue

4  tomorrow?  Does Your Honor really think that they could bring a

5  lawsuit tomorrow and say they just found a document or theory

6  on which the debtor had an obligation to give them a right of

7  first refusal, even though we've already closed on the

8  transaction, even though they were given notice of the

9  transaction, even though they filed an objection to the

10  transaction, even though they withdrew the objection?  Would

11  the Court tolerate for one second a new pleading tomorrow from

12  Mr. Dondero that the debtor actually had a fiduciary duty to

13  give him a right of first refusal to buy that asset under

14  whatever theory, just because he pleads it and the Court has to

15  accept as true the allegations in the complaint?  I think not.

16  And I think it's worth thinking about that to highlight just

17  how -- just how wrong this is.

18          Continuing on.  You know, the Plaintiffs in

19  opposition say it can't be a trial on the merits because we

20  weren't parties.  Of course they were parties.  Again, they

21  filed an objection.  They were the parties to the contested

22  matter, full stop.  They rely on a case called Applewood and

23  they say, this is the very first point they make in their

24  brief.  Applewood, if it wasn't *res judicata* in Applewood, how

25  could it possibly be *res judicata* here?  But the facts are just

App. 00807
002867

Case 22-03052-sgj   Doc 32   Filed 07/26/22   Entered 07/26/22 14:17:26   Desc Main
Case 3:22-cv-02280-S   Document 3-4   Filed 10/27/22   Page 178 of 231   PageID 3020

51

1  so inapposite, right?

2         In <u>Applewood</u>, you had a garden variety plan and

3  release where the debtor and the officers and directors got a

4  discharge.  No objection to it.  And a secured lender later on

5  sought to sue guarantors who happened to be officers and

6  directors.  And the court, not surprisingly, said that the

7  confirmation order wouldn't prevent the secured lender from

8  going after the officers and directors, not in their

9  capacities, as such, but in their capacity as guarantors, which

10 were never part of the confirmation order.  That just doesn't

11 apply here because here, we have the debtor making a motion

12 before the Court in which it sought permission and authority to

13 acquire a particular asset.  Anybody who had a claim to that

14 asset should have stepped forward and put their cards on the

15 table.

16        And again, CLO Holdco put their cards on the table

17 and they lost, and they folded.  To use the poker analogy, they

18 folded.  And to hear them come into Court today and say we're

19 going to sue you because I reshuffled the deck, it's not right

20 and <u>Applewood</u> has no relevance.

21        Finally, Your Honor, you know, it's not on the

22 merits, they say, because you know, Mr. Seery and the debtor

23 hid the true value of the asset, and had we only known the true

24 value of the asset, we would have made all of these other

25 claims.  The fact of the matter is, you either have a fiduciary

Appx 00808
002862

52

 1   duty or you don't.  And if you had a fiduciary duty, they

 2   should have spoken up and they did only under 6.2, but they

 3   did.

 4          But here's the important part, Your Honor.  Take the

 5   allegations as true.  You have to take all of the allegations

 6   as true, not just some of them.  And if you look at

 7   Paragraph 127 of the complaint, and I would ask Ms. Canty to go

 8   to Appendix 11 and let's just put Paragraph 127 up on the

 9   board.

10          Here's the irony of the whole thing, right.  The

11   whole complaint is based on the fact that somehow Mr. Seery was

12   engaged in insider trading.  They accused him of insider

13   trading, and they say he didn't disclose the full value of the

14   asset.  Just read Paragraph 127.  James Dondero, who was on the

15   board of MGM, is the tippee.  You've got an insider trading

16   case -- I mean, I don't represent MGM.  I'm not with the SEC.

17   I don't know why Mr. Dondero thought he should be telling

18   Mr. Seery in December, 2020.  It's not clear if it was before

19   or after the 9019 motion was filed.  But Mr. Dondero is the

20   very source of information -- you can't make this up.  He's the

21   very source of the information that he now complains Mr. Seery

22   didn't disclose.

23          Of course, Mr. Dondero, the trust, CLO Holdco could

24   have asked Mr. Seery at any time, how did you come up with your

25   valuation?  Mr. Dondero, knowing that he had supplied to

App. 00809
002863

53

1  Mr. Seery, according to Paragraph 27, please take it as true

2  for purposes of this motion only.  He's the source of the

3  inside information.  And now he has the audacity to come to

4  this Court, notwithstanding the Court's approval, all of the

5  time and money and effort spent in the 9019 process, and say,

6  Mr. Seery was wrong because he didn't tell CLO Holdco and the

7  DAF about the information that Mr. Dondero gave to Mr. Seery.

8  It's not right.

9          It was a judgment on the merits.  And if Mr. Dondero

10  or the DAF or CLO Holdco or the trust wanted to challenge the

11  valuation, they had every opportunity to do so.  And based on

12  Paragraph 127, if the Court accepts it as true, shame on them.

13  Shame on them for not pursuing this issue before.  The guy gave

14  Mr. Seery, according to this allegation, and I'm just going to

15  leave it there, inside information.  And he sits there in

16  silence, right?  It says, look at the last sentence: "The news

17  of the MGM purchase should have caused Seery to revalue HCLOF's

18  investment."  Seriously?

19          The third element is (indiscernible).  The fourth

20  element, if we can go to the next slide.

21          Are they the same claims?  Did the claims arise from

22  the same set of operative facts?  I've addressed this pretty

23  clearly already, so I don't want to belabor the point.  But

24  obviously, both the 9019 motion and the complaint arise solely

25  from the debtor's settlement with HarbourVest.  The debtor's

App. 002864

54

1  acquisition of HarbourVest's interest in HCLOF and the debtor's

2  valuation of that interest.  Without those three facts, there

3  is no complaint.  It's just not credible to argue that the

4  fourth element is not met.

5         The case law is clear.  It's quoted in the

6  Plaintiffs' opposition.  It's not just the test of whether the

7  claims are the same.  It's whether the claim is the same as

8  that which was brought or could have been brought.

9         In their opposition, the Plaintiffs contend that the

10 claims "did not write them until after the settlement was

11 consummated," and that the first time the plaintiffs heard

12 about the valuation of HarbourVest's interests was at the

13 January 14, 2021, hearing.  I think I quoted that.  If you

14 look, I don't know if it's Page 10 or Paragraph 10; the way I

15 wrote it, it's probably Page 10.  I think that's a quote right

16 out of there.  But of course, as we saw the debtor disclosed

17 the valuation in its very initial motion, CLO Holdco's counsel

18 elicited valuation testimony directly from Mr. Pugatch, so that

19 was before the hearing.

20        And of course, Mr. Dondero and the trusts both cited

21 in their objections the valuation.  The notion that this was

22 not right, just -- it's contradicted by their own conduct,

23 their objections, their questions in deposition, the

24 information that was contained in the motion that they objected

25 to.

55

1          I do want to go off-script for just a minute, if we

2   could just take that down because I know that this is probably

3   something that Mr. Sbaiti may argue.  And that is, well, gee,

4   but you have to take the allegation as true that Mr. Seery

5   wasn't honest, that Mr. Seery lied to the court.  I don't

6   understand why there's not a fraud cause of action in there,

7   but there's not.  But that's their theory.

8          And gee, how does he get to skate away Scott free if

9   he's allowed to do that with impunity, right?  I will tell you,

10  Your Honor, of course you've seen Mr. Seery many times.  You've

11  made your own assessments of his credibility.  I'm not here to

12  argue the merits, but I will just say that the Defendants, if

13  ever forced to, will contest the allegation.

14         But here's the thing, and here's the important point

15  about, you know, whether or not he could lie with impunity and

16  say, I suspect that's where Mr. Sbaiti is going to want to go.

17         Mr. Seery said what he said.  And he had a reason to

18  speak, and he spoke, and he said what he said and he told

19  everybody who would listen exactly what he was doing and how he

20  was doing it.  For whatever reason, the objectors put the

21  valuation front and center.  It's right in their objections.

22  They noted the objections.  But for whatever reason, they did

23  nothing.

24         Whether they were negligent or whether they were

25  lying in wait is kind of irrelevant.  They had a full and fair

Appx 002812
002866

56

1    opportunity to contest this issue.  And if they had done so,

2    and the evidence proved what they're now alleging, they can't

3    tell you what would have happened.  So, you know, HarbourVest

4    may have taken a different position.  The Court may have done

5    something.

6            We're never going to know now because Mr. Seery and

7    the debtor are getting away with something, but because they

8    put in evidence that went unchallenged by Mr. Dondero and the

9    Plaintiffs.  It simply went unchallenged.  And they say, oh,

10   gee, that's because we didn't know.  Well first of all, you

11   didn't ask.  And second of all, again, the source of the inside

12   information, the reason that Mr. Seery should have known the

13   asset was worth more.  The reason that he should have refrained

14   from trading and not engaged in insider information was

15   Paragraph 127.  It was Mr. Dondero.

16           Here's another thing.  If -- if again Mr. Seery had

17   not been honest with the Court and that was ever brought out,

18   Maybe HarbourVest -- maybe HarbourVest would have had a right

19   to complain.  There's a lot in the complaint about oh,

20   HarbourVest was misled.  The actual evidence that's in the

21   record, and this is part of res judicata, Mr. Seery testified

22   very clearly to the arm's length negotiation that took place.

23   He told the Court under oath that the negotiations were

24   contentious.

25           He told the Court under oath that in order to try to

App. 00813
002867

57

1   resolve the case, he and Mr. Pugatch went off and had their own

2   private conversation without lawyers.  They could have taken

3   discovery on any of that, right.  What did you guys talk about?

4   It's certainly not privileged.  They had every opportunity.

5   But what we do know is that Mr. Pugatch under oath, in

6   deposition, and at trial, said the value is $22.5 million.

7           So I don't think Mr. Pugatch or HarbourVest is ever,

8   ever, every going to complain about the transaction they did.

9   Because of what the evidence simply shows.  But again, you've

10  got the Plaintiffs in their complaint saying that somehow the

11  debtor and Mr. Seery in negotiating this transaction has now

12  exposed the debtor to liability.  It just makes no sense.

13          So there was a time and there was a place to

14  challenge Mr. Seery.  Somebody, you know, maybe HarbourVest

15  could have done something, maybe they could still do something.

16  I don't know.  If they really think that there's a problem,

17  maybe we'll hear from HarbourVest someday.  But the Plaintiffs

18  have no right to complain.  They just don't.  They knew

19  everything.  They were the source of the inside information.

20  They sat on their hands, and they shouldn't be allowed to do

21  what they're doing now.

22          If we can go to the next slide.  I want to move to

23  the next theory and try to finish this up.  The next theory is

24  that the Plaintiffs' claims are barred by judicial estoppel.

25  The judicial estoppel argument is really, really very

App.2 002814
002868

58

1 straight-forward.  And it's important because if the Court

2 thinks about this the way I do, it's that the whole issue of

3 valuation is completely irrelevant to the Plaintiffs unless

4 they can show that they were owed some kind of duty, that they

5 had some superior right to acquire the asset.  But that's

6 exactly the issue that CLO Holdco relied upon and withdrew and

7 should now be estopped from pursuing.  Right.

8         The legal standard, again the parties agree on, that

9 in order to be estopped, the party must take an inconsistent

10 position.  And the party must have convinced the Court to

11 accept that position.  Again, both prongs are easily met here

12 in just a few sentences from the January 14 hearing.  You have

13 Mr. Kane saying that he understands and acknowledges and admits

14 that they have no superior right to the investment.  And the

15 Court relying on that very representation in declining to

16 conduct a hearing and render a ruling on the merits of the

17 claim that was withdrawn.  The objection that was withdrawn.

18         And for the avoidance of doubt, after Mr. Draper

19 spoke on behalf of the Trust, the Court, at Page 22 engaged in

20 the following colloquy.  The Court asked Mr. Draper:

21         "THE COURT:  Were you saying that the Court still

22         needs to drill down on the issue of whether the

23         debtor can acquire HarbourVest's interest in HCLOF.

24         "MR. DRAPER:  No.

25         "THE COURT:  Okay.  I was confused whether you were

**WWW.LIBERTYTRANSCRIPTS.COM**

59

1          saying I needed to take an independent look of that.

2          Now that the objection has been withdrawn of CLO

3          Holdco, you're not pressing the issue.

4          "MR. DRAPER:  No.  I am not."

5          Okay.  You can call it res judicata, you can call it

6    judicial estoppel, collateral estoppel, the two prongs are

7    easily met.  They're taking an inconsistent position today and

8    through all kinds of different theories, including the one that

9    they withdrew, the Plaintiffs assert that they had a superior

10   right to acquire the interest from HarbourVest.

11         And they should have asserted those rights at the

12   hearing.  That was the time.  And they should be estopped now

13   from taking a completely inconsistent position from the one

14   that was before the Court.  And I just do want to point out,

15   the statement from a case called <u>Hall vs. G.E. Plastic</u>.  And

16   it's interesting, Your Honor, because there's only a few cases

17   that I focused on, because this is really more fact intensive.

18   And there isn't a dispute as to the, you know, the elements of

19   these matters.

20         But it is interesting that the Plaintiffs, you know,

21   generally ignore all of the cases that we cite to.  One which

22   is <u>Hall vs. G.E. Plastic</u>, where the Court said that the focus

23   on the prior success or judicial acceptance requirements is to

24   minimize the degree of a party contradicting a Court's

25   determination, based on a party's prior position.  That's the

**WWW.LIBERTYTRANSCRIPTS.COM**

002870

60

 1  whole point of the exercise.  You can't do this.  You can't do

 2  this.

 3       Just quickly, that leaves the individual arguments as to

 4  each of the five causes of action and I just want to go through

 5  some highlights.  There's a negligence claim, Your Honor.  And

 6  we did not file a pleading, but the Court can certainly take

 7  judicial notice of the fact that the effective date has

 8  occurred.  Under the effective date, the plan is now effective.

 9  That includes the exculpation clause, as Mr. Pomerantz, I think

10  accurately and without contradiction pointed out earlier, the

11  exculpation clause applies specifically to the debtor and to

12  negligence claims.  And that's not a matter that's at all

13  subject to appeal.

14         So I think just to add to the arguments that we have

15  in our papers, which I adopt and do not abandon for any

16  purpose, I would add to the argument on negligence, that it's

17  now precluded, as a result of the plan becoming effective.

18       The fiduciary duty count suffers from numerous defects.  I

19  just want to point out a couple of them.  They don't respond to

20  the argument under Corwin, that under the Advisor's Act, there

21  is no private right of action to sue for damages arising from a

22  breach of fiduciary duty.  This claim rears its head in

23  virtually every single complaint.  They've never addressed

24  Corwin.  Corwin is binding on this Court, and it is unambiguous

25  that there is no private right of action to sue for damages for

App. 00917
002877

61

1  breach of fiduciary duty under the Advisor's Act.

2        They ignore Goldstein.  Goldstein is not from the

3  Fifth Circuit, but it's very persuasive authority that advisors

4  do not owe fiduciary duties to their individual investors.

5  Instead, they owe fiduciary duty to their client.  Their client

6  is the entity with whom they're in contractual privity.  And so

7  in this case, there's no fiduciary duty there, either.

8        The breach of contract claim.  Again I just -- I

9  would just say quickly, Your Honor, it's barred under judicial

10 estoppel.  Even if it wasn't, it's clear based on Mr. James'

11 analysis and admission that the debtor's, or the reorganized

12 debtor's interpretation of 6.2 is accurate.  And you know, I

13 said this in the beginning.  Now let me tie it in a bow because

14 the breach of contract claim, and the tortuous interference

15 claim are both tied to the same thing.  And that is the

16 assertion that the Plaintiffs had a right under the membership

17 agreement, a right of first refusal.

18       And they basically say that the debtor was playing

19 games.  That they shouldn't be able to get through 6.2 by

20 assigning it to an affiliate.  And that's where I go back, Your

21 Honor, and just remind the Court that the debtor told the whole

22 world exactly what they were doing in their motion.  And their

23 objections, Mr. Dondero and the Trusts both acknowledge to the

24 whole world that they understood exactly what was happening.

25       In fact, their concern was not that it was going to

App. 002918
002872

62

1   the debtor, but that it might be going to an affiliate outside

2   of the bankruptcy court's jurisdiction.  And for them to now

3   say, having taken all of those positions -- talk about

4   inconsistent positions.  They should be barred from saying

5   today, that the use of an affiliate to effectuate the

6   transaction was wrongful, because they actually told the Court

7   that they needed to -- that the Court needed to make sure that

8   it had jurisdiction over the very entity they now say somehow

9   shouldn't have been allowed to get the asset.

10          It's a bit much.  So that takes care of the tortuous

11   interference.

12          The RICO claim, Your Honor, again is a motion.

13   There's so many different aspects to it.  But I don't think the

14   Court needs to get past the Supreme Court holdings in HJ, Inc.

15   Again, just simply ignored by the Plaintiffs in their

16   opposition to the motion to dismiss.  In HJ, Inc., the Court --

17   the Supreme Court did an exhaustive analysis to try to

18   determine and ultimately did determine, what a pattern of

19   racketeering activity meant.  And the Supreme Court came to the

20   following formulation.  That it had to have two or more

21   predicate related offenses that amounted to a threat of

22   continued criminal activities.

23          You know, the notion here is that the debtor and Mr.

24   Seery engaged in insider trading.  We've already -- I've

25   already mentioned that according to the complaint, which the

App. 00919
002873

63

 1  Court can take as true.  Mr. Dondero, himself, was the tippee.
 2  But be that as it may, they don't come close to meeting the
 3  very high standards set forth by the Supreme Court in HJ, Inc.
 4  to show that whatever conduct Mr. Seery and the debtor engaged
 5  in, and if you take the allegations as true, in not telling
 6  what the fair value of the asset was, that that doesn't amount
 7  to a hill of beans for purposes of RICO.  That you don't have
 8  any, I think predicate acts.  I think here's the Court,
 9  predicate acts extending over a few weeks or months,
10  threatening no future criminal conduct, do not meet RICO
11  pleading grounds.  Right.

12          Security fraud claims cannot be predicate acts for
13  purposes of RICO.  That is also clear.  And that is really, I
14  mean they say mail, wire and fraud.  But what's really at heart
15  is the 10(b)(5).  Okay, it's the 10(b)(5) claim.  Again, Mr.
16  Seery being -- I mean Mr. Dondero being the tippee.  But those
17  are just some of the reasons.

18          None of, you know, that the RICO claim fails. You
19  know, I'll otherwise rely on the papers, unless the Court has
20  specific questions as to any of the other pieces of the motion
21  to dismiss the RICO claim, or any other aspect of the
22  Defendants' motion.  I think this is clear.  I think we win, no
23  matter how you slice it.  It's just wrong.  It's just wrong.

24      This Court will never, ever have a final order if Mr.
25  Dondero is able to engineer complaints such as this, which seek

002874

64

1  to assert claims that absolutely positively could have and

2  should have been brought at the time the debtor made its

3  motion.

4          Unless the Court has any questions, I have nothing

5  further.

6          THE COURT:  I do not.  All right.

7          Mr. Sbaiti, I'm going to let you have as much time as

8  Mr. Morris.  He took 55 minutes.  As I mentioned, I have a hard

9  stop at 12:00 to do a swearing in ceremony.  So if you're not

10 finished in 40 minutes, then I'm going to have to take a break

11 and come back and let you finish.  All right?

12         MR. SBAITI:  Thank you, Your Honor.  Although I don't

13 think I'm going to be much longer than 35-ish minutes.

14         THE COURT:  Okay.

15         MR. SBAITI:  if not less.

16         THE COURT:  Okay.

17         MR. SBAITI:  I think you'll be able to be done by --

18 we'll be able to be done by noon.

19         THE COURT:  All right.  Thank you.

20         MR. SBAITI: Thank you, Your Honor.  Your Honor, may I

21 share my screen?

22         THE COURT:  You may.

23         MR. SBAITI:  Thank you, Your Honor.  Do you see my

24 Power Point, Your Honor?

25         THE COURT:  I do.

App. 0921
002875

65

 1          MR. SBAITI:  Thank you, Your Honor.  I don't know
 2   what which one you see.  Is it the --
 3          THE COURT:  I see presentation.
 4          MR. SBAITI:  With the full page?
 5          THE COURT:  Yes, uh-huh.
 6          MR. SBAITI:  Okay, yeah, great.  I just want to make
 7   sure we're on the right page.  Thank you, Your Honor.  So Your
 8   Honor, the defendant debtor is a registered investment advisor.
 9   And it all begins with that.  And this where the distinctions
10   between what happened in the 9019 and I'll get to the elements
11   of res judicata through argument.

12          But the first thing that has to be identified is that
13   the Defendant is a registered investment advisor.  The
14   objection filed by Holdco back during the 9019 was an objection
15   against HarbourVest selling its interest by filing the right of
16   first refusal.  It did not deal with the investment advisor
17   feature of Highland's relationship.  And I'll get to why the
18   9019 doesn't preclude these arguments today.

19          This is essentially the structure.  Highland was the
20   investment advisor of HCLOF, and Holdco is an investor in
21   HCLOF.  And so Highland would owe a fiduciary duty under the
22   Advisor's Act against -- to CLO Holdco.

23          Highland also had a direct advisor relationship with
24   the DAF.  And so under the Investment Advisor's Act, it owed
25   fiduciary duties to both of those entities.  The law governing

Appx 002876
002876

66

1   registered investment advisors is that it's a federally

2   recognized and defined fiduciary duties. The fiduciary duty to

3    there's a fiduciary duty to affirmatively keep the advisee

4   informed and the fiduciary duty not to self-deal, i.e., not to

5   trade ahead of an advisee and opportunity that an advisee would

6   want or expect and without the advisee's expressed informed

7   consent.

8           This is a federally recognized and defined fiduciary

9   duty and it's actionable under state fiduciary duty laws.

10  While Mr. Morris ended his argument by saying we didn't deal

11  with their case law saying that there's no private right of

12  action under the Advisor's Act, the fact of the matter is that

13  Judge Boyle, about ten years ago, found that a state -- the

14  breach of fiduciary duty claim can be predicated on breaches of

15  federally imposed fiduciary duties under the Advisor's Act.

16  And that's what Douglass v. Beakley held. And that's actually

17  what we cited in our response. So I'm not sure why he would

18  argue that we haven't addressed the issue of where does this

19  private right of action come from.

20          Federal Law supplies the rules of the relationship

21  and State Law provides the cause of action for those breaches.

22  Now the scope of that has been expounded upon by many cases.

23  The Fifth Circuit held in Laird, as a fiduciary, the standard

24  of care to which an investment advisor must adhere imposes an

25  affirmative duty of utmost good faith and full and fair

App. 00923
002877

67

1    disclosure to all material facts, as well as an affirmative

2    obligation to employ reasonable care to avoid misleading his

3    clients.

4          The word "affirmative" there is important because it

5    means the investment advisor is not supposed to wait to be

6    asked.  The investment advisor as an affirmative duty to

7    proactively provide the information to the client.

8          The next standard comes from the SEC.  We call it the

9    SEC interpretation letter.  It's a release that came out in

10   2019.  And to meet it's duty of loyalty, an advisor must make

11   full and fair disclosure to its clients of all material facts

12   relating to the advisor relationship.  Material facts relating

13   to the advisor relationship include the capacity at which the

14   firm is acting with respect to the advice provided.

15         The SEC had another release in 2000 -- or excuse me,

16   in that same release, the SEC said the duty of loyalty requires

17   that an advisor not subordinate its clients interests to its

18   own.  In other word, an investment advisor must not place its

19   own interest ahead of its clients' interests.  An advisor has a

20   duty to act in the client's best interest, not its own.

21         The SEC general instruction three to part 2 of Form

22   ADV, that every investment advisor has to pull out.  And this

23   is cited in our papers.  As a fiduciary, you must also seek to

24   avoid conflicts of interest with your clients, and at a

25   minimum, make full disclosure of all material conflicts of

App. 00934
002878

Case 22-03052-sgj    Doc 32    Filed 07/26/22    Entered 07/26/22 14:17:26    Desc Main
Case 3:22-cv-02280-S    Document 3-4    Filed 03/09/23    Page 195 of 231    PageID 3037

68

1  interest between you and your clients that could affect the

2  advisor relationship. This obligation requires that you provide

3  the client with sufficiently specific facts, so that the client

4  is able to understand the conflicts of interest you have, and

5  the business practices in which you engage, and can give

6  informed consent to such conflicts or practices or reject them.

7          And, finally, the Third Circuit in <u>Belmont</u> said:

8          "Under the best interest test, an advisor may benefit

9          from a transaction recommended to a client if, and

10         only if, that benefit, and all related details of the

11         transaction are fully disclosed."

12         These fiduciary duties are unwaivable by the advisor.

13 Any condition, stipulation or provision binding any person to

14 waive compliance with any provision of this subchapter, or with

15 any rule, regulation or order thereunder shall be void.

16         So the lawsuit does not allege that the HarbourVest

17 settlement should be undone or unwound.  I'd like to move to

18 that point.  Mr. Morris says well, you have to unwind half of

19 the settlement.  Maybe HarbourVest doesn't have to give back

20 what it got, but Highland would still be saddled with the cost

21 of the settlement, but not with the benefit of the settlement.

22         Well, actually that's not true.  There's two points

23 that we would make on that.  Number one, our suit is a suit for

24 damages.  In other words, the suit would be a suit for money

25 damages, based on the difference between the value of the asset

App. 00925
002879

69

1   and what HarbourVest or what the actual value of the asset that

2   was represented, $22.5 million.  So the second point, though,

3   is that even under a situation where CLO or Holdco or the DAF,

4   or even HCLOF were to purchase the HarbourVest suit, the

5   expectation would obviously be that they'd pay the $22.5

6   million that Highland paid for it.

7          So Highland is -- so it's not unwinding, and there's

8   no saddling Highland with a burden that they didn't otherwise

9   have, I think that's a misrepresentation.  But we're not

10  seeking to unwind the lawsuit -- or excuse me, unwind the

11  settlement.

12         Now Mr. Morris is correct, the representation of

13  value by Mr. Seery is -- is one of the main points here.  And

14  the representation was that the value of the entire asset.  Not

15  just the shares of MGM, but the value of the entire asset was

16  $22.5 million.  So in other word, nearly half of HCLOF was

17  represented to be worth $22.5 million.  It was argued by

18  counsel on Page 14 of the January 14th transcript, and then on

19  Page 112 of that transcript, Mr. Seery specifically says the

20  current value is right around $22.5 million.

21         Now that was also in some of the filing papers and

22  Mr. Morris put up the evidence to Your Honor that Mr. Pugatch,

23  on behalf of HarbourVest also parroted that number.  But

24  there's not any evidence today about where that number came

25  from, or whether he was simply relying on Highland's

Appx 00826
002880

70

1  representation of that value.

2          Now as a general rule, in these 12(B)(6) motions, as
3  I said before, we don't look at the evidence because the whole
4  point of discovery is to find out what's behind a lot of the
5  evidence.  That's been quoted.  The amount of evidence that
6  went into the 9019 motion as not necessarily full-blown
7  discovery.

8          I understand Mr. Morris saying well, they could have
9  asked the question.  But as I just showed you, they shouldn't
10 have to ask the question.  There should be fair and full
11 disclosure of all the material facts.  And if it turns out,
12 which we believe it is true, that by January, the value of
13 HCLOF was twice what it was represented, or the HarbourVest
14 portion of HCLOF was twice as to what it was represented,
15 that's a material omission that Highland had an affirmative
16 duty to not misrepresent.  Irrespective of the questions being
17 asked.

18         The DAF found out later on that the representation of
19 the value wasn't true.  Now Mr. Morris talked for a very long
20 time about all the opportunities that somebody, Mr. Dondero,
21 somebody other than CLO Holdco.  In addition to CLO Holdco,
22 could have asked the magic question to find out whether or not
23 they were telling the truth.  But that runs right in the face
24 of the standards set forth by the SEC and by the Courts as to
25 the affirmative obligation of an advisor to disclose all the

App. 00827
002887

71

 1  material benefits that they're going to get as part of a trade.

 2  The idea being that when you're a registered investment advisor

 3  and you want to engage in a transaction, you make a full

 4  disclosure and say this is the transaction.  It's worth 41, but

 5  I'm paying 22-1/2.  But here's why I'd like to be able to do

 6  it.  And then that's the discussion that happens.

 7          That clearly didn't happen here.  And when it turned

 8  out that there was this entirely huge upside that they were

 9  gaining the benefit of, and maybe HarbourVest didn't care, that

10  that was a false statement.  Now the reason we don't have a

11  common law fraud claim, or that we don't necessarily hang our

12  hat on a fraud claim is we don't have enough evidence as it

13  stands today, to specifically say that Mr. Seery intentionally

14  misrepresented that.  Although we believe that it was grossly

15  reckless of him to do so.  But we don't really need a fraud

16  claim with a gross recklessness standard.  We have a breach of

17  fiduciary duty, which basically gets us to the same place.

18          So the timeline we have is September 30th was the

19  last valuation of HCLOF assets provided by HCMLP.  And the

20  value of HCLOF, at that time, or the HarbourVest of that value,

21  would have been about 22.5 million.  So what it appears to be

22  is that in January or in late December, the valuation that was

23  being done -- what was being reported, wasn't the current

24  valuation.  It was the valuation as of the end of the third

25  quarter of 2020.

App. 00828
002882

Case 22-03052-sgj   Doc 32   Filed 07/26/22   Entered 07/26/22 14:17:26   Desc Main
Case 3:22-cv-02280-S   Document 3-4   Filed 12/23/22   Page 199 of 231   PageID 3041

72

1          On December 22nd, the motion to approve the

2   settlement with HarbourVest was filed.  HCMLP should have had

3   or would have had up-to-date valuations of the HCLOF assets,

4   but didn't necessarily disclose them as being different than

5   the 22.5 million.  On January the 14th, Your Honor, held the

6   9019 hearing.  And then that same day, Your Honor entered the

7   approval order.

8          And finally, in March, the DAF learns the true value

9   of HLOF assets as of January 2021 and starts to look into it.

10  Now Mr. Morris makes much of the fact that well, Mr. Dondero at

11  least knew that he had tipped them off, Mr. Seery.  And if you

12  actually read Paragraph 127, you'll see specifically what it's

13  purported that he said.  He said stop trading in the MGM

14  assets, because MGM might be in play.  So you can't trade

15  because I'm an advisor, Mr. Dondero's an insider, he's the

16  tipper, not the tippee.  Mr. Seery becomes the tippee under

17  that theory of the case, and he has to, and is required to,

18  because of their affiliation at the time, he's required to

19  cease trading.  And that was the purpose of saying that.

20          The collateral issue that we point is that he at the

21  very least knew about that, and that should have caused him to

22  revalue, if he hadn't done so at the time.  Not that, knowing

23  that alone is sufficient to know what the value of HCLOF

24  actually was on that date.  That's a complete misrepresentation

25  of the point and purpose of that allegation.

Appx 002883
002883

Case 22-03052-sgj    Doc 32    Filed 07/26/22    Entered 07/26/22 14:17:26    Desc Main
Case 3:22-cv-02280-S    Document 3-1    Filed 10/14/22    Page 200 of 231    PageID 3042

73

1          And as Your Honor knows, under 12(B)(6)

2    jurisprudence, the way this is supposed to go is we get the

3    benefit of every inference based upon the allegations, not the

4    movant.  So the first violation is that the debtor as an IRA

5    failed to affirmatively disclose the true current valuation of

6    HCLOF and failed to keep the DAF and CLO Holdco reasonably

7    informed of the value of the assets.

8          And the debtor as an IRA, failed to obtain CLO

9    Holdco's with the DAF's informed consent before it traded in

10   the asset, because it didn't have all of the information.  The

11   typical remedy for breach of fiduciary duty is typically

12   damages for any loss suffered by the Plaintiff as a result of

13   the breach.  I don't think there's a debate there.

14          So now we get to Mr. Morris' key argument.  His key

15   argument is that we should be talking about res judicata.  The

16   elements of res judicata and I think we agree is you have to

17   have identical parties in the action; the prior judgment was

18   rendered by a Court of competent jurisdiction; the final

19   judgment was final on the merits, and the cases involved the

20   same causes of action or the same transaction and nexus of

21   facts.

22          Now I'm going to skip to three, because I think

23   that's one of the key points that we disagree with them on.

24   There is no case, Your Honor, that we could find, and no case

25   that I read them citing that says an order on an 9019 has

002884
App. 00830

74

1    preclusive effect under res judicata under an objector to the

2    settlement.  We looked.  We looked in the Fifth Circuit.  We

3    looked outside of the Fifth Circuit.  No District Court, no

4    Fifth Circuit Court of Appeals' opinion we could find held that

5    a 9019 order has res judicata effect on an objector's

6    objection.  And I think the reason is pretty simple.  Is it

7    doesn't.

8           Because the Plaintiff's claims, here our claims

9    hadn't even accrued.  We have a four year statute of

10   limitations, but I think more importantly is that, as the Fifth

11   Circuit said, the 9019 motion grants the Court discretion.

12   It's not supposed to be a mini trial.  The Court can approve a

13   settlement over even the valid objection of an objector.  It's

14   not a trial on the merits.  It's not supposed to be a trial on

15   the merits.  It's not supposed to be a disposition on the

16   merits.

17          So the fact that Your Honor could have approved the

18   9019 settlement with HarbourVest, even if we had a valid

19   objection, means this isn't a disposition on the merits, as res

20   judicata would envision.  It wasn't a trial on the merits, even

21   though it was withdrawn.

22          The other elements that we would point out to is that

23   neither the DAV nor Holdco were parties to the dispute between

24   HarbourVest and Highland.  And this keys off of the issue that

25   I just raised.  The cases that are cited by the debtor to Your

Appx 00831
002885

75

1   Honor all have to do with where one of the settling parties is

2   trying to undo the settlement for some collateral reason.  And

3   the Courts have held, no, that's res judicata, because you were

4   a party to the action.  HarbourVest brought the claims against

5   Highland.  Highland settled those claims.

6          CLO Holdco was collateral to that settlement, it's

7   not a -- excuse me, collateral to that dispute.  It's not a

8   party to that dispute.  Its claims weren't being resolved by

9   the settlement.  And while you have a notice to all creditors

10  and those objections can be raised, there was not inherently

11  any manner for resolving those objections on their own merits.

12  Only -- it was only resolved in so far as deciding whether or

13  not the settlement was in the best interest of the debtor,

14  which Your Honor decided, and we don't challenge that.  But we

15  do argue that it caused damages and the debtor shouldn't get

16  off for those damages.

17          The fourth element is that the --

18          THE COURT:  Just for the record, the standard in a

19  9019 context is not best interest of the debtor, right?

20          MR. SBAITI:  Your Honor, I mean that's what the rule

21  says and Your Honor's order --

22          THE COURT:  That is not what the rule says.  The rule

23  is actually very sparsely worded and then we have Fifth Circuit

24  case law and U.S. Supreme Court law that talk about what the

25  standard is.

**WWW.LIBERTYTRANSCRIPTS.COM**

76

1          MR. SBAITI:  Yes, Your Honor.  And there are five --

2          THE COURT:  And it's -- is it fair?

3          MR. SBAITI:  There are five elements.

4          THE COURT:  Is it fair and equitable and in the best

5    interest of the estate given a long list --

6          MR. SBAITI:  Correct, Your Honor.  And I didn't mean

7    to --

8          THE COURT:  -- of considerations that the Court is

9    supposed to consider that "bear on the wisdom of the

10   settlement."  Okay.  So it's actually much more involved, is my

11   point, than is it in the best interest of the estate.  Is it in

12   the best interest of the estate and fair and equitable given

13   all factors bearing on the wisdom of the compromise?  And then

14   we have a long laundry list of things the Court should consider

15   as part of that analysis.

16         MR. SBAITI:  That's a --

17         THE COURT:  I just bring that up because if I'm still

18   -- my brain is still stuck five minutes ago on your comment

19   that you can't find any case saying that an order approving a

20   9019 compromise has res judicata effect on creditors.  And it's

21   -- let me just say it's shocking to me that someone would argue

22   otherwise.  Bankruptcy is a collective proceeding --

23         MR. SBAITI:  Your Honor --

24         THE COURT:  -- where creditors can weigh in and

25   object and raise whatever arguments they think the Court should

App. 00839
002887

77

 1   consider that bear on the wisdom of the compromise.  And the

 2   Fifth Circuit in Foster Mortgage has said the Court should give

 3   great deference to the views of the creditors, the paramount

 4   interest of creditors.

 5           So it's a really sort of shocking proposition that

 6   the order approving a 9019 compromise wouldn't have res

 7   judicata effect on all parties and interests who got notice of

 8   that.  So if you have any elaboration on that, I'd like to hear

 9   it.

10           MR. SBAITI:  Your Honor, we looked at the Fifth

11   Circuit cases that they cited, which I believe included that

12   case.  And even in that case, the point that we made in our

13   papers and the point I was trying to arrive at is that among

14   the factors, yes, the Court should give great deference to the

15   creditors.  But among the factors is not that the objections

16   lack merit or are meritless or that they wouldn't be winnable

17   if they were simply standalone claims.

18           And that was really the only point I was trying to

19   make is that Your Honor has discretion.  Granted it's -- as you

20   mentioned, it's not unfettered discretion.  It's bounded by

21   standards and there are -- there is, I know, about five

22   standards Your Honor has to consider or the Court has to

23   consider.  But among those, that laundry list of standards, is

24   not that the Court finds that any objection lacks merit.  And

25   that was really the only point I was making.

002888

Case 22-03052-sgj    Doc 32    Filed 07/26/22    Entered 07/26/22 14:17:26    Desc Main
Case 3:22-cv-02280-S    Document 3-4    Filed 03/09/23    Page 205 of 231    PageID 3047

78

1          And in terms of the case law, we looked at the Fifth

2    Circuit.  We looked, frankly, outside the Fifth Circuit as much

3    as we could, and because this is actually not an easy one to

4    research, as it turned out, despite the language.  And we also

5    looked for district court opinions in the Fifth Circuit to see

6    did any district court or did any court of appeals give this

7    type of approval to the standard that a 9019 order has res

8    judicata effect on a claim raised in an objection by a

9    creditor.

10          And we couldn't find any and I read all the cases

11   that Mr. Morris cited in his papers, and they didn't cite one

12   that explicitly said that.  They tried to drive at it through

13   insinuation that, well, if the Court has to give great

14   deference or if the Court has to take into account the

15   underlying facts and the fact that there is discovery, surely

16   that must mean this is akin to the trial on the merits.  And I

17   think that's where we simply disagree in good faith.  I'm not

18   ascribing any bad intention.  But we disagree that that's where

19   the law goes.

20          Res judicata is not -- while it's supposed to stop

21   the relitigation of issues, it is predicated on there having

22   been actual litigation of those issues.  And when HarbourVest

23   and Highland settle a case and my clients show up with an

24   objection, even though they withdraw an objection, that, in our

25   opinion -- and we're asking the Court to see it our way -- is

Appx 00835
002889

79

1  not trial on the merits.  It's not a disposition on the merits

2  of the objection in and of itself.  Some objections we can --

3        THE COURT:  But the context matters.  In the context

4  of a 9019 compromise, the hearing is about look at the bonafide

5  ease of the settlement.  And it's either fair and equitable and

6  in the best interest of the estate or not.  And an objector can

7  say this is a terrible settlement and here's why it's a

8  terrible settlement and let me cross-examine the movant and let

9  me put on my own witness that will enlighten the Court as to

10 why this is a terrible settlement, why I say terrible, why it's

11 not fair and equitable.

12        That's your chance to convince the Court, don't

13 approve this settlement because there are, you know, 14

14 problems with it.  And if you convince the Court, then you

15 convince the Court and it's not approved.  If you don't, you

16 appeal, and we do have an appeal of the settlement order.

17        So, again, I'm not understanding the "res judicata

18 doesn't apply" argument.

19        MR. SBAITI:  Your Honor, if I could riff on two

20 points based upon what you just said, if I could address those.

21        The first is there are clearly two kinds of

22 objections that get -- at least two kinds of objections that

23 get raised in these 9019 approval hearings.  The two that you

24 heard recounted, some were this is bad for the estate.  There's

25 reasons why we don't think the estate will benefit from it and

App. 000836
002890

80

1  it will be harmed from it.

2          And those types of objections, which I believe mostly

3  comprise the objections that Mr. Morris was talking about

4  because they are concerns for the estate.  And so creditors who

5  want to get money from the estate are concerned that the

6  settlement will not enter (phonetic) to the benefit of the

7  estate, and therefore, not enter to their benefit as creditors.

8  That's number one.

9          But those don't adhere in a lawsuit.  Those aren't

10 claims for damages that the settlement is going to create for

11 the person objection or for the party objecting.  There's a

12 whole separate set of objections similar to the ones HCLO

13 Holdco raised where that what inheres in the objection is this

14 is actually going to cause us some kind of damage.

15         And so, the factors though, don't require the Court

16 in those second set of instances to say, well, you know what?

17 Not only do I think you're wrong, but I think that your

18 lawsuit, the underlying causes of action that give rise to this

19 objection, have no merit on their own face, that the discovery

20 is not there to support them, that a jury is not going to find

21 there.  I am now the trier or the Court is now the trier of

22 fact on the merits of the underlying causes of action that

23 animate the objection.

24         And that's where I believe we're diverging with the

25 debtor on the law.  It goes too far to say that a 9019 hearing

App. 000837
002891

Case 22-03052-sgj    Doc 32    Filed 07/26/22    Entered 07/26/22 14:17:26    Desc Main
Case 3:22-cv-02280-S    Document 3-4    Filed 10/12/22    Page 208 of 231    PageID 3050

81

1  where the Court in the end has discretion to approve it, even

2  over a meritorious objection by any party, regardless of what

3  bucket of objections the objection falls into.  It goes -- our

4  argument today, Your Honor, and we're asking the Court to see

5  it our way, is that that would go too far.  That an actual

6  cause of action shouldn't be eradicated simply because of the

7  9019 process because, as you pointed out, the Court does have

8  to go through a litany of factors.

9           And if the Court determines that it's fair and it's

10 more equitable to overrule the objection, the Court has that

11 discretion.  And we're not here to unwind that discretion.

12          But the settlement process did violate certain

13 obligations and did cause my client damages.  And that's what

14 we're saying isn't precluded.

15          THE COURT:  Okay.

16          MR. SBAITI:  The fourth element, Your Honor, which I

17 guess in many ways maps on to the argument I just made to Your

18 Honor is that the cases, the underlying cases, do not involve

19 the same claims.  Plaintiffs' claims arise from the settlement

20 process itself and not from the underlying issues being settled

21 between HarbourVest and Highland.  So that's why we think at

22 least three of the four elements aren't met here.  And we'll

23 reserve on the papers, you know, whether jurisdiction was

24 applicable because I think that's probably water under the

25 bridge at this point in the oral argument.

App. 002838
002892

82

1          Now, Mr. Morris attacks the case that we cite,

2   Applewood Chair vs. Three Rivers Planning.  And he argues that,

3   well, this is not applicable.  And the argument he made however

4   was he put it in the context of, well, the parties there, the

5   issue was you had guarantors who were not parties in their

6   capacity as guarantors.  But that's not actually what the Court

7   held.

8          The Court didn't say that the release wasn't

9   applicable to them because they didn't appear as parties in

10  their guarantee capacities.  They -- the Court held that, well,

11  the specific discharge language doesn't enumerate those

12  specific guarantees, and so therefore it's not released.

13         And where this dovetails, we believe, as closely as

14  we can, this isn't a 9019 case.  This is a final confirmed

15  plan.  But where it dovetails with what our argument is, is

16  that the Court there as well was essentially saying the

17  underlying causes of action weren't really presented to us, so

18  we're not -- we -- and the confirmation of the plan didn't

19  involve disposing of them, so we're not going to say that they

20  are precluded.  And we think that that's as close an analogy as

21  we've found in the Fifth Circuit to the issues here today.

22         So I would say, Your Honor, that we believe that

23  dispenses with the res judicata argument.  The judicial

24  estoppel argument, they conflate the language.  I'll go back to

25  this for a second.  They conflate the language of judicial

002893

83

1   estoppel on the success of the claim.  None of the cases they

2   cite on judicial estoppel involved where a party took a

3   position, withdrew their argument, and then the Court moved on.

4           Mr. Morris tries to convert a judicial estoppel claim

5   into a judicial reliance claim, which is not the purpose of the

6   doctrine and is not the doctrine at all.  The doctrine is that

7   if you take a successful position in one court, you can't take

8   the opposite position in another court.  CLO Holdco didn't take

9   a successful position in one court and then change its position

10  later on.  In fact, its positions, as Mr. Morris stated, are

11  remarkably similar.  They're not inconsistent, which is the

12  problem with their judicial estoppel argument.  And we -- I

13  think we fairly briefed that in our papers and we'll otherwise

14  rest on the papers.

15          To deal -- to address the actual claims, again, I

16  come back to the idea of a fiduciary duty claim, which is our

17  lead claim.  And to be clear, it's a state claim predicated on

18  the violation of federally imposed fiduciary duties.

19          And I'm looking for a clock to make sure I'm not

20  abusing Your Honor's time, and I don't have one right in front

21  of me because my screen -- my screen is up.

22          Your Honor, the Douglass v. Beakley case is, like I

23  said, is Judge Boyle's case.  It specifically provides a cause

24  of action based upon violations of the Advisers Act.  We also

25  cite about four or five other cases in footnote 8 of our

002894

84

1   response from other circuits, including the Third Circuit, the

2   Belton case that I referred to earlier, all of which held that,

3   yes, a state fiduciary duty claim can be predicated on breaches

4   of a federal Advisers Act violation.

5           The other point that they make on the fiduciary duty

6   claim is they argue HCMLP doesn't owe fiduciary duties to CLO

7   Holdco.  And the cases they cite, Your Honor, we dealt with in

8   the papers why they were distinguishable, because in those

9   cases they were dealing with the fact that there wasn't any

10  harm or any direct relationship.  But what they ignore is the

11  actual language of the Advisers Act, which is important.

12          Well, first of all, Mr. Seery admitted in his own

13  testimony during the approval hearing in July of 2019 that he

14  says, "We owe."  He says, "There are third party investors in

15  the fund -- in these funds who have no relation whatsoever to

16  Highland, and we owe them a fiduciary duty both to manage their

17  assets prudently, but also to seek to maximize value."  I think

18  Mr. Seery was absolutely correct when he said that.  Highland

19  owes fiduciary duties to the investors in the funds that

20  Highland manages.  The core of our case is that Highland is

21  using or abusing the assets of the funds it managed in HCLOF

22  for its own enrichment, which is a classic breach of fiduciary

23  duty case under the Advisers Act.

24          Now -- excuse me.  The other point that I would say,

25  Your Honor, is that there is a statutory basis for us to argue

App. 00841
002895

85

1    a breach of fiduciary duty.  Excuse me.  I didn't mean to stop

2    sharing.  I apologize.

3            Are you back with me, Your Honor, on my --

4            THE COURT:  Yes.

5            MR. SBAITI:  -- PowerPoint?

6            THE COURT:  Yes.

7            MR. SBAITI:  Sorry about that, Your Honor.  I just

8    hit the wrong thing.  I'm not very technologically savvy.  Here

9    we go.

10           So Holdco is an investor in HCLOF, which is a pooled

11   investment vehicle.  A pooled investment vehicle under the case

12   law we cite is simply defined as an investment vehicle that

13   doesn't publicly solicit investors and has few than 100

14   investors.  Highland advises it.  That's the same holding in

15   TransAmerica Mortgage, by the way, which we also cite.

16           15 U.S. C. Section 80(b)(6) establishes the federal

17   fiduciary standards to govern the conduct of registered

18   investment advisers.  That's also the TransAmerica case.  15

19   U.S.C. Section 80(b)(6)(D) delegated to the SEC the power to

20   decide the scope of those duties that are imposed under the

21   statute.  And so the SEC enacted 17 C.F.R. Section 275.206(4)-

22   8.

23           And it expressly states, and we cite the statute or

24   the regular in full in our papers, that the fiduciary duties

25   are owed to investors in the pooled investment vehicles.  It

Appx. 002842
002896

86

1  specifically says that.  It talks about two different duties

2  owed and they're owed to the investors in the vehicles, which

3  means they're owed to Holdco as an investor in HCLOF, which is

4  the vehicle that Highland manages.

5       It's black and white in the regulation.  And we

6  haven't seen any response.  There was no response of that in

7  the reply that was filed, Your Honor.  And so the argument that

8  there's not a fiduciary duty owed to Holdco because it's merely

9  an investor in HCLOF simply doesn't comport with the law.

10      And finally, the petition lays out the basis for our

11 claims including the applicable federal and state law.

12 Plaintiffs' response lays out why the legal arguments aren't

13 opposite at the 12(b)(6) stage and Rule 9(b) is met where

14 necessary under the federal claim.  And I'm trying to unshare

15 so that I can get back to regular argument.

16      I'd like to briefly address Mr. Morris' argument,

17 Your Honor.  Your Honor, I re-raise my argument that I made

18 before, which is that a 12(b)(6) motion and hearing is not the

19 appropriate time for all the evidence that was poured in here.

20 And I understand Mr. Morris' contention, well, it's really hard

21 to ignore all the history of this case.  But a lot of that

22 history really boils down to things that were actually admitted

23 in the complaint.  The complaint recognized there was a 9019.

24 But what Mr. Morris wants to do is go beyond that and to go to

25 what people said and what they must have meant.  What Mr.

App: 002843
002897

87

1  Dondero must have meant in his objection, what Dugaboy must

2  have meant by their objection, what Mr. Pugatch must have meant

3  by his testimony.

4        All of that is highly improper at this stage of the

5  proceeding, Your Honor.  It's outside of the 12(b)(6) confines.

6  It's outside the four corners of the complaint.  And we object

7  to all of that evidence being considered.

8        THE COURT:  Let me --

9        MR. SBAITI:  The question we --

10       THE COURT:  Let me ask you about that procedural

11 point.

12       MR. SBAITI:  Yes, Your Honor.

13       THE COURT:  As we know, 12(d) provides that if

14 matters outside the pleadings are presented to and not excluded

15 by the Court in a 12(b)(6) motion, the motion must be treated

16 as one for a summary judgment under Rule 56 and all parties

17 must be given a reasonable opportunity to present all the

18 material that is pertinent to the motion.

19       Are you -- what are you arguing?  That I should treat

20 it as a motion for summary judgment and give you more time to

21 present other materials?  I mean, you both presented an

22 appendix, okay.  And I'm telling you we're seeing this more and

23 more, I've noticed.  People are going beyond the four corners

24 of a motion to dismiss and attaching things.  And there's some,

25 you know, Fifth Circuit authority that says, well, if what is

App. 002844
002898

Case 22-03052-sgj   Doc 32   Filed 07/26/22   Entered 07/26/22 14:17:26   Desc Main
Case 3:22-cv-02280-S   Document 3-4   Filed 10/13/22   Page 215 of 231   PageID 3057

88

1   attached is integral to understanding, you know, an allegation

2   or whatever in the pleading, you know, there is some discretion

3   to go outside the four corners.

4           So I'm trying to understand the point you're making

5   with this.  Are you saying I should treat it as a motion for

6   summary judgment or do these attachments really -- you know, do

7   I have authority under the Fifth Circuit to consider them as

8   part of the 12(b)(6) motion or not?

9           MR. SBAITI:  Typically, in our experience, Your

10  Honor, is when a summary or when a 12(b)(6) is going to be

11  treated as summary judgment under 12(d), the Court says that

12  and then the parties are given an opportunity, as you said, to

13  go do some discovery in order to put together the evidence and

14  materials to then come back and respond as a summary judgment.

15  We responded to a 12(b)(6) and objected to the evidence.  If

16  the Court wants to treat it as a summary judgment, then we

17  would ask for an opportunity for -- to conduct discovery in

18  order to be able to respond as a summary judgment motion, but

19  we didn't -- because we responded to a 12(b)(6) --

20          THE COURT:  You did the same thing though.  You did

21  the same thing in your response.  You submitted an appendix of

22  evidence, if you want to call it evidence.  As someone pointed

23  out, it's stuff from the bankruptcy court record.  I don't

24  think it went beyond what was already in the bankruptcy court.

25          MR. MORRIS:  And if I -- can I be heard on this, Your

App. 002845

002899

89

1   Honor?

2          THE COURT:  You can.  You can.

3          MR. MORRIS:  Just to respond.  This is really quite

4   simple.  The motion to dismiss is based on res judicata.  Res

5   judicata necessarily requires a review of what happened in

6   connection with the prior hearing.  There's nothing that we

7   have identified or put forth in the appendix or on our exhibit

8   list except for the pleadings in the 9019, the transcripts, the

9   one deposition transcript, the one trial transcript, the

10  settlement agreement, the transfer agreement.  I'd love to know

11  what the Court couldn't or shouldn't take judicial notice of.

12  There is no emails.  There is no -- there is no -- there is no

13  extrinsic evidence, if you will.  All of this is either on the

14  docket or was presented as part of the hearing.

15         THE COURT:  Yeah.  I'm just trying to ferret --

16         MR. MORRIS:  And it's necessary.  And it's necessary

17  for the motion.

18         THE COURT:  Yeah.  I'm just trying to ferret out the

19  procedural position that's being asserted here.  And I don't

20  have the case cites off the top of my brain, but there is

21  authority from at least the Northern District judges, if not

22  the Fifth Circuit, saying in a 12(b)(6) motion I can take

23  judicial notice of items in the record.  And then, you know,

24  there -- I know there's Fifth Circuit authority saying I can go

25  beyond the four corners in a 12(b) context if it's just basic,

App. 00846
002900

Case 22-03052-sgj   Doc 32   Filed 07/26/22   Entered 07/26/22 14:17:26   Desc Main
Case 3:22-cv-02280-S   Document 3-1   Filed 11/21/22   Page 217 of 231   PageID 3059

90

1  you know, explaining things that are in allegations.  You know,

2  such as --

3              MR. SBAITI:  May I address that, Your Honor?

4              THE COURT:  -- such as if a contract is in dispute,

5  okay.  Like there's no way you can have a cause of action under

6  the contract and here's the contract.  So I'm just trying to

7  nail down your procedural position here.

8              MR. SBAITI:  Your Honor, the distinction I was trying

9  to make that I don't think I put as artfully as I might be able

10 to put now is in a 12(b)(6) if there's a contract, as you said,

11 if there's a legal document, a contract and order that's

12 integral to the case, Your Honor can take judicial notice of

13 that.  Generally, a court can take judicial notice of filings

14 in a bankruptcy, the fact that they were filed.

15             So the transcripts, which Your Honor can't take

16 judicial notice of, is the truth of those.  And that was what I

17 was objecting to is it's one thing for him to say an objection

18 was filed and therefore, because an objection was filed, that

19 should be it.  That was your only chance.  I'm not saying Mr.

20 Morris can't make that argument.

21             But when he goes beyond the fact of the filing or the

22 fact that there was a transcript or the fact that there was a

23 deposition and starts to read from the depositions or read from

24 the filings and say this is what those mean, that goes against

25 the 12(b)(6) parameters because, number one, now it's

002907

91

1    substantive evidence and not simply a judicial notice of

2    something that's right there in front of the Court, i.e.,

3    something on its own docket.  Because those statements and the

4    interpretation of those statements are subject to credibility

5    findings.  They're subject to clarification.  They're subject

6    to rebuttal.  That's the purpose of discovery.

7            And so if Your Honor -- and Mr. Morris is right.

8    Usually, res judicata involves knowing what happened in the

9    prior proceedings.  So if all he wants to do is rest on the

10   fact that an objection was filed by CLO Holdco and maybe even

11   other people, and that should be it and he thinks that's enough

12   for Your Honor to say res judicata applies, then I don't think

13   we have a problem.  It's when he goes beyond that and says,

14   Your Honor, these people must have known and this is what they

15   meant by their argument, that's what I'm asking Your Honor not

16   to consider.  And if Mr. Morris wants you to consider that,

17   that's a summary judgment motion and we should have the

18   opportunity to do discovery at the very least into the issues

19   he has now raised as supporting his res judicata defense which

20   he has the burden of proof on.

21           MR. MORRIS:  Your Honor, this is one of the strangest

22   arguments I have ever heard.  I'm allowed to offer the Court

23   and the Court is allowed to accept the documents, but I'm not

24   allowed to read them.  I'm not allowed to make arguments.  I

25   don't understand what that even means.  If it were a contract,

App. 00848
002902

Case 22-03052-sgj   Doc 32   Filed 07/26/22   Entered 07/26/22 14:17:26   Desc Main
Case 3:22-cv-02280-S   Document 3-4   Filed 10/13/22   Page 219 of 231   PageID 3061

92

1    I would be allowed to put the contract in front of Your Honor,

2    but I wouldn't be able to argue why the contract doesn't say

3    what the Plaintiff says.  I don't get it.

4              THE COURT:  Okay.

5              MR. MORRIS:  That's --

6              THE COURT:  Just I've heard enough on this.  I don't

7    think we have moved into Rule 12(e), that realm of me needing

8    to treat this as a motion for summary judgment.  I think the

9    so-called evidence, the appendix that was attached to the

10   motion as well as the appendix that was attached to Plaintiffs'

11   response, it's stuff that I can take judicial notice of that's

12   in the record of this Court and I can look at it.  You know, it

13   is what it is, the record of this Court.

14             All right.  So I have nine people waiting in

15   chambers.  I'm trying to figure out should I take a break now

16   or are you fairly close to wrapping up.  Either answer is fine,

17   Mr. Sbaiti.  I just need to figure out who I make wait here.

18             MR. SBAITI:  I have -- oh, I'm sorry.  I didn't mean

19   to interrupt you, Your Honor.  I was just going to say I have

20   five minutes left, but I know Mr. Morris probably wants to come

21   back.  So if you want to break now and we can come back at

22   whenever the Court wants us to, we can do so.

23             THE COURT:  All right.  Why don't you make your final

24   five minutes and then we'll take a break?

25             MR. SBAITI:  Okay.  Thank you, Your Honor.

App. 002903

Case 22-03052-sgj   Doc 32   Filed 07/26/22   Entered 07/26/22 14:17:26   Desc Main
Case 3:22-cv-02280-S   Document 1   Filed 10/14/22   Page 220 of 231   PageID 3062

93

 1          I just wanted to address some of the arguments that

 2   Mr. Morris raised in his argument.  The first thing is -- and I

 3   addressed this in part -- but Mr. Morris makes a big deal about

 4   paragraph 127 of the complaint and essentially suggests that

 5   we're the -- or that Mr. Dondero is the perpetrator of a

 6   nefarious scheme.  Whereas, what the pleading actually says,

 7   and I again encourage Your Honor to re-read -- to read it

 8   specifically, is that Mr. Dondero warned Mr. Seery not to trade

 9   in the stock and not to make any transactions because the stock

10   was going to appreciate in value.

11          That has two implications for us, Your Honor.  Number

12   one, it means Mr. Seery was a tippee of insider information,

13   and number two, it means that Mr. Seery, if he did trade on

14   that information or if he did pass that information on to

15   someone else, that is a problem from the Advisers Act

16   standpoint, which is really the only purpose of saying that.

17          While paragraph 127 also says that that should have

18   caused Mr. Seery to revalue the NAV of HCLOF, it does not state

19   and we did not plead that the entire value of HCLOF is tied to

20   the MGM stock.  So the insinuation that that somehow gave us

21   inside information about what the true value of HCLOF was and

22   we should have known or that Mr. Dondero should have known is

23   simply untrue.

24          The other argument Mr. -- that Mr. Morris likes to

25   harp on is that CLO Holdco withdrew its argument, but he

App. 00850
002904

94

1   characterizes Mr. Kane's withdrawal testimony -- as he says,

2   Mr. Kane admitted that CLO Holdco lacked the superior right to

3   obtain the HarbourVest.  If you read the very language that was

4   highlighted on Mr. Morris' slide, that's not what Mr. Kane

5   says.  Mr. Kane says, "We've gone back to the drawing board.

6   We've read your reply.  And my client has given me permission

7   to withdraw the argument or withdraw the objection."  That's

8   all he said.  There was not an admission that he was wrong.

9   There was not an admission that they had made a mistake.  There

10  was simply an admission that they decided to withdraw the

11  objection for whatever reason.

12          Lastly, on the specific claims --

13          THE COURT:  That's not an accurate description of the

14  record.  He said he looked at --

15          MR. SBAITI:  Your Honor, I was reading it along with

16  him.

17          THE COURT:  -- Guernsey Law.  And I don't know if his

18  words were deep dive.

19          MR. SBAITI:  Yeah.

20          THE COURT:  But he had looked at the agreements

21  extensively.  That's just not what he said.

22          MR. SBAITI:  And he said he was with -- Your Honor,

23  he said he was withdrawing.  He didn't say we were wrong.  He

24  didn't say we don't have a claim.  What he said was, "We're

25  withdrawing the objection."

**WWW.LIBERTYTRANSCRIPTS.COM**

95

1          THE COURT:  After doing an extensive look at the
2    agreements in Guernsey Law, okay, so.
3          MR. SBAITI:  Sure.  But, Your Honor, he might have --
4    he could just as easily thought we have a chance, but it's not
5    a good one.  And frankly, we'll be here for 20 days and we're
6    withdrawing it for that reason because we'll live to fight
7    another day.  Your Honor, there's an innumerable number.  To
8    simply say that he admitted that they didn't have a correct
9    claim, it's just he didn't say that.  That's all.  That's the
10   only point I'm making.

11         Your Honor, I don't disagree with the debtor that the
12   Court's exculpation clause gets rid of the negligence claim
13   which was obviously filed before the effective date, so that
14   claim is gone.

15         And I think the last argument that Mr. Morris makes
16   on the RICO claim is the federal court, the Supreme Court
17   standard for pleading a RICO claim, that acts that only
18   continue for a few weeks are not -- don't set out a RICO claim.
19   Your Honor, in our response to that, we actually submitted an
20   amended complaint that shows that the type of acts we're
21   talking about, the pattern of the debtor using its investor
22   vehicles assets to liquidate is a long pattern and practice
23   than simply the HarbourVest suit.  And so, we move to amend on
24   that basis to satisfy that pleading defect, which is the main
25   one that they focused on.

App. 00852
002906

96

 1          That's all I have, Your Honor.

 2          THE COURT:  All right.  Thank you.

 3          We're going to take a 15 minute break and come back.

 4  I'll ask Mr. Jordan and Mr. Bessette did they have anything

 5  they wanted to say today.  I know they joined in the debtor's

 6  motion.  And then we'll let Mr. Morris have rebuttal.

 7          All right.  So we'll be back in 15 minutes.

 8          THE CLERK:  All rise.

 9          MR. MORRIS:  Thank you, Your Honor.

10     (Recess at 12:05 p.m./Reconvened at 12:23 p.m.)

11          THE CLERK:  All rise.

12          THE COURT:  All right.  Please be seated.

13          We're back on the record in Charitable DAF v.

14  Highland Capital.  All right.  So I promised I was going to go

15  back to counsel for Highland CLO Funding, Ltd.  So Mr. Jordan,

16  Mr. Bessette, is there anything you wanted to say for oral

17  argument?

18          MR. JORDAN:  Thank you, Your Honor.  John Jordan on

19  behalf of HCLOF.

20          Our points are two procedural points.  The first is

21  as the Court anticipated, in our motion to dismiss filed back

22  in August, we joined in the motion to dismiss of Highland.  And

23  so to the extent that the Court after deliberation is inclined

24  to grant that motion, we would ask that as a joining party,

25  HCLOF be pulled along with that.

97

1          The second procedural point is that back in our

2    motion to dismiss, we pointed out that the complaint does not

3    actually allege anything against HCLOF.  In the story, we're

4    essentially the football and neither Oklahoma nor UT.  And we

5    pointed that out as an additional argument to what you've heard

6    today.  That motion was never responded to.  The deadline by

7    agreement was extended to October 11th.  And the lack of

8    response was, we believe, not inadvertent but simply an

9    acknowledgment that HCLOF is not a party that anything is being

10   claimed against.

11         It particularly makes sense since effectively and in

12   rough numbers, they're half owned by both sides.  So for every

13   dollar that HCLOF spends hanging around the case, the parties

14   are paying essentially 100 cents collectively.  So for that

15   reason, we would ask, and subject to Mr. Sbaiti's input,

16   whether the Court would ask us or direct us to upload an order

17   granting our motion as unopposed.  We just feel like we don't

18   have any role in this case.

19         THE COURT:  All right.

20         Mr. Sbaiti, what about that?

21         MR. SBAITI:  Your Honor, they were originally added

22   as a nominal party.  And as a nominal party, because of the

23   potential need to have a derivative action, I think that based

24   upon Highland's arguments and the arguments that we had, I

25   don't think the derivative action is necessary for us to

App. 00854
002908

98

1  maintain on a go-forward basis.  And so we don't oppose them

2  being dismissed.

3           THE COURT:  All right.  Then I assume, Mr. Morris,

4  you don't have any problem with this, correct?

5           MR. MORRIS:  No, Your Honor.

6           THE COURT:  Okay.  So I'll look for the parties to

7  submit an agreed order of dismissal of HCLOF after the hearing.

8  All right?

9           MR. JORDAN:  Thank you, Your Honor.

10          THE COURT:  All right.  Mr. Morris, you get the last

11  word.

12          MR. MORRIS:  Thank you, Your Honor.  I hope to be

13  relatively brief.  I really just want to focus on the arguments

14  concerning whether or not the order that was entered by this

15  Court was an order that was entered on the merits.

16          As the Court is well aware, a 9019 motion filed by a

17  debtor is done so on notice.  It is to give all parties in

18  interest an opportunity to be heard, not just as to whether or

19  not the debtor meets its burden of proof under Rule 9019 but

20  whether or not the Court can find, as it must, that the

21  proposed settlement is in the best interest of the estate.

22          The purpose of -- I mean that is the purpose of the

23  giving notice so that everybody has a chance to be heard.  The

24  questions that the Court asked, the questions that every

25  bankruptcy court asks in a 9019 is can the debtor do this deal,

002909

99

1   should the debtor do this deal, is it in the best interest of

2   the estate to do this deal.

3          And, you know, the idea that a 9019 order is somehow

4   res judicata only to the parties to a settlement is just

5   something that doesn't make any sense to me because it

6   abrogates so many rules that exist that allows and encourages

7   and requires parties who have objections to be heard.

8          Mr. Sbaiti's clients filed an objection.  They

9   initiated a contested matter.  They obtained rights.  They were

10  litigants.  They are litigants in a contested matter where

11  they're required to tell the Court what objections they have to

12  the settlement, and they did that.

13         Mr. Sbaiti, you know, told me that I wasn't allowed

14  to characterize the words that are used in the documents that

15  have now been admitted by the Court.  And, yet, I heard him say

16  that maybe Mr. Kane (phonetic) really meant to tell Your Honor

17  that he was withdrawing the claim because he was going to save

18  it for another day.

19         I'd just ask the Court to look at the transcript.  I

20  don't have to interpret it at all.  And I'd ask the Court to

21  read the words.  I can put them back up on the screen, but

22  they're pretty short.  It's at Pages 7 and 8 of the transcript

23  of what Mr. Kane told you and what you said in response.  It's

24  on the page, not my interpretation, and what the import of that

25  was.

App. 00856
002910

100

1        Mr. Sbaiti believes, I guess, if one is allowed to

2   engage in such conduct without consequence, that one is allowed

3   to allow to file objections, cause the Court and the litigants

4   to participate, to give discovery, to write briefs, to do

5   analyses, withdraw it on the basis of their own good faith

6   analysis of Guernsey law of the documents and somehow say it's

7   irrelevant.  Not what the law is, not what res judicata is

8   intended to do.

9        He should have put all of his cards on the table.  In

10  fact, I think that Mr. Kane believed he was putting all of his

11  cards on the table because that's what he did.  He filed a very

12  comprehensive objection.  He asserted a right to the

13  opportunity that the debtor was proposing to take in the 9019

14  motion.  That's what he was doing.  He was objecting on the

15  basis that he claimed his client had a superior right to this

16  asset.

17       And he didn't -- like I said earlier, Your Honor, I

18  don't think he would be permitted, I don't think these claims

19  would fly today if no objection was filed.  But the fact that

20  there was renders, I think, indisputable that there was a

21  finding on the merits, right.  And the only reason that the

22  Court didn't rule on Mr. Kane's motion, the only reason the

23  Court didn't rule on it is because Mr. Kane withdrew it.

24       Is that really the way this process is supposed to

25  work, that one can tell the Court that after a review of the

App. 00857
002911

101

1  documents, I'm going to withdraw the objection and then file a

2  claim for damages three months later with a different client,

3  with a different control person, with a different lawyer?

4  That's okay under doctrine of res judicata?  I don't think so.

5          They had a full and fair opportunity.  The fact that

6  this was somehow -- you know, they're denigrating the fact that

7  this was a 9019 motion.  There's not supposed to be a mini-

8  trial.  Your Honor had discretion as to what to do.  Every

9  court in every bench trial has discretion as to what to do and

10 whether or not to overrule objections and whether or not to

11 substain [sic] objections.  That's what judges to.

12         And there's nothing offensive about the fact that it

13 happened in the context of a 9019 motion.  They don't get to

14 sit on their hands and wait to fight another day.  If they

15 believed that the debtor was exposing itself to liability, and

16 that's what they actually say in the opposition, that's what I

17 actually think they say in the complaint, accept it as true,

18 they believe that the debtor created liability for itself by

19 rendering -- by entering into this transaction.

20         Shouldn't they have raised their hand and said you

21 can't do this deal, right?  And the only response to that --

22 they have to that is they had no idea about value.  Paragraph

23 127, Your Honor, Mr. Dondero, the architect of this complaint,

24 as was proven on June 8th, knew very well about value.  And it

25 doesn't matter that it was only MGM.  Your Honor commented on

APP 00858
002912

102

1  that at the June 8th hearing in a different context.  But

2  everybody knows, right, it is.  He sits on the board of MGM.

3        And I'm sorry if I called him a tippee instead of a

4  tipper.  But if this complaint goes forward, we'll dig into

5  that real deep.  But there's no reason it ought to, Your Honor.

6  This case ought to be dismissed on res judicata grounds.  It

7  should be dismissed on judicial estoppel grounds.  And it

8  should be dismissed for all the reasons that I said in my

9  argument in my brief.

10        But I do just want to close with one point, and that

11 is to read from a case called Goldstein, which I think I

12 alluded to earlier on this issue of whether there's a fiduciary

13 duty that's owed by an advisor to an investor and a fund:

14        "At best, it is counterintuitive to characterize the

15        investors in a hedge fund as the clients of the

16        advisors.  The advisor owes fiduciary duties only to

17        the fund, not to the fund's investors."

18        There's a lot of discussion about fiduciary duties,

19 Your Honor.  But to the extent that they have any basis to

20 defeat the motion to dismiss on res judicata or collateral

21 estoppel grounds, we hope and we trust and we know the Court

22 will review the case law vigorously to test some of the

23 assertions to that.

24        I have nothing further, Your Honor.

25        THE COURT:  All right.  Well, thank you to all of

App. 00859

002913

103

 1   you.

 2            As a reminder, I don't think you need it, but as a

 3   reminder, I am essentially acting as a magistrate for Judge

 4   Boyle in this action.  And whichever way I go on whichever

 5   theories, I think she would expect a thorough write-up.  It

 6   would, of course, be in the form of a report and recommendation

 7   for her to either adopt or not if I dispose of some or all of

 8   the counts in the lawsuit.

 9            Even to the extent I deny dismissal, even though the

10   rule typically does not require a court to make detailed

11   findings and conclusions in connection with a denial of a

12   motion to dismiss, again, since I'm sitting as a magistrate, I

13   think Judge Boyle would expect some thorough explanations and

14   reasoning from me.

15            So that's my way of saying I'm taking this under

16   advisement.  I am going to drill down on some of the cases that

17   have been argued.  I think some important issues are raised

18   here that need some thorough reasoning.

19            So I will do the best to get this out without too

20   much delay.  I think there's probably zero chance, zero chance

21   I'm going to get it done by the end of the year.  We're just

22   too behind with some of our under-advisements.  But I will try

23   earnestly to get it out fairly soon after the first of the

24   year.  All right?

25            Thank you.  You all have a good holiday.

App. 00860

002914

104

 1          THE CLERK:  All rise.

 2      (Proceedings concluded at 12:37 p.m.)

 3                    * * * * *

 4

 5              **C E R T I F I C A T I O N**

 6          We, DIPTI PATEL, KAREN WATSON, CRYSTAL THOMAS, AND

 7  PATTIE MITCHELL, court approved transcribers, certify that the

 8  foregoing is a correct transcript from the official electronic

 9  sound recording of the proceedings in the above-entitled

10  matter, and to the best of my ability.

11

12  /s/ Dipti Patel

13  DIPTI PATEL, CET-997

14

15  /s/ Karen Watson

16  KAREN WATSON, CET-1039

17

18  /s/ Crystal Thomas

19  CRYSTAL THOMAS, CET-

20

21  /s/ Pattie Mitchell

22  PATTIE MITCHELL

23  LIBERTY TRANSCRIPTS              DATE: November 23, 2021

24

**WWW.LIBERTYTRANSCRIPTS.COM**